**KRISS & FEUERSTEIN, LLP**
Daniel N. Zinman New Jersey State Bar Number 052031996
360 Lexington Ave., Suite 1200
New York, NY 10017
Telephone: (646) 454-4109
Facsimile: (646) 454-4168
E-Mail: dzinman@kandfllp.com

Donna T. Parkinson –  State Bar Number 125574
Thomas R. Phinney – State Bar Number 159435
**PARKINSON PHINNEY**
3600 American River Drive, Suite 145
Sacramento, CA 95864
Telephone:    (916) 449-1444
Facsimile:    (916) 449-1440
E-Mail: donna@parkinsonphinney.com

Attorneys for Merced DIP Lender, LLC

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISON**

| | |
|---|---|
| **In re** | **Case No. 22-10778-A-11** |
| **COMPASS POINTE OFF CAMPUS PARTNERSHIP B, LLC,** | **DCN: NCK-5** |
| **Debtor.** | October 19, 2022<br>Time: 9:30 a.m.<br>Courtroom: 11, 5th Floor<br>Dept: A<br>2500 Tulare Street, Fresno, CA<br>Hon. Jennifer E. Niemann |

**FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105(a) AND 364(c), MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362, AND GRANTING RELATED RELIEF**

Upon the motion [ECF No. 115] ("**Motion**") of the above-captioned debtor (the "**Debtor**") in this chapter 11 case (the "**Case**") seeking entry of a final order (this "**Final DIP Order**"), *inter alia*, pursuant to §§ 105(a) and 364(c) of title 11 of the United States Code ("**Bankruptcy Code**"), authorizing the Debtor to obtain financing in the principal amount of up to $24,375,000.00 (the "**Financing**") from Merced DIP Lender LLC ("**Lender**") and grant liens and superpriority

Final Order Authorizing Debtor to Obtain Post-Petition Financing, etc.

administrative expense status, and upon all relevant pleadings in connection therewith, and upon the findings and conclusions read into the record by the Court at the hearing held on October 6, 2022, and sufficient cause appearing therefor, this Court hereby makes the following findings of facts and conclusions of law:

A. On May 8, 2022 ("**Petition Date**"), a voluntary petition was filed by the Debtor under Chapter 11 of the Bankruptcy Code.

B. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.

C. The statutory predicates for the relief sought in the Motion and the basis for the approvals and authorizations contained in this Final DIP Order are sections 105(a), 363(b), and 364(c) of the Bankruptcy Code.

D. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (M), and (O).

E. Venue of this Case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

F. Sufficient notice of the relief sought in the Motion has been given and such notice complies with Bankruptcy Rule 4001(c), and no further notice is required. The Debtor has adequately disclosed all material facts necessary to permit the Court, the Debtor's creditors, and all other parties in interest to evaluate the merits of the Motion and the relief sought thereby. A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities.

G. The Debtor's estate is the fee owner of the Property.

H. The Property is encumbered with a first deed of trust ("**Dakota Deed of Trust**") in favor of Dakota Note, LLC ("**Dakota**") to secure the Dakota Note in the approximate amount of

Final Order Authorizing Debtor to Obtain Post-Petition Financing, etc.

$6,125,531.88 as of October 15, 2022, with interest and charges continuing to accrue on the Dakota Note.

      I.      The Loan Documents[1] and any other documents memorializing the provisions thereof were negotiated and entered into (or will be entered into) in good faith and pursuant to arm's-length bargaining positions by and between the Debtor and the Lender.  Any credit extended to Debtor under the terms of this Final DIP Order shall be deemed to have been extended in good faith by the Lender as that term is used in section 364(e) of the Bankruptcy Code.

      J.      The Debtor is unable to obtain any financing without granting a lien on all property and assets of the Debtor and its estate pursuant to Section 364(c)(2) of the Bankruptcy Code and a superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

      K.      The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

      L.      The terms and conditions of the Financing and the Loan Documents as set forth herein and thereon, including, without limitation, the liens and provisions set forth therein and herein, are: (i) fair, just, and reasonable; (ii) are ordinary and appropriate for secured financing to a Chapter 11 debtor; (iii) reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties; (iv) are supported by reasonably equivalent value and consideration; (v) are necessary in order to preserve the assets of the Debtor's estate; and (vi) is in the best interests of the Debtor's estate and its Creditors.

      M.      Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2). No party appearing in this Case has filed or made an objection to the relief sought in the Motion and the entry of this Final DIP Order, or if any objections were made (to the extent such objections have not been withdrawn) all objections to the Motion are hereby overruled.

---

[1] Any capitalized terms not defined herein shall have the definitions set forth in the DIP Loan Agreement.

Final Order Authorizing Debtor to Obtain Post-Petition Financing, etc.

Based upon the forgoing, and after due consideration and good cause appearing therefor, it is hereby ORDERED, DETERMINED, ADJUDGED AND DECREED AS FOLLOWS:

1. The Debtor is hereby authorized and empowered to immediately borrow and obtain the Financing from the Lender and to incur indebtedness and obligations owing to Lender pursuant to the terms and conditions of this Final DIP Order and the Loan Documents. The Debtor shall use the proceeds of the Financing in accordance with the Loan Documents, which shall include that the amount owing on the Dakota Note shall be paid in full from the Financing.

2. Notwithstanding any other provision in this Final DIP Order: (a) the amount owing on the Dakota Note shall be paid in full through escrow before Lender shall be entitled to place a lien against the Property or any other collateral of the Dakota Note, (b) unless and until Dakota is paid in full, under no circumstances shall any claim of Lender be given higher priority than the claim of Dakota, and (c) unless and until Dakota is paid in full, any claim of Lender shall be subordinate to the claim of Dakota.

3. The Debtor is authorized to enter into and deliver: (a) the DIP Loan Agreement; in substantially the forms of **Exhibit A**, attached hereto and incorporated herein by reference, to the Motion or containing such non-material changes or modifications thereto as the parties thereto shall, in their discretion, determine to be reasonable, necessary or appropriate; and (b) all other Loan Documents as may be required by the Lender.

4. The Debtor is authorized to enter into, execute and deliver to the Lender, any and all other documents, agreements and instruments contemplated by, related to or to be delivered pursuant to or in connection with the Loan from the Lender, which are reasonably requested by the Lender to evidence or effectuate any of the transactions or other matters contemplated by or set forth in the Loan Documents or this Final DIP Order, which Loan Documents may be amended hereafter from time to time without further order of this Court. The Debtor's execution and delivery of such

Final Order Authorizing Debtor to Obtain Post-Petition Financing, etc.

documents, agreements and instruments, the DIP Loan Agreement and/or any other Loan Document shall be evidence of the Debtor's determination that all such documents are reasonable, necessary and appropriate.

5. The Debtor is further authorized to perform its obligations under the Loan Documents on behalf of the estate of the Debtor, and to take any and all actions, and execute any and all documents, that the Debtor determines to be reasonable, necessary or appropriate to effectuate and/or to consummate the transactions contemplated in the Loan Documents as the Debtor, in its discretion, determines may be reasonable or necessary to conduct the construction on the Property contemplated and provided for in the DIP Loan Agreement. The Debtor's performance of any such action or execution of any such document shall be evidence of the Debtor's determination that such action and/or document is reasonable and necessary.

6. The Loan Documents and each term set forth therein are approved and are hereby incorporated into the terms and conditions of this Final DIP Order. If the Debtor and the Lender sign the Loan Documents and the Lender originates the Loan contemplated thereby, the terms, conditions, and covenants contained in the Loan Documents shall be sufficient evidence of the borrowing arrangements by and between the Debtor and the Lender (in all cases, whether absolute or contingent, fixed, or liquidated or unliquidated, matured or unmatured and whether now or hereafter existing or arising, collectively referred to herein as "**Post-Petition Obligations**") and of the Debtor's adoption of all of the terms, conditions, and covenants of the Loan Documents for all purposes.

7. The Post-Petition Obligations hereby shall constitute legal, valid, and binding obligations of the Debtor and Debtor's estate, and are hereby enforceable against the Debtor and the Debtor's estate, and their successors or assigns (including, without limitation, any trustee or other estate representative in this Case, or subsequent Chapter 7 or Chapter 11 case) in accordance with their respective terms.

---

8. Subject to the terms and conditions of the Loan Documents, the Debtor and the Lender may amend, modify, supplement, or waive any provision of the Loan Documents (an "**Amendment**") without further approval or order of this Court so long as such Amendment is not material (for purposes hereof, a "**material**" Amendment shall mean any Amendment that operates to increase the rate of interest other than as currently provided in the Loan Documents, increase the total amount of the Financing, add specific new events of default or enlarge the nature and extent of default remedies available to Lender following an event of default, or otherwise modify any financial terms and conditions in any Loan Documents in a manner materially less favorable to the Debtor, in the good faith judgment of the Lender and the Debtor). Any material Amendment to the Loan Documents must be approved by the Court to be effective.

9. The Debtor is authorized to pay all sums which the Debtor determines are reasonable, necessary or appropriate to effectuate, consummate and perform under the transactions contemplated under the Loan Documents, including, without limitation, all principal, interest and default rate interest, fees, expenses and any other amounts required or Da to be paid in accordance with the Loan Documents, or which may arise therefrom, all without further order of this Court. The Debtor's payment of any amounts to Lender shall be evidence of the Debtor's determination that such payments are reasonable, necessary and appropriate to effectuate, consummate and perform under the Loan Documents. No payments made by the Debtor to the Lender pursuant to the Loan Documents shall be avoidable or recoverable from Lender under sections 544, 548, 550, 553 or any other provision of the Bankruptcy Code or on account of any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law, or otherwise.

10. To secure the prompt payment and performance of any and all Post-Petition Obligations of the Debtor to Lender of whatever kind or nature or description, absolute or contingent, now existing or hereafter arising, pursuant to 11 U.S.C. § 364(c)(2) and (c)(3), and contingent upon payment in full of

Final Order Authorizing Debtor to Obtain Post-Petition Financing, etc.

the Dakota Note, Lender shall have and is hereby granted, effective as of the date hereof valid and perfected security interests, mortgages and liens in and upon all of the Collateral (as such term is defined in the DIP Loan Agreement), including, without limitation, the Property (the liens granted to the Lender pursuant to this section 10 of this Final DIP Order and the Loan Documents are collectively referred to herein as "**Post-Petition Liens**").

11. Subject to paragraph 2 hereof, this Final DIP Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the Post-Petition Liens, effective as of the date and time the Loan closes, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the Collateral or other act to validate or perfect such security interest, mortgage, or liens including, without limitation any control agreements with any financial institutions, banks or securities intermediary holding any depository, brokerage, or securities account consisting of Collateral (a "**Perfection Act**"). Notwithstanding the foregoing, if the Lender shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the Lender is hereby authorized to perform such act and the Debtor is hereby authorized to perform such act to the extent reasonably necessary or required by the Lender, which act or acts shall be deemed to have been accomplished as of the date and time of entry of the closing of the Loan, notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law. Lender may choose to file, record, or present a certified copy of this Final DIP Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Final DIP Order in accordance with applicable law. Should the Lender so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity,

enforceability, attachment, or perfection of the Post-Petition Liens by virtue of entry of this Final DIP Order, effective as of the closing of the Loan.

12. Post-Petition Obligations shall have superpriority in payment afforded by section 364(c)(1) of the Bankruptcy Code ("**Superpriority Claim**"), which subject to paragraph 2 hereof, shall have priority in right of payment over any and all other unsecured obligations, liabilities, indebtedness, and claims of any kind and nature, now in existence or hereafter incurred by the Debtor (or any trustee whether in this Case or any subsequent Chapter 7 case) including, without limitation, any and all administrative expenses of the kinds specified or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, and other sections of the Bankruptcy Code, including those resulting from the conversion of this to a case under Chapter 7 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any trustee, or any creditor or party in interest in this Case or any subsequent proceedings or cases under the Bankruptcy Code.

13. As additional protection to Lender for the liens, rights, priorities, claims and protections granted to it, contingent upon closing of the Loan, the Lender is hereby granted: (a) replacement liens on all property acquired by the Debtor after the closing of the Loan ("**Replacement Liens**") to the extent of any diminution in the value of the Lender's liens and security interests in all Collateral securing the obligations of the Debtor under the Loan Documents, including any diminution in such Collateral that may result or arise from the Debtor's use, sale, lease, depreciation, decline in market price or otherwise as to the Collateral, in each case resulting or arising from and after the closing of the Loan (collectively, "**Collateral Diminution**"), and (b) a priority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code in respect of any and all Collateral Diminution ("**Adequate Protection Administrative Claim**") having priority over all any and all other unsecured obligations, liabilities, indebtedness, and claims of any kind and nature, now in existence or hereafter incurred by the Debtor or the Debtor's estate (or any trustee in this Case or any subsequent chapter 7 case), including, without

limitation, any and all administrative expenses of the kinds specified or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, and other sections of the Bankruptcy Code, including those resulting from the conversion of this Case to a case under Chapter 7 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any trustee, or any creditor or other party in interest in this Case or any subsequent proceedings or cases under the Bankruptcy Code; provided, however, the Adequate Protection Administrative Claim shall be subject and subordinate in all respects to Lender's Superpriority Claim and the Carve-Out Expenses (as defined below).

14. The Lender's liens, claims and security interests in the Collateral shall be subject only to the right of payment of the following expenses ("**Carve Out Expenses**"):

    a.  Statutory fees and interest payable to the U.S. Trustee pursuant to 28 U.S.C. section 1930(a)(6); and

    b.  If the Debtor's Case is converted to one under Chapter 7 of the Bankruptcy Code, the sum of $5,000 shall be carved out from the liens of the Lender arising from or in connection with the Loan for any post-conversion expenses of the Chapter 7 trustee and/or its professionals.

15. At the Lender's sole and absolute discretion, Lender may fund at any time and in any increment in Lender's sole and absolute discretion an amount equal to the Carve-Out Expenses by, among other things, making one or more Advances (as defined in the DIP Loan Agreement), to be added to the Post-Petition Obligations owing by the Debtor and the Debtor's Estate to the Lender in order to pay any other party entitled to receive payment in respect of a Carve Out Expense.

16. Lender's obligation to fund or otherwise pay the Carve Out Expenses shall be added to and made a part of the Post-Petition Obligations, secured by the Collateral, and entitle the Lender to all of the rights, claims, liens, priorities and protections under this Final DIP Order, the Loan Documents, the

Final Order Authorizing Debtor to Obtain Post-Petition Financing, etc.

Bankruptcy Code, and/or applicable law. Payment of any Carve Out Expenses, whether by or on behalf of the Lender, shall not and shall not be deemed to reduce the Post-Petition Obligations and shall not be deemed to subordinate any of the Lender's liens and security interests (on account of any of the Post-Petition Obligations) in the Collateral or its Superpriority Claim to any junior pre-petition or post-petition lien, interest, or claim in favor of any other party. Except as otherwise provided herein with respect to the Carve Out Expenses, the Lender shall not be responsible for the direct or indirect payment or reimbursement of any fees or disbursements of any trustee or any professionals incurred in connection with this Case (or any subsequent case under any chapter of the Bankruptcy Code), and nothing in this Final DIP Order shall be construed to obligate the Lender in any way, to pay compensation to or to reimburse expenses of same.

17. The automatic stay imposed under section 362(a) of the Bankruptcy Code shall be, and hereby is, modified as to the Lender to allow implementation of the provisions of this Final DIP Order and enforcement of Lender's rights and remedies under the Loan Documents, without further notice or any further order of the Bankruptcy Court, including, without limitation: (a) to implement the post-petition financing arrangements authorized by this Final DIP Order and pursuant to the terms of the Loan Documents, (b) to take any act to create, validate, evidence, attach, or perfect any lien, security interest, right or claim in the Collateral, (c) to assess, charge, collect, advance, deduct, and receive payments with respect to the Post-Petition Obligations, including, without limitation, all interests, fees, costs, expenses permitted under the Loan Documents, and apply such payments to the Post-Petition Obligations pursuant to the Loan Documents, and (d) taking the steps necessary under the Loan Documents to declare or make effective a default should there be a default. In addition, and without limiting the foregoing, upon the occurrence of any default under the Loan Documents, subject to the provisions of the Loan Documents and any notice provisions therein, the transmission of which shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code, the Lender shall be

Final Order Authorizing Debtor to Obtain Post-Petition Financing, etc.

entitled to take any action and exercise all rights and remedies provided to it by this Final DIP Order, the Loan Documents and/or applicable law as it may deem appropriate in its sole discretion to, among other things, proceed against the Collateral and any other assets and properties of the estate upon which the Lender has been or may hereafter be granted liens and security interests to obtain the full and indefeasible repayment of all Post-Petition Obligations, provided however, that to the extent that the Bankruptcy Court retains jurisdiction over this Case, the Lender shall seek the entry of an Order from the Bankruptcy Court granting relief from the automatic stay prior to conducting a sale of the Collateral.

18. At all times during this Case, and whether or not a default has occurred under the Loan Documents, the Debtor irrevocably waives any rights that it may have to seek authority: (a) to use cash collateral of Lender under section 363 of the Bankruptcy Code except as provided in the Loan Documents; (b) to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code from any person or entity, other than from the Lender, unless the full amount of all Post-Petition Obligations is paid to Lender by wire transfer to Lender on the date the closing of any such other post-petition loan; (c) to challenge the application of any payments authorized by this Final DIP Order pursuant to section 506(b) of the Bankruptcy Code or otherwise; or (d) unless the Lender provides prior written approval, to propose or support a chapter 11 plan that does not provide for the indefeasible payment in full and satisfaction of all Post-Petition Obligations owed to the Lender by the Debtor and the Debtor's Estate on the effective date of such plan.

19. Except as may be provided in the Loan Documents and subject to the Carve Out Expenses, no costs or expenses of administration which have been or may be incurred in this Case at any time shall be charged against the Lender or the Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the Lender during the time period beginning with the first dollar borrowed by the Debtor under the Financing and ending with the date in which there is

indefeasible payment in full and satisfaction of all Post-Petition Obligations owed to the Lender by the Debtor and the Debtor's estate, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender.

20. In the event the Debtor or the Debtor's estate seek to sell or in any way transfer, whether in whole or in part, the Property, whether pursuant to a sale under Section 363 of the Bankruptcy Code, a transaction under a plan, or otherwise, other than to Aspen Real Estate Financial LLC ("**Aspen**") pursuant to that Agreement for Purchase and Sale of Real Property and Joint Escrow Instructions, entered into between Aspen and the Debtor (the "**Aspen Purchase Agreement**"), Lender shall have at all times the right to credit bid the full amount owed to Lender under the Loan Documents.

21. Until all of the Post-Petition Obligations owed to the Lender shall have been indefeasibly paid and satisfied in full and without further order of the Court, no other party with notice of this Final DIP Order shall foreclose or otherwise seek to enforce any junior lien or claim in any Collateral.

22. Notwithstanding: (a) any stay, modification, amendment, supplement, vacating, revocation, or reversal of this Final DIP Order, the Loan Documents, or any term hereunder or thereunder; (b) the failure to obtain a final order pursuant to Bankruptcy Rule 4001(c)(2); or (c) the dismissal or conversion of this Case (a "**Subject Event**"), (x) the acts taken by Lender in accordance with this Final DIP Order, and (y) the Post-Petition Obligations incurred or arising prior to the Lender's actual receipt of written notice from the Debtor expressly describing the occurrence of such Subject Event shall be governed in all respects by the original provisions of this Final DIP Order, and the acts taken by Lender in accordance with this Order, and the Post-Petition Liens granted to the Lender, and all other rights, remedies, privileges, and benefits in favor of the Lender pursuant to this Final DIP Order and the Loan Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code. For purposes of this Final DIP Order, the term "appeal", as used in section 364(e) of the

Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Final DIP Order by this Court or any other tribunal.

23. Unless the Post-Petition Obligations will be paid in full in cash to Lender prior to the Maturity Date (as defined in the DIP Loan Agreement) or a sale to Aspen pursuant to the Aspen Purchase Agreement (such sale may be less than all of the Property as provided in and pursuant to the Aspen Purchase Agreement), the Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of the Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the Lender).

24. This Final DIP Order shall be binding upon the Debtor, all parties in interest in this Case, and their respective successors and assigns, including any trustee or other fiduciary appointed in this Case or any subsequently converted bankruptcy case(s) of the Debtor. This Final DIP Order shall also inure to the benefit of Lender, the Debtor, the Debtor's Estate, and their respective successors and assigns. The provisions of this Order and the Loan Documents, and any and all rights, remedies, privileges, and benefits in favor of the Lender provided or acknowledged in this Final DIP Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Final DIP Order pursuant to Bankruptcy Rules 6004(h) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including, without limitation, any Order which may be entered confirming any plan of reorganization, converting this Case to any other chapter under the Bankruptcy Code, or dismissing this Case. Any Order dismissing this Case under section 1112 of the Bankruptcy Code or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that: (a) the Superpriority Claim and Lender's liens in the Collateral shall continue in full force and effect notwithstanding such dismissal until all Debt (as defined in the DIP Loan Agreement) is indefeasibly paid and satisfied in full; and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and liens in the Collateral.

Final Order Authorizing Debtor to Obtain Post-Petition Financing, etc.

25. The rights, remedies, powers, privileges, liens, and priorities of the Lender as contemplated herein shall not be modified, altered or impaired by any subsequent order of this Court or any other court (including, but not limited to, any financing order or any confirmation order), by any plan or reorganization or liquidation in this Case, or any successor case, without the express prior written consent of the Lender, unless the Financing has been indefeasibly paid in full in cash and completely satisfied, and the commitments of the Debtor as set forth in the Loan Documents have been terminated.

26. This Court shall retain jurisdiction to enforce the provisions of this Final DIP Order and the Loan Documents and to resolve any disputes concerning this Final DIP Order, the Loan Documents, the distribution of the loan proceeds or the rights and duties of the parties thereunder.

27. This Final DIP Order may be recorded in the land records in which title to any property of the Debtor or Debtor's estate granted or pledged as security in connection with the Financing is registered or recorded. Each and every federal, state and local governmental agency or department is hereby directed to accept and record this Final DIP Order any and all documents and instruments necessary and appropriate to consummate the transactions (including, without limitation, the granting and perfection of any mortgage, security interest, and other liens) contemplated by the Loan Documents and this Final DIP Order. The automatic stay under Bankruptcy Code section 362 is hereby modified to allow, among other things, the recordation and other actions provided for in this paragraph.

28. The Debtor is authorized to pay, disburse or reserve, as the case may be, the distributions provided for under the Loan Documents from the proceeds of the Financing pursuant to the Loan Documents, together with the costs and expenses under the Loan Documents payable by the Debtor.

29. The Debtor shall hold the balance, if any, of the proceeds of the Financing not paid or disbursed after any Advance (as defined in the Note) in a segregated account and shall distribute said proceeds only in accordance with the terms of the Loan Documents.

1    Approved as to Form:

2                                        **FEAR WADDELL, PC**

3
     Dated: 10/19/22            By: _____
4                                   Peter L. Fear, Attorneys for Dakota Note, LLC

5
                                     **THE KNIGHT LAW GROUP**
6

7
     Dated: 10.19.22            By: _____
8                                   Noel Knight, Attorney for Debtor, Compass Pointe Off
9                                   Campus Partnership B, LLC

10

11

12

13   Dated: October 20 2022

14                                  _Jennifer E. Niemann_
                                    Honorable Jennifer E. Niemann
15                                  United States Bankruptcy Judge

16

17

18

19

20

21

22

23

24

25

26

27

28
                                              Final Order Authorizing Debtor to Obtain Post-
     {402/00001/DTP/A0448273.DOCX}        15  Petition Financing, etc.

**Exhibit A**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Final Order Authorizing Debtor to Obtain Post-Petition Financing, etc.

**DEBTOR-IN-POSSESSION
CONSTRUCTION LOAN AGREEMENT**

Dated as of [_____]

Between

**COMPASS POINTE OFF CAMPUS PARTNERSHIP B LLC**
(as Borrower)

and

**MERCED DIP LENDER LLC**
(as Lender)

**<u>Premises</u>**:

3700 Horizons Avenue
Merced, California 95348

Loan Amount: Up to [$24,375,000.00]

## DEBTOR-IN-POSSESSION CONSTRUCTION LOAN AGREEMENT

**THIS DEBTOR-IN-POSSESSION CONSTRUCTION LOAN AGREEMENT**, dated as of [_____] (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), by and between **MERCED DIP LENDER LLC**, a New York limited liability company, having an address at [_____] (together with its successors and/or assigns, "Lender") and **COMPASS POINTE OFF CAMPUS PARTNERSHIP B LLC,** a California limited liability company, having an address at [2401 A-Waterman Boulevard, PMB 143, Fairfield, California 94534] ("Borrower").

### W I T N E S S E T H:

**WHEREAS**, on May 8, 2022 (the "Petition Date"), Borrower filed a voluntary petition in the United States Bankruptcy Court for the Eastern District of California (the "Bankruptcy Court") for relief under Chapter 11 of Title 11 of the United States Code (as the same may be amended from time to time, the "Bankruptcy Code"), and its Chapter 11 case is being administered under the caption *In re Compass Pointe Off Campus Partnership B, LLC*, No. 22-10778 (the "Case");

**WHEREAS**, Borrower has continued in possession of its assets and management of its business pursuant to Bankruptcy Code Sections 1107 and 1108;

**WHEREAS**, an immediate and ongoing need exists for Borrower to obtain funds in order to fund the Case and work toward a successful exit from Chapter 11 of the Bankruptcy Code and, accordingly, Borrower has requested that Lender lend to Borrower the sum of not more than [$24,375,000.00] to be used solely in accordance with the terms and conditions of this Agreement; and

**WHEREAS**, Lender has advised Borrower that, subject to the terms, provisions, covenants and conditions of the Loan Documents, and based upon the representations, warranties, covenants and undertakings of Borrower herein contained, Lender is willing to make and disburse this Loan to Borrower on the terms, provisions, covenants and conditions set forth herein.

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

### ARTICLE I.  DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1**      Definitions.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"Acceptable Accounting Basis" shall mean GAAP.

"Access Laws" or "ADA" shall mean, collectively, the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, State and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access, including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities (as same may be amended from time to time).

"<u>Additional Indemnified Liabilities</u>" shall have the meaning set forth in Section 10.13(b) hereof.

"<u>Advance</u>" shall mean any disbursement of the proceeds of the Loan by Lender pursuant to the terms of this Agreement.

"<u>Affiliate</u>" shall have the meaning given to such term in the Bankruptcy Code.

"<u>Affiliated Manager</u>" shall mean any manager of the Property that is an Affiliate of Borrower or Guarantor, or in which Borrower or Guarantor has, directly or indirectly, any legal, beneficial or economic interest.

"<u>Agreement</u>" shall have the meaning set forth in the introductory paragraph hereto.

"<u>ALTA</u>" shall mean the American Land Title Association, or any successor thereto.

"<u>Annual Budget</u>" shall mean the operating budget, including all planned Capital Expenditures, for the Property prepared by Borrower for the applicable Fiscal Year or other period.

"<u>Applicable Laws</u>" shall mean all existing and future federal, State, local and other laws, orders, ordinances, governmental and administrative rules and regulations, and court orders.

"<u>Approved Annual Budget</u>" shall have the meaning set forth in Section 5.1.10 hereof.

"<u>Approved Form</u>" shall mean in form and substance acceptable to (as evidenced by the prior written consent of) Lender.

"<u>Architect</u>" shall mean Golden Valley Engineering & Surveying, having an address of 405 W. 19th Street, Merced, California 95340, or any successor engaged by Borrower with the prior written consent of Lender.

"<u>Architect's Agreement</u>" shall mean that certain letter agreement dated as of October 18, 2017 for the performance of architectural services for the Property between 3N Realty Advisors

2

("3N"), an affiliate of the Borrower, and Architect, as architect, as assigned by 3N to Borrower pursuant to that certain [_____] dated as of [_____].[1]

"Aspen" shall mean Aspen Real Estate Financial LLC, or any of its Affiliates.

"Assignment of Agreements, Licenses, Permits and Contracts" shall mean the Collateral Assignment of Contracts, Permits and Development Rights dated as of the Closing Date, made by Borrower to Lender.

"Assignment of Leases" shall mean that certain first priority Assignment of Leases and Rents, dated as of the Closing Date, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Avoidance Actions" means all claims and causes of action described in Bankruptcy Code Chapter 5, or any non-bankruptcy law referenced therein, and all proceeds thereof.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"Bankruptcy Code" shall have the meaning set forth in the introductory paragraph hereto.

"Bankruptcy Court" shall have the meaning set forth in the Recitals hereto.

"Bankruptcy Rules" the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Chapter 11 Cases.

"Borrower" shall have the meaning set forth in the Recitals hereto.

"Borrower's Designated Account" shall mean the bank account designated by Borrower pursuant to Borrower's Draw Request as the deposit account into which Advances shall be wired.

---

[1] Borrower to provide assignment document to Borrower.

"<u>Borrower's Requisition</u>" shall mean a Borrower's Requisition in the form attached hereto as <u>Exhibit F</u>.

"<u>Borrowing Date</u>" shall have the meaning set forth in Section 3.2.1 hereof.

"<u>Breakage Costs</u>" shall have the meaning set forth in Section 2.2.10 hereof.

"<u>Budget Line</u>" shall have the meaning as set forth in Section 2.1.6.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or Legal Holiday (as defined in Federal Rule of Bankruptcy Procedure 9006(a)(6)).

"<u>Capital Expenditures</u>" shall mean, for any period, the amount expended for items capitalized under the Acceptable Accounting Basis (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"<u>Carry Costs</u>" shall mean Taxes, Insurance Premiums, Other Charges, and all other costs customary or reasonably appropriate to own, maintain and operate the Property as determined by Lender in its sole discretion.

"<u>Case</u>" shall have the meaning set forth in the Recitals hereto.

"<u>Casualty</u>" shall have the meaning set forth in Section 6.2 hereof.

"<u>Casualty Consultant</u>" shall have the meaning set forth in Section 6.4(b)(iii) hereof.

"<u>Casualty Retainage</u>" shall mean an amount equal to ten percent (10.00%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed.

"<u>Change Order</u>" shall mean any amendments or modifications to the Plans and Specifications, the General Contractor's Agreement or any Trade Contract.

"<u>Chapter 11 Plan</u>" shall mean a plan of reorganization filed in any of the Chapter 11 Cases under Section 1121 of the Bankruptcy Code.

"<u>Closing Date</u>" shall mean the date of this Agreement.

4

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"<u>Collateral</u>" shall mean the Property, the Guaranty, the Equipment, the Rents, the Stored Materials, and all other assets and properties, whether real, personal, intellectual, or otherwise, whether tangible or intangible, whether domestic, foreign, or international, that Borrower now owns or hereafter acquires, or to or in which Borrower, now or in the future, holds any right, title, or interest (whether fixed, contingent, inchoate, or otherwise), expressly including all Avoidance Actions, together with (in each case) all proceeds thereof.

"<u>Commitment Fee</u>" shall have the meaning set forth in Section 2.4.1 hereof.

"<u>Completion</u>" or "<u>Completion of the Improvements</u>" or "<u>Complete the Improvements</u>" shall mean completion of the construction of the Improvements, in accordance with all Plans and Specifications, all Legal Requirements, all Permitted Encumbrances, and this Agreement, such compliance to be evidenced to the satisfaction of Lender and the Construction Consultant; together with the delivery to Lender of a temporary certificate of occupancy (if subject to any conditions, such conditions being Punch List Items or otherwise acceptable to Lender in its sole discretion) for the Improvements and evidence that all other Governmental Approvals have been issued and all other Legal Requirements have been satisfied so as to allow the use and occupancy of the Improvements in accordance with their intended use and the definition of "Improvements" set forth in this Agreement.

"<u>Completion Date</u>" shall have the meaning set forth in Section 3.2(d) hereof.

"<u>Completion Guaranty</u>" shall mean that certain Guaranty of Completion dated as of the Closing Date, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Condemnation</u>" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation (in connection with a *bona fide* written threat from such Governmental Authority) of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

5

"Condemnation Proceeds" shall have the meaning set forth in Section 6.4(b) hereof.

"Conditional Guaranty" shall mean that certain Conditional Guaranty dated as of the Closing Date, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Construction Consultant" shall mean Partner Engineering and Science, Inc., or such other Person as Lender may designate and engage as a replacement to inspect the Improvements and the Property as construction progresses and consult with and to provide advice to and to render reports to Lender, which Person may be, at Lender's option, either an officer or employee of Lender or consulting architects, engineers or inspectors appointed by Lender.

"Construction Milestones" shall have the meaning set forth in Section 3.2(d) hereof.

"Construction Schedule" shall mean the schedule, broken down by trade, of the estimated dates of commencement and completion of the Improvements certified by Borrower to Lender and approved by the Construction Consultant prior to the date of the Initial Advance hereunder and showing Completion of the Improvements by the Completion Date.

"Control" (and the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"Creditors Rights Laws" shall mean with respect to any Person, the Bankruptcy Code, any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"Debt" shall mean the outstanding Principal, together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document (including, without limitation, DIP Lender Expenses, any applicable Undrawn Line Fee, Monitoring Fee, Commitment Fee, Underwriting Fee, the Reserved Funds Fee, and any applicable Make Whole Fee, or other fee or similar obligation) and any protective advances (and interest thereon) made by Lender hereunder or under

6

4885-5497-3488, v. 2

the other Loan Documents, including without limitation protective advances made for the payment of operating expenses.

"Debt Service" shall mean, with respect to any particular period of time, interest payments due under the Note and Section 2.2.1 of this Agreement for such period.

"Debt Service and Carry Guaranty" shall mean that certain Debt Service and Carry Guaranty dated as of the Closing Date, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean a rate per annum equal to the Note Rate plus Four and 75/100 Percent (4.75%).

"Defects" shall have the meaning set forth in Section 3.1.5 hereof.

"DIP Claims" shall mean "superpriority" administrative-expense claims (including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under Sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code (including adequate protection payments), whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment) with priority over (x) all other administrative-expense claims, expenses, and costs permitted by, described in, or entitled to priority under the Bankruptcy Code) and (y) all other unsecured claims against Borrower. For the avoidance of doubt, all Obligations shall constitute DIP Claims. DIP Claims shall be payable from and have recourse to all pre-petition and post-petition property of Borrower and all proceeds thereof (excluding Avoidance Actions but including any proceeds or property recovered, unencumbered, or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise) in accordance with the other Loan Documents. The DIP Claims shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code if the DIP Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise. The DIP Claims shall survive any conversion of any of the Chapter 11 Case to a case under Chapter

7 of the Bankruptcy Code or the dismissal of the Chapter 11 Case.  The DIP Claims shall be payable from and have recourse to all pre- and postpetition property of Borrower.

"DIP Lender Expenses" shall mean all costs and expenses of Lender incurred in connection with, arising from, or relating to Borrower or its Case, the Loan Documents, and any exercise of rights or remedies thereunder, whether before or after the date hereof and irrespective of the occurrence of any Default or Event of Default, including (without limitation) all costs of inhouse counsel, advisers, and consultants of Lender, together with all fees, expenses, and disbursements of outside counsel or other advisers and consultants retained by Lender with respect thereto, which DIP Lender Expenses shall constitute a portion of the Debt and the Obligations for all purposes hereunder.

"DIP Liens" has the meaning set forth in Section 5.1.37 hereof.

"DIP Order" means an order of the Bankruptcy Court approving the Loan in Approved Form.

"Disbursement Schedule" shall mean the schedule of the amounts of Advances anticipated to be requisitioned by Borrower each month during the term of the Loan, as approved by Lender.

"Division" shall mean the filing of a certificate of division, adoption of a plan of division, amending of any organizational documents, or any other actions taken, permitted, or consented to in order to divide a Person into two or more Persons pursuant to a plan of division such as contemplated under the California Limited Liability Company Act or any other similar requirement of law in any jurisdiction.  The term "Divide" shall have a correlative meaning.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Draw Request" shall mean, with respect to each Advance, Borrower's Requisition, together with the General Contractor's application for payment on AIA Forms G702 and G703 (or such other form or forms as Lender may approve, in Lender's sole and absolute discretion) with the Architect's certification for payment, requesting that Lender make an Advance with respect to costs incurred after the Closing Date for materials which have been incorporated into the Project and other Project Costs.

"Embargoed Person" shall have the meaning set forth in Section 4.1.44 hereof.

8

"<u>Environmental Indemnity</u>" shall mean that certain Environmental Indemnity Agreement executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Environmental Law</u>" shall mean any federal, State and local laws, statutes, ordinances, rules, regulations, standards, policies and other government directives or requirements, as well as common law, that, at any time, apply to Borrower, Guarantor or the Property and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act.

"<u>Environmental Report</u>" shall mean that certain [_____] of the Property prepared by _____] dated [_____].

"<u>Equipment</u>" shall have the meaning set forth in the Security Instrument.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"<u>Event of Default</u>" shall have the meaning set forth in Section 8.1(a) hereof.

"<u>Final Advance</u>" shall have the meaning set forth in Section 3.1.3 hereof.

"<u>Final Completion</u>" shall mean that, in addition to the Completion of the Improvements, all Punch List Items shall have been completed in accordance with the Plans and Specifications, all Legal Requirements and this Agreement, and that a permanent certificate of occupancy shall have been issued (if subject to any conditions, such conditions being acceptable to Lender in its sole and absolute discretion) for the Improvements and evidence that all other Governmental Approvals have been issued and all other Legal Requirements have been satisfied so as to allow the Improvements to be used and operated in accordance with the Loan Documents.

"<u>Fiscal Year</u>" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"<u>Fitch</u>" shall mean Fitch, Inc.

"<u>Floor Rate</u>" shall mean a per annum rate equal to Fifteen and 75/100 Percent (15.75%).

"GAAP" shall mean Generally Accepted Accounting Principles in the United States of America consistently applied.

"General Contractor" shall mean Doug Boyer Construction, having an address of 450 West 21st Street, Suite E, Merced, California 95340, or another general contractor legally licensed in the State of California, engaged by Borrower and approved by Lender.

"General Contractor's Agreement" shall mean that certain Proposal and Contract dated as of August 29, 2022, by and between [Compass Pointe Off Campus, LLC][2] and General Contractor, or any other agreement to be entered into by and between Borrower and General Contractor in accordance with this Agreement, which General Contractor's Agreement is [a GMP / construction management agreement][3] that provides for the construction of the Improvements on the Property in accordance with the Plans and Specifications, as same may be amended from time to time in accordance with the terms of this Agreement.

"GMP" shall mean a General Contractor Agreement that is approved by Lender in Lender's sole discretion, and which is a guaranteed maximum price contract that provides for the construction of the Improvements in accordance with the Plans and Specifications, as the same may be amended from time to time in accordance with the terms of this Agreement.

"Government Lists" means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (ii) any list maintained by any government entity pursuant to United Kingdom or European Union sanctions laws and regulations or any United Nations sanctions resolutions that in each case would expose Lender, any of its Affiliates or any direct or indirect beneficial owner of Lender to any sanction, prohibition or restriction under the trade or economic sanctions laws or regulations of the European Union or the United Kingdom or such United Nations resolution, (iii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC, or (iv) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America.

---

[2] Borrower to confirm if this is a different entity than Borrower, or whether there is a typo in the GC Agreement. If a typo, that should be corrected.
[3] Borrower to advise

10

"<u>Governmental Approvals</u>" shall mean all approvals, consents, waivers, orders, acknowledgments, authorizations, permits and licenses required under applicable Legal Requirements to be obtained from any Governmental Authority for the construction of the Improvements and/or the use, occupancy and operation following completion of construction, as the context requires, including, without limitation, all land use, building, subdivision, condominium, zoning and other Legal Requirements.

"<u>Governmental Authority</u>" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever for any governmental unit (federal, State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"<u>Gross Income From Operations</u>" shall mean all income, computed in accordance with the Acceptable Accounting Basis, derived from the ownership and operation of the Property from whatever source, including, but not limited to, the Rents, utility charges, escalations, service fees or charges, license fees, parking fees, rent concessions or credits, and other required pass-throughs, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, Insurance Proceeds (other than business interruption or other loss of income insurance), Awards, interest on credit accounts, security deposits, and utility and other similar deposits. Gross Income From Operations shall not be diminished as a result of the Security Instrument or the creation of any intervening estate or interest in the Property or any part thereof.

"<u>Guarantor</u>" shall mean David C. Sowels and any successor as permitted hereunder.

"<u>Guaranty</u>" shall mean, individually and collectively, as the case may be, the Environmental Indemnity, the Debt Service and Carry Guaranty, the Conditional Guaranty, the Completion Guaranty, and any other guaranty or indemnity issued in connection with the Loan.

"<u>Hazardous Materials</u>" shall have the meaning set forth in the Environmental Indemnity.

"<u>Immediate Family Member</u>" means with respect to any individual, (i) such individual's children, sons-in-law, daughters-in-law, parents, brothers, sisters, spouses, nephews, nieces or any lineal descendants of such individuals and their spouses (or former spouses), children, grandchildren and great grandchildren of the foregoing, (ii) any guardianship or trusteeship set up for the benefit of an individual Guarantor, and/or any one or more of the foregoing individuals in

11

clause (i); or (iii) any trusts set up substantially for the benefit of an individual Guarantor, and/or any one or more of the foregoing individuals in clause (i).

"<u>Improvements</u>" shall mean a fully entitled two parcel assemblage totaling 10.43 acres in the City of Merced, California, to be developed into a 128-unit apartment complex with sixteen, two-story buildings, known as Axis II.

"<u>Increased Cost Notice</u>" shall have the meaning given in Section 2.2.9 hereof.

"<u>Indemnified Parties</u>" shall mean Lender, any Affiliate of Lender (including, without limitation, Legalist, Inc. and Legalist DIP GP, LLC) who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties, as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

"<u>Indemnified Taxes</u>" shall mean any past, present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority.

"<u>Initial Advance</u>" shall have the meaning set forth in Section 3.1.1 hereof.

"<u>Insurance Premiums</u>" shall have the meaning set forth in Section 6.1(c) hereof.

"<u>Insurance Proceeds</u>" shall have the meaning set forth in Section 6.4(c) hereof.

"<u>Interest Period</u>" shall mean, initially, the period commencing on (and including) the Closing Date and ending on (and including) the last day of the calendar month in which the Closing

12

Date occurs. Thereafter, each Interest Period shall commence on (and include) the first day of each calendar month immediately following the last day of the previous Interest Period and end on (and include) the last day of such calendar month.

"Investor" shall have the meaning set forth in Section 5.1.10(g) hereof.

"Late Charge" shall have the meaning set forth in Section 2.2.6 of this Agreement.

"Leases" shall mean any lease, including, without limitation, any sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, heretofore, now or hereafter entered into, and every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and every guaranty of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"Leasing Milestone" shall have the meaning set forth in Section 3.2(e) hereof.

"Legal Requirements" shall mean, with respect to the Property, all federal, State, county, municipal and other governmental statutes, laws (including Environmental Laws), rules, orders, regulations, ordinances, codes, judgments, decrees, writs, demands, and injunctions of Governmental Authorities affecting the Property, the Improvements or any part thereof, or the zoning, subdivision, building, construction, use, alteration, occupancy or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lender" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Licenses" shall have the meaning set forth in Section 4.1.21 hereof.

13

"<u>Lien</u>" shall mean, with respect to the Property, any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanics', materialmen's and other similar liens and encumbrances or any other Lien as defined in the Bankruptcy Code.

"<u>Line Items</u>" shall have the meaning as set forth in Section 2.1.6.

"<u>Loan</u>" shall mean the loan in the principal sum of up to [$24,375,000.00] made by Lender to Borrower pursuant to this Agreement and the other Loan Documents as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time or split pursuant to the terms hereof.  The phrases "Maximum Loan" and "Maximum Loan Amount" shall mean the maximum amount eligible to be advanced under the Note, whether or not such full amount has been advanced, and whether or not any portion thereof has been repaid.

"<u>Loan Contingency</u>" shall mean the amount allocated as contingency reserve in the Project Cost Budget for costs of construction.

"<u>Loan Documents</u>" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Environmental Indemnity, the Guaranty, the Pledge Agreement, the Assignment of Agreements, Licenses, Permits and Contracts, the DIP Order, the Project Cost Budget and related reporting, and all other agreements, documents, and instruments in any way arising from, related to, or connected with the Loan, DIP Claims, and/or DIP Liens, together with all schedules, exhibits, and other addenda thereto, all of which shall be in Approved Form.

"<u>Lockout Date</u>" shall mean the date that is six (6) months after the Closing Date

"<u>Losses</u>" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages (including special, punitive and consequential damages), losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, and amounts paid in settlement of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense).

14

"Make Whole Fee" shall mean, upon any prepayment or repayment of Principal on or prior to the Make Whole Fee Outside Date, an amount equal to Four and 75/100 Percent (4.75%) of the amount of the Principal so prepaid or repaid on or prior to the Make Whole Fee Outside Date.

"Make Whole Fee Outside Date" shall mean the date that is eight (8) months after the Closing Date.

"Management Agreement" shall mean any property management agreement entered into by and between Borrower and a Manager, pursuant to which the Manager is to provide management and other services with respect to the Property, or, if the context requires, the Replacement Management Agreement executed in accordance with the terms and provisions of this Agreement.

"Manager" shall mean any property manager approved by Lender in its sole and absolute discretion or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Agreement.

"Margin" shall mean Eleven and 00/100 Percent (11.0%).

"Maturity Date" shall mean the earliest to occur of (w) [November 1, 2024][4], (x) Borrower's exit from bankruptcy, (y) repayment in full of the Loan and the Debt, and/or (z) the acceleration of the Loan following the occurrence of an Event of Default

"Maximum Legal Rate" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or in the other Loan Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"Milestone" shall have the meaning set forth in Section 3.2(e) hereof.

"Monitoring Fee" shall have the meaning set forth in Section 2.4.3 hereof.

"Moody's" shall mean Moody's Investors Service, Inc.

---

[4] Thirteen (13) months after the Closing Date.

4885-5497-3488, v. 2

"<u>Net Proceeds</u>" shall have the meaning set forth in Section 6.4(b) hereof.

"<u>Net Proceeds Deficiency</u>" shall have the meaning set forth in Section 6.4(b)(vi) hereof.

"<u>Non-U.S. Entity</u>" shall have the meaning set forth in Section 2.2.7(b) hereof

"<u>Note</u>" shall mean that certain [Secured Promissory Note] dated as of the Closing Date in the original principal amount of the Loan, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"<u>Note Rate</u>" means, for any day, a per annum rate equal to the greater of (a) the Floor Rate and (b) the sum of (x) the Prime Rate plus (y) the Margin, subject in all cases to the potential imposition of the Default Rate pursuant to Section 2.2.5 hereof.

"<u>Obligations</u>" shall mean Borrower's obligation to pay the DIP Lender Expenses and the Debt (including, without limitation, DIP Lender Expenses, any applicable Undrawn Line Fee, Monitoring Fee, Commitment Fee, Underwriting Fee, the Reserved Funds Fee, and any applicable Make Whole Fee) and perform its obligations under this Agreement and the other Loan Documents. For the avoidance of doubt, all Obligations shall constitute DIP Claims.

"<u>Officer's Certificate</u>" shall mean a certificate delivered to Lender by Borrower which is signed by a Responsible Officer of Borrower.

"<u>Operating Expenses</u>" shall mean the total of all expenditures, computed in accordance with the Acceptable Accounting Basis, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance premiums, license fees, property taxes and assessments, advertising and marketing expenses, legal fees, third-party management fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Lender and other similar costs, but excluding depreciation, Debt Service, and Capital Expenditures.

"<u>Organizational Documents</u>" shall mean, as to any Person: the certificate of incorporation and by-laws with respect to a corporation; the articles of organization (or the equivalent of such items under applicable State law) and operating agreement with respect to a limited liability

4885-5497-3488, v. 2

company; the certificate of limited partnership and partnership agreement with respect to a limited partnership; the trust agreement with respect to a trust; or any other organizational, governing or constituent documents of such Person.

"Other Charges" shall mean all maintenance charges, impositions other than Taxes, and any other charges, if any, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"Other Design Professionals" shall mean all architects (other than Architect) and engineers engaged by Borrower and/or Borrower's agent to work on the Improvements.

"Other Design Professionals Agreement(s)" shall mean any agreements between Borrower and each Other Design Professional for the design of the Project or otherwise relating to the Improvements.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

"Patriot Act Offense" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (a) the criminal laws against terrorism; (b) the criminal laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or the (e) Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.

"Payment Date" shall mean the first (1st) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately succeeding Business Day.

"Permits" shall mean all licenses, permits, authorizations, certificates, registrations, permits and/or approvals (including, without limitation, zoning and construction approvals) necessary for the development, operation, use and occupancy of the Property, the construction of the Project and the conduct of the Work.

4885-5497-3488, v. 2

"<u>Permitted Encumbrances</u>" shall mean, collectively, (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet delinquent, and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"<u>Person</u>" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"<u>Petition Date</u>" shall have the meaning set forth in the Recitals hereto.

"<u>Phase 1</u>" shall mean that portion of the Project comprised of thirteen (13) buildings containing sixty-four (64) units and the clubhouse for the Project, as more specifically described in the Project Cost Budget and the Plans and Specifications.

"<u>Phase 1 Completion Date</u>" shall have the meaning set forth in Section 3.2(d) hereof.

"<u>Phase 1 Construction Milestones</u>" shall have the meaning set forth in Section 3.2(d) hereof.

"<u>Phase 2</u>" shall mean that portion of the Project comprised of three (3) buildings containing sixty-four (64) units, as more specifically described in the Project Cost Budget and the Plans and Specifications.

"<u>Phase 2 Completion Date</u>" shall have the meaning set forth in Section 3.2(d) hereof.

"<u>Phase 2 Construction Milestones</u>" shall have the meaning set forth in Section 3.2(d) hereof.

"<u>Plan</u>" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA) whether or not subject to ERISA or a plan or other arrangement within the meaning of Section 4975 of the Code.

4885-5497-3488, v. 2

"Plan Assets" shall mean assets of a Plan within the meaning of section 29 C.F.R. Section 2510.3-101, as modified by section 3(42) of ERISA, or similar law.

"Plans and Specifications" shall mean the plans and specifications for the Improvements prepared by the Architect and the Other Design Professionals (as well as the approved [_____ Department of Buildings][5] plans), as the same may be amended and supplemented from time to time in accordance with the terms of this Agreement.

"Pledge Agreement" shall mean that certain Ownership Interests Pledge and Security Agreement dated as of the date hereof given by Pledgor for the benefit Lender with respect to the ownership interests in Borrower owned by Pledgor.

"Pledgor" shall mean, individually and/or collectively, as the context may require, (i) Guarantor, (ii) Robert A Safier, (iii) Koval Inc., (iv) Janelle Dalson, (v) LNH Properties Inc. and (vi) 3N Land and Building Fund REIT Inc.

"Policy" or "Policies" shall have the meaning set forth in Section 6.1(b) hereof.

"Prepayment Date" shall have the meaning set forth in Section 2.3.1(a) hereof.

"Presale Agreement" shall mean a purchase and sale agreement with respect to Phase 1 and Phase 2 to be entered into by and between Borrower, as seller, and Aspen, as purchaser, on terms and conditions substantially similar to those set forth in that certain Letter of Agreement dated as of August 22, 2022 by and between Borrower, as seller, and Aspen, as purchaser, with respect to Phase 1 and Phase 2.

"Prime Rate" shall mean the annual rate of interest which is the highest prime lending rate of interest most recently in effect (as published in the Money Rates Section in The Wall Street Journal or if The Wall Street Journal fails to publish such rate, such other publication as Lender shall designate in its sole discretion). A certificate made by an officer of Lender stating the Prime Rate in effect on any given day, for the purposes hereof, shall be conclusive evidence of the Prime Rate in effect on such day. The Prime Rate is a base reference rate of interest adopted by Lender as a general benchmark from which Lender determines the floating interest rates chargeable on various loans to borrowers with varying degrees of creditworthiness and Borrower acknowledges

---

[5] Borrower to provide applicable agency.

19

and agrees that Lender has made no representations whatsoever that the Prime Rate is the interest rate actually offered by Lender to borrowers of any particular creditworthiness. In the event that the concept of the Prime Rate shall no longer exist, then the Prime Rate shall be deemed to be the Prime Rate as last reported in The Wall Street Journal. For the avoidance of doubt, at no time and in no event shall the Prime Rate be less than Four and 75/100 Percent (4.75%) for purpose of calculating the Note Rate herein.

"Principal" shall mean the unpaid principal balance of the Loan at the time in question.

"Prohibited Person" means any Person:

(a) listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

(b) that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(c) with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d) who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e) that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov.ofac/tllsdn.pdf or at any replacement website or other replacement official publication of such list; or

(f) who is an Affiliate of a Person listed above.

"Project" shall mean the development and construction of the Improvements at the Property in accordance with the Plans and Specifications and all Legal Requirements, which Project shall be deemed to constitute Phase 1 and Phase 2.

20

"<u>Project Cost Budget</u>" shall mean a budget which details the Project Costs estimated to be incurred by Borrower in connection with the Final Completion of the Improvements constituting Phase 1.

"<u>Project Costs</u>" shall mean (a) all direct and indirect costs and expenses of constructing and developing the Improvements, (b) Carry Costs, and (c) Debt Service.

"<u>Property</u>" shall mean each parcel of real property more particularly described on <u>Schedule I</u> annexed hereto and made a part hereof and located at 3700 Horizons Avenue, Merced, California 95348, the improvements thereon and all Personal Property (as defined in the Security Instrument) owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to the Property and Improvements, as more particularly described in the Security Instrument and referred to therein as the "Mortgaged Property."

"<u>Provided Information</u>" shall have the meaning set forth in Section 4.1.32 hereof.

"<u>Punch List Items</u>" shall mean, collectively, minor or insubstantial details of construction, decoration, mechanical adjustment or installation, which do not hinder or impede the use, operation, or maintenance of the Property or the ability to obtain a permanent certificate of occupancy with respect thereto.

"<u>Qualified Manager</u>" shall mean a reputable and experienced professional management organization which manages, together with its Affiliates, at least ten (10) properties of a type, quality and size similar to the Property, and who shall have been approved by Lender.

"<u>Rating Agencies</u>" shall mean each of S&P, Moody's, and Fitch, and any other nationally recognized statistical rating agency that has been approved by Lender.

"<u>Rents</u>" shall have the meaning set forth in the Security Instrument.

"<u>Replacement Management Agreement</u>" shall mean, collectively, (a) a management agreement with a Qualified Manager or another Person acceptable to Lender, in form and substance acceptable to Lender and (b) an assignment and subordination of management agreement in the form attached as <u>Exhibit C</u>.

"<u>Reserved Funds Fee</u>" shall have the meaning set forth in Section 2.4.5 hereof.

21

"Responsible Officer" shall mean with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer, senior vice president, manager, managing member or such other authorized representative of such Person.

"Restoration" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be approved by Lender.

"Restricted Party" shall mean Borrower, Pledgor, any Guarantor, any Immediate Family Member of Guarantor or any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of any of the foregoing.

"Retainage" shall mean, for each construction contract and subcontract, the greater of (a) ten percent (10.00%) of all costs funded to the contractor or subcontractor under the contract or subcontract, and (b) the actual retainage required under such contract or subcontract.

"S&P" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"Sale or Pledge" shall mean a voluntary or involuntary sale, assignment, conveyance, transfer, hypothecation, pledge or other encumbrance of a direct or indirect legal or beneficial interest.

"Security Instrument" or "Deed of Trust" shall mean that certain first priority [Construction Loan Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing], executed and delivered by Borrower as security for the Loan and encumbering the Property in the principal amount of up to the Loan amount, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time

"Servicer" shall have the meaning set forth in Section 9.4 hereof.

"Servicing Agreement" shall have the meaning set forth in Section 9.4 hereof.

"Shortfall" shall have the meaning set forth in Section 2.1.11 hereof.

"State" shall mean the State in which the Property or any part thereof is located.

"Stored Materials" shall have the meaning as set forth in Section 2.1.9.

22

4885-5497-3488, v. 2

"<u>Survey</u>" shall mean a survey prepared by a surveyor licensed in the State where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Lender.

"<u>Taxes</u>" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"<u>Term</u>" shall mean the period commencing on the Closing Date through and including the Maturity Date.

"<u>Title Company</u>" shall mean Fidelity National Title Company, a California corporation.

"<u>Title Insurance Policy</u>" shall mean an ALTA mortgagee title insurance policy in a form acceptable to Lender (or, if the Property is located in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and (i) insuring the lien of the Security Instrument encumbering the Property, (ii) providing full coverage against mechanics' liens (filed and inchoate), (iii) containing a Pending Disbursements Clause in the form of <u>Exhibit A</u> annexed hereto, if applicable, (iv) containing no survey exceptions, unless previously approved by Lender, and (v) containing such other endorsements and affirmative coverages as Lender may require.

"<u>Trade Contract</u>" shall mean any agreement (other than the General Contractor's Agreement) entered into by the Borrower or by the General Contractor, in which the Trade Contractor thereunder agrees to provide labor and/or materials in connection with the construction of the Improvements.

"<u>Trade Contractor</u>" shall mean the contractor or vendor under any Trade Contract.

"<u>Transfer</u>" shall have the meaning set forth in Section 5.2.10(a) hereof.

"<u>UCC</u>" or "<u>Uniform Commercial Code</u>" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located and the State in which the Borrower is organized.

"<u>Underwriting Fee</u>" shall have the meaning set forth in Section 2.4.2 hereof.

"<u>Undrawn Line Fee</u>" shall have the meaning set forth in Section 2.4.4 hereof.

23

"Work" shall mean the construction, furnishing and equipping of the Improvements in accordance with the Plans and Specifications and all Legal Requirements.

**Section 1.2**      Principles of Construction.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

**Section 1.3**      Presumption.

This Agreement and all other Loan Documents shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement and all such other Loan Documents to be drafted. If any words or phrases in this Agreement or any other Loan Document shall have been stricken or otherwise eliminated in the course of negotiations, whether or not any other words or phrases have been added, this Agreement and all other Loan Documents shall be construed as if the words or phrase so stricken or otherwise eliminated were never included herein or therein and no implication or inference shall be drawn from the fact that said words or phrases were so stricken or otherwise eliminated.

**ARTICLE II.  GENERAL TERMS**

**Section 2.1**      Loan Commitment; Disbursement to Borrower.

(1)      Agreement to Lend and Borrow.

Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan in an aggregate principal amount of up to [TWENTY-FOUR MILLION THREE HUNDRED SEVENTY-FIVE THOUSAND and 00/100 Dollars] ($[24,375,000.00]).

24

(2)     Reborrowing Prohibited.

Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

(3)     The Note, Security Instrument and Loan Documents.

The Loan shall be evidenced by the Note and secured by the Security Instrument, the Assignment of Leases and the other Loan Documents.

(4)     Use of Proceeds.

(a)     Borrower shall use the proceeds of the Loan (i) to repay the existing indebtedness secured by the Property, (ii) to finance Borrower's Project Costs as set forth on the Project Cost Budget, (iii) to pay closing costs incurred in connection with the closing of the Loan on the Closing Date and (iv) as otherwise set forth in the settlement statement executed by Borrower on the Closing Date.

(b)     Borrower acknowledges and agrees that no proceeds of the Loan shall be used to pay Borrower, any Restricted Party, or any Affiliate thereof any developer's fees, management fees or other fees owed to Borrower, a Restricted Party, or any Affiliate of Borrower or a Restricted Party, and all such fees are absolutely and unconditionally subordinate to the Loan.

(5)     Quality of Work.

No Advance or any portion thereof shall be made with respect to Work that is subject to Defects or to any contractor that has performed Work that is subject to Defects and that has not been cured, as confirmed by the report of the Construction Consultant, but Lender may disburse all or part of any Advance at any time if Lender believes it advisable to do so, and all such Advances or parts thereof shall be deemed to have been made pursuant to this Agreement.

(6)     Project Cost Budget.

On or prior to the Closing Date, Borrower has provided to Lender the Project Cost Budget. Each category of direct and indirect cost (the "Line Items" or "Budget Line") shall be delineated in the Project Cost Budget to be disbursed out of Loan proceeds subject to availability pursuant to this Agreement and satisfaction of all applicable conditions to Advances hereunder, being so

25

indicated. A copy of the Project Cost Budget, certified by Borrower to be true, accurate and complete in all material respects as of the hereof, is set forth on <u>Schedule III</u> attached hereto.

(7)     <u>Contingency; Budget Reallocations</u>.

(a)     Subject to the prior written approval of Lender, the Borrower may revise the Project Cost Budget from time to time to move Loan Contingency from the Project Cost Budget to other Budget Lines.

(b)     If there is a savings in a particular Budget Line, and if such savings is substantiated by evidence satisfactory to Lender (based on completed Work), the Borrower shall have the right, upon prior approval of Lender, to reallocate such savings to another Budget Line with respect to which additional costs have been or may be incurred.

(c)     If Borrower becomes aware of any change in Project Costs that will increase a Line Item of Project Costs reflected on the Project Cost Budget, Borrower shall immediately notify Lender in writing and promptly submit to Lender for its approval a revised Project Cost Budget. Any reallocation of any Line Item in the Project Cost Budget in connection with cost overruns shall be subject to Lender's approval in Lender's sole discretion. Lender shall have no obligation to make any further Advances unless and until either (i) the revised Project Cost Budget so submitted by Borrower is approved by Lender, and Lender reserves the right to approve or disapprove any revised Project Cost Budget in its sole and absolute discretion, or (ii) Borrower deposits the amount of the cost overrun in question with Lender pursuant to Section 2.1.11.

(8)     <u>Advances; Advances for Deposits</u>.

(a)     The Project Cost Budget reflects, by category and line item, the purposes and the amounts for which funds to be advanced by Lender under this Agreement are to be used. Lender shall not be required to disburse for any category or line item more than the amount specified therefor in the Project Cost Budget, or in connection with any category or line item on the Project Cost Budget.

(b)     Lender shall not be required to make any Advance to fund any deposit due in connection with any Trade Contract, nor shall Lender be required to make an Advance to reimburse Borrower for any funds previously expended by Borrower to fund any deposit due in connection with any Trade Contract.

4885-5497-3488, v. 2

(9)     <u>Stored Materials</u>.

Lender shall not be required to disburse any funds for any materials, machinery or other Personal Property (as defined in the Security Instrument) not yet incorporated into the Improvements (the "<u>Stored Materials</u>"), unless the following conditions are satisfied:

(a)     Borrower shall deliver to Lender bills of sale or other evidence satisfactory to Lender of the cost of, and, subject to the payment therefor, Borrower's title in and to such Stored Materials;

(b)     The Stored Materials are identified as belonging to the Property and Borrower, are segregated so as to adequately give notice to all third parties of Borrower's title in and to such materials, and are components in substantially final form ready for incorporation into the Improvements;

(c)     The Stored Materials are stored at the Property or at such other third-party owned and operated site within the continental United States as Lender shall approve, and are protected against theft and damage in a manner satisfactory to Lender, including, if requested by Lender, storage in a bonded warehouse in the State in which the Property is located;

(d)     The Stored Materials will be paid for in full with the funds to be disbursed, and all lien rights or claims of the supplier will be released upon full payment;

(e)     Lender has or will have upon payment with disbursed funds a perfected, first priority security interest in the Stored Materials;

(f)     The Stored Materials are insured for an amount equal to their replacement costs in accordance with Section 6.1 of this Agreement;

(g)     Borrower shall have provided photographic evidence of the Stored Materials, and if required by Lender, the Construction Consultant has certified that it has inspected such Stored Materials and they are in good condition and suitable for use in connection with the Project;

(h)     To the extent that Advances with respect to materials that have not been incorporated in the Improvements shall exceed Fifty Thousand Dollars ($50,000), Lender shall

4885-5497-3488, v. 2

have received UCC-1 financing statements or other evidence satisfactory to Lender of Lender's perfected first (1st) priority lien on and security interest in such materials; and

(i)      The cost of Stored Materials not stored at the Property, in the aggregate is not more than [$_____] and the aggregate cost of Stored Materials stored off and on the Property shall not exceed [$_____].[6]

(j)      In each Requisition for Loan proceeds, Borrower shall provide to Lender Borrower's reasonable estimate of the amount, value and type of Stored Materials that will be stored onsite and offsite over the following sixty (60) days.

(10)     <u>Amounts of Advances</u>.

(a)      In no event shall any Advance exceed the full amount of Project Costs theretofore paid by Borrower since the date of the last Draw Request (if any) and through the date of the Draw Request for such Advance <u>minus</u> (i) the applicable Retainage for each contract and subcontract, and (ii) the aggregate amount of any Advances previously made by Lender. The Retainage is intended to provide a contingency fund protecting Lender against failure of Borrower or Guarantor to fulfill any Obligations under the Loan Documents, and Lender may charge amounts against such Retainage in the event Lender is required or elects to expend funds to cure any Event of Default. For the avoidance of doubt, and notwithstanding anything in this Agreement or any of the other Loan Documents to the contrary, it is the intention of Borrower and Lender that each Advance be made to reimburse Borrower for Project Costs previously paid for by Borrower (and for which Borrower is providing Lien waivers), however, further provided that same were paid for the Borrower after the Closing Date (and otherwise in accordance with the terms and conditions of this Agreement).

(b)      The Retainage shall be Advanced on a contract-by-contract basis after Final Completion of all Work provided for under such Trade Contract, subject to approval thereof by the Construction Consultant and receipt by Lender of final and unconditional lien waiver(s) for said contract.

---

[6] Borrower to provide coverage information for Lender to determine acceptable stored materials thresholds.

4885-5497-3488, v. 2

(c)     No Advance of the Loan by the Lender shall be deemed to be an approval or acceptance by the Lender of any Work performed thereon or the materials furnished with respect thereto.

(11)    <u>Loan Balancing</u>.

At any time and from time to time during the term of the Loan, Lender shall have the right (but not the obligation) to notify Borrower that, in Lender's estimation, made in its sole and absolute discretion, (a) the cost of all Project Costs that remain unpaid at the time in question exceeds the undisbursed proceeds of the Loan, plus any sums deposited with Lender pursuant to this Section 2.1.11 and not previously disbursed, and/or (b) the cost of completing any Line Item in the Project Cost Budget exceeds the remaining undisbursed portion of the Loan allocated to such Line Item in the Project Cost Budget, plus any sums deposited with Lender pursuant to this Section 2.1.11 to pay for such deficiency and not previously disbursed (the amount of any such deficiency under clauses (a) or (b) being herein referred to as the "<u>Shortfall</u>").  If Lender at any time shall so notify Borrower, Borrower shall within ten (10) days of Lender's notification as aforesaid, deposit with Lender an amount equal to such Shortfall, which Lender may from time to time apply to such Project Costs (it being understood that Lender may first apply the Shortfall to Project Costs prior to making any additional Advances under the Loan).  Borrower hereby agrees that Lender shall have a lien on and security interest in any sums deposited pursuant to the previous sentence and that Borrower shall have no right to withdraw any such sums.  Lender shall have no obligation to make any further Advances of proceeds of the Loan until the sums required to be deposited pursuant to clause (i) above have been exhausted and the Loan is back "<u>in balance</u>." Notwithstanding anything herein to the contrary, if a Default or an Event of Default shall have occurred (in addition to the Shortfall), then Lender may use such funds on deposit on account of such Shortfall to satisfy any Obligation hereunder, at Lender's sole discretion.

**Section 2.2**     <u>Interest; Loan Payments; Late Payment Charge</u>.

(1)     <u>Payments</u>.

(a)     <u>Interest</u>. Interest on the outstanding Principal of the Loan outstanding from time to time shall accrue from and including the Closing Date up to and including the Maturity Date at the Note Rate; <u>provided</u>, <u>however</u>, that after the occurrence of an Event of Default, interest shall accrue at the Default Rate as is set forth in Section 2.2.5 below.  All interest on the outstanding Principal of the Loan shall be earned as and when provided for in this Agreement, but shall not due and

29

payable until the Maturity Date.  For the avoidance of doubt, all accrued interest shall be compounded and capitalized on a monthly basis and shall at all times constitute a part of the Debt and the Obligations.

(b)     <u>Making of Payments</u>.  All payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office by wire transfer, direct account debit or check to the order of Lender, as directed by Lender, and Lender shall have the absolute right to reject any payment not made by any of such methods (unless such other method is approved by Lender (in Lender's sole discretion)), and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. In addition, Borrower shall pay to Lender the sum of $2,500.00 for any payment which is returned for any reason by Borrower's bank unpaid.  Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due (except by reason of acceleration) on a day that is not a Business Day, the due date thereof shall be the immediately succeeding Business Day, including the payment of the Principal due on the Maturity Date.

(c)     All payments and other amounts due under the Note, this Agreement and the other Loan Documents shall be made without any setoff, defense or irrespective of, and without deduction for, counterclaims.

(2)     <u>Interest Calculation</u>.

Interest on the outstanding Principal shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Note Rate divided by three hundred sixty (360) by (c) the outstanding Principal.

(3)     <u>Payment on Maturity Date</u>.

Borrower shall pay to Lender on the Maturity Date (i) the outstanding Principal, (ii) all accrued and unpaid interest thereon, (iii) the applicable Make Whole Fee, if any, and (iv) all other amounts due hereunder and under the Note, the Security Instrument and the other Loan Documents.

4885-5497-3488, v. 2

(4)    <u>Intentionally Omitted</u>.

(5)    <u>Payments after Default</u>.

Upon the occurrence of an Event of Default, (a) interest on the outstanding Principal of the Loan and, to the extent permitted by Applicable Law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date of the underlying Default (including during any period prior to and subsequent to the entry of a judgement of foreclosure and sale) without regard to any grace or cure periods contained herein. Interest at the Default Rate shall be computed from the date of the Event of Default until the actual receipt and collection of the Debt (or that portion thereof that is then due).  To the extent permitted by Applicable Law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the Security Instrument and the other Loan Documents.  This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

(6)    <u>Late Payment Charge</u>.

If any Principal, interest or any other sums due under the Loan Documents is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of ten percent (10.00%) of such unpaid sum or the maximum amount permitted by Applicable Law (the "<u>Late Charge</u>") in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by Applicable Law.

(7)    <u>Usury Savings</u>.

This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the outstanding Principal at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the outstanding Principal at a rate in excess of the Maximum Legal Rate, the Note Rate or the Default Rate, as the case may be, shall be deemed to be automatically and immediately reduced to the Maximum Legal

31

Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of the Principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.  For the avoidance of doubt, Borrower and Lender hereby acknowledge and agree that New York law shall govern in all respects with respect to interest calculations and usury concerns with respect to the Loan.

        (8)    <u>Indemnified Taxes</u>.

        (a)    All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, Indemnified Taxes, excluding (i) Indemnified Taxes measured by Lender's net income, and franchise taxes imposed on it, by the jurisdiction under the laws of which Lender is resident or organized, or any political subdivision thereof, (ii) taxes measured by Lender's overall net income, and franchise taxes imposed on it, by the jurisdiction of Lender's lending office or any political subdivision thereof or in which Lender is resident or engaged in business, and (iii) withholding taxes imposed by the United States of America, any State, commonwealth, protectorate territory or any political subdivision or taxing authority thereof or therein as a result of the failure of a Lender which is a Non-U.S. Entity to comply with the terms of paragraph (b) below. If any non-excluded Indemnified Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all non-excluded Indemnified Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any non-excluded Indemnified Tax is payable pursuant to Applicable Law by Borrower, Borrower shall send to Lender an official receipt showing payment of such non-excluded Indemnified Tax or other evidence of payment reasonably satisfactory to Lender. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such non-excluded Indemnified Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.

4885-5497-3488, v. 2

(b)　　　If Lender is a U.S. Person (other than the lender originally named herein), Lender shall deliver to Borrower, upon request, a Form W-9 (unless it establishes to the reasonable satisfaction of Borrower that it is otherwise eligible for an exemption from backup withholding tax or other withholding tax).  In the event that Lender or any successor and/or assign of Lender is not incorporated under the laws of the United States of America or a state thereof (a "Non-U.S. Entity") Lender agrees that, prior to the first date on which any payment is due such entity hereunder, it will deliver to Borrower two duly completed copies of United States Internal Revenue Service Form W-8BEN-E or W-8ECI or successor applicable form, as the case may be, certifying in each case that such entity is entitled to receive payments under the Note, without deduction or withholding of any United States federal income taxes. Each entity required to deliver to Borrower a Form W-8BEN-E or W-8ECI pursuant to the preceding sentence further undertakes to deliver to Borrower two further copies of such forms, or successor applicable forms, or other manner of certification, as the case may be, on or before the date that any such form expires (which, in the case of the Form W-8ECI, is the last day of each U.S. taxable year of the Non-U.S. Entity) or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by it to Borrower, and such other extensions or renewals thereof as may be requested by Borrower, certifying in the case of a Form W-8BEN-E or W-8ECI that such entity is entitled to receive payments under the Note without deduction or withholding of any United States federal income taxes, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required which renders all such forms inapplicable or which would prevent such entity from duly completing and delivering any such form with respect to it and such entity advises Borrower that it is not capable of receiving payments without any deduction or withholding of United States federal income tax.

(9)　　　<u>Change in Law; Additional Costs.</u>

In the event that any change in any requirement of law or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority (it being expressly agreed that the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith shall be deemed to be a change in law and/or a change in capital adequacy requirements, as applicable, regardless of the date enacted, adopted or issued):

33

(a)      shall hereafter impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of SOFR hereunder;

(b)      shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(c)      shall hereafter impose on Lender any other condition and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Lender shall give notice thereof to Borrower (an "Increased Cost Notice"), and Borrower shall either (a) promptly pay Lender any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable which Lender deems to be material as determined by Lender, or (b) deliver written notice to Lender within thirty (30) days of receipt of the Increased Cost Notice electing to repay the Loan.  Payments pursuant to this Section 2.2.9 shall be made within five (5) Business Days after the date Lender makes written demand therefor. Borrower's obligations under this Section 2.2.9 shall survive the payment of the other portions of the Debt.

4885-5497-3488, v. 2

(10)     <u>Breakage Indemnity</u>. Borrower shall indemnify Lender against any loss or expense which Lender may sustain or incur in liquidating or redeploying deposits from third parties acquired to effect or maintain the Loan or any part thereof as a consequence of (i) any payment or prepayment of the Loan or any portion thereof made on a date other than a day which is the last day of an Interest Period, and/or (ii) any default in payment or prepayment of the Principal or any part thereof or interest accrued thereon, as and when due and payable (at the date thereof or otherwise, and whether by acceleration or otherwise) (the amounts referred to in the foregoing clauses (i) and (ii) are herein referred to collectively as the "<u>Breakage Costs</u>"). Lender shall deliver to Borrower a statement for any such sums which it is entitled to receive pursuant to this Section 2.2.10, which statement shall be binding and conclusive absent manifest error. Borrower's obligations under this Section 2.2.10 are in addition to Borrower's obligations to pay any Make Whole Fee applicable to a payment or prepayment of Principal and shall survive the payment of the other portions of the Debt.

    **Section 2.3**     <u>Prepayments</u>.

    (1)     <u>Voluntary Prepayments</u>.

    Borrower may, at its option, repay or prepay the Loan, in whole or in part (subject to a $50,000.00 minimum repayment or repayment), on any Payment Date occurring after the Lockout Date, upon satisfaction of the following conditions:

    (a)     Borrower shall provide prior written notice to Lender specifying the date (the "<u>Prepayment Date</u>") upon which the prepayment or repayment is to be made, which notice shall be delivered to Lender not less than ten (10) (but no earlier than sixty (60)) days prior to such payment or on such shorter notice as Lender is willing to accept in its sole and absolute discretion, provided that if Borrower fails to timely prepay in accordance with such notice then Borrower shall pay a $1,000.00 prepayment cancellation fee to compensate Lender for expenses associated with Borrower's failure to comply with its request (and is not a penalty);

    (b)     Borrower shall pay to Lender the outstanding Principal being repaid or prepaid pursuant to the terms and conditions of this Agreement;

    (c)     Borrower shall pay to Lender, simultaneously with such prepayment, (i) all accrued and unpaid interest calculated at the Note Rate on the Principal being repaid through and including the Prepayment Date, (ii) unless the Prepayment Date is also a Payment Date, the interest which

would have accrued at the Note Rate from the Prepayment Date until the last day of the month during which the Prepayment Date occurs (which shall constitute additional consideration for Lender's acceptance of such prepayment), (iii) with respect to any repayment or prepayment made by Borrower on or prior to the Make Whole Fee Outside Date, the applicable Make Whole Fee, and (iv) all other sums then due under this Agreement, the Note or the other Loan Documents with respect to the portion of the Loan then being repaid or prepaid.

(2)    <u>Mandatory Prepayments</u>.

(a)    On the next occurring Payment Date following the date on which Borrower and/or Lender actually receives any Net Proceeds, if and to the extent Lender is not obligated to (and elects not to) make such Net Proceeds available to Borrower for the Restoration of the Property in accordance with the Loan Documents, Borrower shall prepay in whole or in part (or, if Lender is holding the Net Proceeds, Lender may apply the same to) the outstanding Principal in an amount equal to one hundred percent (100%) of such Net Proceeds. Such prepayment shall be applied in accordance with Section 2.3.4 hereof, and shall be subject to the payment of the applicable Make Whole Fee if such prepayment occurs on or prior to the Make Whole Fee Outside Date.

(b)    The Loan shall be mandatorily repaid to the extent of, and within 10 Business Days of Borrower's receipt of, any net proceeds from the sale or other disposition of any Collateral; <u>provided</u> that no such sale or disposition shall occur without Lender's prior written consent (in Lender's sole and absolute discretion) and any such sale or disposition shall be conducted solely in Approved Form; <u>provided further</u> that such any repayment made on or prior to the Make Whole Fee Outside Date shall be subject to the contemporaneous payment of the applicable Make Whole Fee.

(3)    <u>Prepayments After Default</u>.

Lender shall have no obligation to accept any voluntary prepayment of the Loan after the occurrence of an Event of Default. Notwithstanding the foregoing, if, following an Event of Default, Borrower tenders payment of all or any part of the Debt, or if all or any portion of the Debt is recovered by Lender after such Event of Default (which tender Lender may reject to the extent permitted under Applicable Law) and Lender elects, in its sole discretion to accept such prepayment, such tender or recovery shall be deemed a voluntary prepayment by Borrower and Borrower shall pay, in addition to the Debt, (i) all accrued and unpaid interest calculated at the Default Rate on the Principal being prepaid through and including the Prepayment Date, (ii) unless

36

the Prepayment Date is also a Payment Date, the interest which would have accrued at the Note Rate from the Prepayment Date until the last day of the month during which the Prepayment Date occurs (which shall constitute additional consideration for Lender's acceptance of such prepayment), (iii) the applicable Make Whole Fee, and (iv) all other sums due under this Agreement, the Note or the other Loan Documents in connection with a partial or total prepayment.

(4)     Application of Prepayments.

(a)     So long as no Event of Default shall then be continuing, all repayments and prepayments received shall be applied, at Lender's sole discretion: (i) first, for accrued and unpaid DIP Lender Expenses, (ii) second, to payment of accrued and unpaid interest (including interest at the Default Rate, if any); (iii) third, to the payment of any Principal; (iv) fourth, for all other Obligations owed hereunder; and (v) fifth, after all Obligations (including reasonable reserves) have been indefeasibly paid in full in cash, Lender shall distribute any surplus in accordance with a final, non-appealable Bankruptcy Court order.  For the avoidance of doubt, the Debtor shall remain liable for any deficiency All payments hereunder shall be made without offset, demand, counterclaim, deduction, abatement, defense or recoupment, each of which Borrower hereby waives.

(b)     Notwithstanding anything to the contrary set forth in the Loan Documents, the Security Instrument shall secure only the obligations with regard to the payment of the Loan, the Note and the other Loan Documents.

(5)     Make Whole Fee.

(a)     Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents and (b) if the Loan is repaid in full prior to the date that Lender has received the Make Whole Fee, for any reason whatsoever, whether voluntarily, as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender may not receive all such interest and other benefits and may, in addition, incur costs. For these reasons, and to induce Lender to make the Loan, Borrower agrees that on the Maturity Date or such earlier date on which the Loan is prepaid in full, such repayment or prepayment will be accompanied by the Make Whole Fee. Such Make Whole Fee shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale. Borrower further acknowledges that (A) it is a knowledgeable real estate

37

developer and/or investor, (B) it fully understands the effect of the provisions of this Section 2.3.5, as well as the other provisions of the Loan Documents, (C) the making of the Loan by Lender at the Note Rate and on the other terms set forth in the Loan Documents is sufficient consideration for Borrower's obligation to pay the Make Whole Fee, and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions. Borrower also acknowledges that the provisions of this Agreement and the other Loan Documents limiting the right of prepayment and providing for the payment of the Make Whole Fee and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan.

     (b)     **SUCH MAKE WHOLE FEE SHALL BE PAID WHETHER THE PREPAYMENT IS VOLUNTARY OR INVOLUNTARY, INCLUDING ANY PREPAYMENT AFFECTED BY THE ACCELERATION PROVISIONS CONTAINED IN THE NOTE OR THE OTHER LOAN DOCUMENTS. IF FOR ANY REASON LENDER HAS NOT RECEIVED THE MAKE WHOLE FEE ON THE DATE THE LOAN IS PAID IN FULL (DUE TO THIS LOAN BEING PAID ON THE MATURITY DATE, OR THEREAFTER, SUBJECT TO EXTENSION IN ACCORDANCE HEREWITH), THE AMOUNT OF THE MAKE WHOLE FEE, WHICH SHALL BE CALCULATED AS OF THE DAY PRIOR TO THE MATURITY DATE, SHALL INSTEAD BE DUE AND OWING AS AN EXIT FEE, AND EARNED ON THE APPLICABLE MATURITY DATE (REGARDLESS IF EXTENDED IN ACCORDANCE HEREWITH). UPON ACCELERATION, THE MAKE WHOLE FEE SHALL BE CALCULATED BASED UPON THE AMOUNT OF THE PREPAYMENT DUE ON THE DATE OF SUCH ACCELERATION; PROVIDED, HOWEVER, IF SUCH MAKE WHOLE FEE CONSTITUTES INTEREST UNDER APPLICABLE LAW, THE AMOUNT OF SUCH MAKE WHOLE FEE WILL BE REDUCED TO AN AMOUNT WHICH, WHEN ADDED TO ALL OTHER AMOUNTS WHICH CONSTITUTE INTEREST UNDER APPLICABLE LAW, WILL NOT EXCEED THE MAXIMUM AMOUNT OF INTEREST WHICH MAY BE CONTRACTED FOR, CHARGED OR RECEIVED WITH RESPECT TO THE LOAN EVIDENCED HEREBY UNDER APPLICABLE LAW FOR THE ACTUAL PERIOD OF TIME THE LOAN IS OUTSTANDING.**

     **Section 2.4     Fees and Other Payments**.

     (1)     <u>Commitment Fee</u>:   In connection with the closing of the Loan, Borrower

acknowledges that a commitment fee equal to Two Percent (2.0%) of the Maximum Loan Amount (the "Commitment Fee") has been fully and irrevocably earned by Lender as of the Closing Date, but such Commitment Fee shall not be due and payable by Borrower to Lender until the Maturity Date. For the avoidance of doubt, the Commitment Fee shall be compounded and capitalized on a monthly basis and shall at all times constitute a part of the Debt and the Obligations

(2)     Underwriting Fee. In connection with the closing of the Loan, Borrower acknowledges that an underwriting fee equal to One Percent (1.0%) of the Maximum Loan Amount (the "Underwriting Fee") has been fully and irrevocably earned by Lender as of the Closing Date, but such Commitment Fee shall not be due and payable by Borrower to Lender until the Maturity Date. For the avoidance of doubt, the Underwriting Fee shall be compounded and capitalized on a monthly basis and shall at all times constitute a part of the Debt and the Obligations.

4885-5497-3488, v. 2

(3)  <u>Monitoring Fee</u>.  Borrower shall pay to Lender an annual monitoring fee equal to One and 50/100 Percent (1.50%) of the Maximum Loan Amount (the "<u>Monitoring Fee</u>"), which Monitoring Fee shall accrue and be compounded and capitalized on a monthly basis, and shall not be due and payable by Borrower to Lender until the Maturity Date. For the avoidance of doubt, the Monitoring Fee shall at all times constitute a part of the Debt and the Obligations.

(4)  <u>Undrawn Line Fee</u>.  Until such time as all Loan proceeds are Advanced to Borrower in accordance with the terms and conditions of this Agreement (at which time, such Advanced proceeds shall accrue interest at the Note Rate in accordance with the terms and conditions of this Agreement and the Note), all unadvanced Loan proceeds shall accrue from and after the Closing Date an undrawn line fee in an amount equal to Four and 75/100 Percent per annum (the "<u>Undrawn Line Fee</u>"), which Undrawn Line Fee shall be earned as and when provided for in this Section 2.4.5, but shall not be due and payable by Borrower to Lender until the Maturity Date.  For the avoidance of doubt, the Undrawn Line Fee shall accrue and shall be compounded and capitalized on a monthly basis and shall at all times constitute a part of the Debt and the Obligations.

(5)  <u>Reserved Funds Fee</u>.  In the event that Borrower has not filed a motion for expedited approval of the DIP Order by September 4, 2022, a reserved funds fee equal to One and 00/100 Percent of the Maximum Loan Amount (the "<u>Reserved Funds Fee</u>"), which Reserved Funds Fee shall accrue and be compounded and capitalized on a monthly basis, and shall not be due and payable by Borrower to Lender until the Maturity Date. For the avoidance of doubt, the Reserved Funds Fee shall at all times constitute a part of the Debt and the Obligations.

**Section 2.5**  <u>Release on Payment in Full</u>.

Lender shall, upon the written request and at the expense of Borrower, upon payment in full of all Principal and interest due on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Agreement, release the lien of the Security Instrument not theretofore released and remit to Borrower any funds on deposit with Lender in excess thereof. As a condition to any such release, Borrower covenants and agrees to pay Lender's fees and expenses (including attorneys' fees and expenses) in connection therewith.  Upon any such release, Lender shall, automatically and without the need for any further documentation, be absolutely and unconditionally released from any and all claims or liabilities in connection with the Loan.  In addition, Borrower hereby indemnifies and agrees to hold Lender harmless from and against any and all claims and liabilities arising out of the release hereof and thereof, such indemnification to survive any such release.

## ARTICLE III.  CONDITIONS OF ADVANCES; BORROWING PROCEDURES

**Section 3.1**      Conditions of Advances.

(1)      Conditions of Initial Advance.

Lender shall not be obligated to make the first Advance of the Loan (the "Initial Advance") until all of the conditions precedent set forth in this Section have been satisfied:

(a)      Payment of Fees.  Payment by Borrower of all fees and expenses required by this Agreement, to the extent due and payable, including, without limitation, Lender's attorneys' fees and expenses.

(b)      Loan Documents.  The Loan Documents, in form and substance satisfactory to Lender, shall have been duly executed and delivered by the parties thereto and shall be in full force and effect, and Lender shall have received the originals or fully executed counterparts thereof.

(c)      Construction Documents.

(i)      General Contractor.  Borrower shall deliver to Lender a fully executed copy of the General Contractor's Agreement [which shall be a GMP], which agreement shall be approved by Lender in its sole discretion.  General Contractor shall have executed and delivered to Lender an original Assignment and Subordination of Construction Management Agreement substantially in the form of Exhibit B.

(ii)      Trade Contracts.  Borrower shall have delivered to Lender, and Lender shall have approved, a list of all Trade Contractors who have been or, to the extent identified by Borrower, will be supplying labor or materials for the Property in connection with the Work.  In addition, Borrower shall deliver to Lender and the Construction Consultant true, correct, and complete copies of all executed Trade Contracts.

(iii)      Architect and Other Design Professionals.  Borrower shall deliver to Lender fully executed copies of the Architect's Agreement and Other Design Professionals' Agreements, which agreements shall be approved by Lender in its sole and absolute discretion for the design of the Project.  In addition, Borrower shall deliver to Lender a "Will Serve" Letter from the Architect and such Other Design Professionals required by

4885-5497-3488, v. 2

Lender, unless otherwise expressly waived by Lender, substantially in the form of <u>Exhibit H</u> to Lender.

        (iv)   <u>Standard Form of Trade Contract</u>.  Borrower shall deliver to Lender a copy of the standard form of contract and/or subcontract to be used by the General Contractor, which standard form shall be approved by Lender in its sole and absolute discretion.

        (v)   <u>Construction Consultant Certificate</u>.  Each Draw Request shall be accompanied by a certificate or report of the Construction Consultant to the Lender based upon a site observation of the Improvements made by the Construction Consultant not more than fifteen (15) days prior to the date of such Advance, in which the Construction Consultant shall in substance: (A) indicate its review and acceptance of the Plans and Specifications; (B) verify that the portion of the Improvements completed as of the date of such site observation has been completed substantially in accordance with the Plans and Specifications; (C) state its estimate of (1) the percentages of the construction of the Improvements completed as of the date of such site observation on the basis of work in place as part of the Improvements and the Budget, (2) the costs actually incurred for work in place as part of the Improvements as of the date of such site observation, (3) the sum necessary to complete construction of the Improvements in accordance with the Plans and Specifications, and (4) the amount of time from the date of such inspection that will be required to achieve Completion of the Improvements; and (D) verify such other items as requested by Lender.

        (vi)   <u>Plans and Specifications</u>.  Borrower shall deliver to the Construction Consultant a complete set of the Plans and Specifications and any and all modifications and amendments made thereto.  Borrower shall deliver to the Lender a list identifying the Plans and Specifications and any and all modifications and amendments made thereto, which Plans and Specifications and such amendments, supplements, replacements or other modifications shall be approved by Lender**.**

        (vii)   <u>Project Cost Budget</u>.  The Project Cost Budget shall have been approved by Lender and the Construction Consultant.

        (viii)   <u>Lien Waivers</u>.  Borrower shall deliver duly executed (1) unconditional lien waivers from the General Contractor and all Trade Contractors for all Work performed, and all labor or material supplied in connection with the Work for which payment thereof

4885-5497-3488, v. 2

has been made prior to the Initial Advance, and (2) conditional lien waivers (conditioned only upon payment) from the General Contractor and all Trade Contractors for all Work performed, and all labor or material supplied in connection with the Work for which payment thereof has been or will be made in connection with the applicable Advance (which Advance may reimburse Borrower for such payment(s)).

(d)     <u>Title Insurance Policy</u>.  The Security Instrument shall constitute a valid first Lien the Property for the full amount of the Loan advanced to and including the Borrowing Date, free and clear of all Liens, other than Permitted Encumbrances.  Lender shall have been furnished with a notice of title continuation or an endorsement to the Title Insurance Policy issued to Lender in connection with the Initial Advance of the Loan which continuation or endorsement shall increase the coverage of the Title Insurance Policy by the amount of the Advance through the pending disbursement clause (but not the overall policy amount which shall be for the full amount of the Loan), amend the effective date of the Title Insurance Policy to the date of such Advance, continue to insure the lien of the Security Instrument subject to no Liens or encumbrances, other than Permitted Encumbrances, and which shall state that since the last disbursement of the Loan there have been no changes in the state of title to the Property and that there are no additional survey exceptions not previously approved by Lender.

(e)     <u>Other Insurance</u>.  Borrower shall cause to be delivered to Lender Policies of all insurance (or certificates thereof) required by Section 6.1 of this Agreement or any other Loan Document, and the same shall be in form and substance satisfactory to Lender.

(f)     <u>Environmental Report</u>.  Borrower shall cause to be delivered to Lender the Environmental Report, in form, scope and substance satisfactory to Lender, which report or reports shall indicate a condition of the Property in all respects satisfactory to Lender in its sole discretion and upon which report or reports Lender is expressly entitled to rely.

(g)     <u>Survey</u>.  Borrower shall deliver to Lender a Survey prepared in accordance with Lender's survey requirements, certified by a land surveyor registered and appropriately licensed as such in the State, which Survey shall be in form and substance satisfactory to Lender.

(h)     <u>Governmental Approvals and Legal Requirements</u>.  Borrower shall deliver to Lender evidence that all Governmental Approvals and all other approvals necessary for the construction of the Improvements and the Work, as contemplated by the Plans and Specifications, have been obtained, and that Borrower shall have complied with all Legal Requirements, including

43

4885-5497-3488, v. 2

all land use, building, subdivision, zoning and similar ordinances and regulations promulgated by any Governmental Authority and applicable to the commencement of the construction of the Improvements and to permit the construction to continue to progress to the stage of completion at which work is then proceeding at the Project and in order to achieve Completion of the Improvements by not later than the Completion Date.

(i)     Evidence of Utilities.  Borrower shall cause to be delivered to Lender letters from those local utility companies whose services are necessary to complete the Improvements in accordance with the Plans and Specifications and to operate the Improvements thereafter, or from the appropriate local Governmental Authority stating that sufficient electric, steam, gas, storm and sanitary sewer, telephone, cable and water facilities will be available to the Property upon the Completion of the Improvements.

(j)     Legal Opinions.  Lender shall have received opinions in form, substance and scope satisfactory to Lender and Lender's counsel from counsel satisfactory to Lender as to such matters as Lender shall request, including without limitation, an opinion of Borrower and Guarantor's counsel.

(k)     Searches.  Lender shall have received a certification from the Title Company or other service satisfactory to Lender or counsel satisfactory to Lender (which shall be updated from time to time at Borrower's expense upon request by Lender in connection with future Advances) that a search of the public records disclosed no judgment, UCC or Tax liens affecting Borrower or Guarantor, or the Property, and no conditional sales contracts, chattel mortgages, leases of personalty, financing statements or title retention agreements affect the Property.

(l)     Notices.  All notices required by any Governmental Authority or by any applicable Legal Requirement to be filed prior to commencement of construction of the Improvements shall have been filed.

(m)     Performance; No Default.  Borrower shall have performed and complied with all terms and conditions herein required to be performed or complied with by it at or prior to the date of the Initial Advance, and as of the date of the Initial Advance, no Default or Event of Default shall have occurred.

(n)     Representations and Warranties.  The representations and warranties made by Borrower and Guarantor in the Loan Documents or otherwise made by or on behalf of Borrower

44

or Guarantor in connection therewith or after the date thereof shall have been true and correct on the date on which made and shall continue to be true and correct on the date of the Initial Advance.

(o)　　Other Documents.　Borrower shall have delivered such other documents and certificates as Lender or its counsel may require.

(p)　　Balancing.　Borrower is in compliance with the provisions of Section 2.1.11.

(q)　　No Damage.　The Improvements shall not have been injured or damaged by fire, explosion, accident, flood or other Casualty, unless Lender shall have received insurance proceeds or other monies sufficient in the judgment of Lender to effect the satisfactory restoration of the Improvements and to permit the Completion of the Improvements prior to the Completion Date.

(r)　　Construction Consultant Approval.　Lender has received advice from the Construction Consultant, satisfactory to Lender, as to Construction Consultant's determination based on on-site inspections of the Improvements and the data submitted to and reviewed by it as part of Borrower's Draw Request of the value of the labor and materials in place, that the construction of the Improvements is proceeding satisfactorily and according to schedule and that the work on account of which the Advance is sought has been completed in a good and workmanlike manner to such Construction Consultant's satisfaction within cost estimates approved by Lender and substantially in accordance with the Plans and Specifications.

(s)　　Architect's Certificates.　Borrower shall cause to be delivered to Lender an Architect's Certificate certifying the use of the funds requested under the applicable Advance.

(t)　　Construction and Access License Agreement. To the extent applicable, Borrower shall cause to be delivered to Lender any and all construction and access license agreements with respect to any of the neighboring properties required in connection with the Project.

(u)　　Bankruptcy Matters. The Bankruptcy Court entry of the DIP Order, which remains in full force and effect as so entered and in Approved Form.

(v)　　Presale Agreement.　Borrower and Aspen shall have executed and delivered to Lender the Presale Agreement, which Presale Agreement shall be subject to the review and approval of Lender in its sole but reasonable discretion, and shall be in full force and effect at all times.

4885-5497-3488, v. 2

(2)     Conditions of Subsequent Advances.

The obligation of the Lender to make any Advance after the Initial Advance shall be subject to the following conditions precedent:

(a)     Prior Conditions Satisfied.  All conditions precedent to the Initial Advance set forth in Section 3.1.1 shall continue to be satisfied as of the date of such subsequent Advance.

(b)     Balancing.  Borrower is in compliance with the provisions of Section 2.1.11.

(c)     Anticipated Cost Report.  Borrower shall submit to the Lender an anticipated cost report provided by the General Contractor, which indicates the costs anticipated to complete the construction of the Improvements, after giving effect to costs incurred during the previous month and projected costs; provided, however, that Lender may, in its sole discretion, accept in lieu thereof a completed and signed AIA form G702/703 or equivalent together with copies of all pending Change Orders, if any.

(d)     Construction Milestones. Borrower shall be in compliance with (i) the construction milestones for the Project (the "Construction Milestones") as set forth on Exhibit G attached hereto, which Construction Milestones include the dates by which the various buildings comprising the Project shall be Completed (including, without limitation, issuance of a certificate of occupancy for the entirety of the Project) (individually and/or collectively, as the context may require, the "Completion Date").

(e)     Leasing Milestone.  Upon certificate of occupancy of the first 64 units, Borrower will have leased at least 80% of the first 64 units, which Leases shall be subject to the review and approval of Lender in accordance with Section 5.1.17 hereof (the "Leasing Milestone", and together with the Construction Milestones, individually and/or collectively, as the context may require, a "Milestone").

(f)     Satisfactory Title; Survey Update.  The Security Instrument shall constitute a valid first Lien on the Property for the full amount of the Loan advanced to and including the Borrowing Date, free and clear of all Liens, other than Permitted Encumbrances.  Lender shall have been furnished with a notice of title continuation or an endorsement to the Title Insurance Policy issued to Lender in connection with the Initial Advance of the Loan, which continuation or endorsement shall increase the coverage of the Title Insurance Policy by the amount of the Advance through

4885-5497-3488, v. 2

the pending disbursement clause (but not the overall policy amount which shall be for the full amount of the Loan), amend the effective date of the Title Insurance Policy to the date of such Advance, continue to insure the lien of the Security Instrument subject to no Liens or encumbrances (except Permitted Encumbrances) and which shall state that since the last disbursement of the Loan there have been no changes in the state of title to the Property and that there are no additional survey exceptions not previously approved by Lender.

(g)     No Other Security Interests.  Except as otherwise permitted herein, all materials and fixtures incorporated in the construction of the Improvements shall have been purchased so that their absolute ownership shall have vested in Borrower either prior to or immediately upon delivery to the Property and Borrower shall have produced and furnished, if required by Lender, the contracts, bills of sale or other agreements under which title to such materials and fixtures is claimed.

(h)     Performance; No Default.  Borrower shall have performed and complied with all terms and conditions herein required to be performed or complied with by it at or prior to the date of such Advance, and as of the date of such Advance no Default or Event of Default shall have occurred.  All amounts previously advanced by Lender pursuant to the terms of this Agreement shall have been expended on Costs of the Improvements and Lender shall have received evidence of same satisfactory to Lender and Construction Consultant.

(i)     Representations and Warranties.  The representations and warranties made by Borrower and Guarantor in the Loan Documents or otherwise made by or on behalf of Borrower or Guarantor in connection therewith after the date thereof shall have been true and correct on the date on which made and shall also be true and correct on the date of such Advance.

(j)     No Damage.  The Improvements shall not have been injured or damaged by fire, explosion, accident, flood or other Casualty, unless Lender shall have received insurance proceeds or other monies sufficient in the judgment of Lender to effect the satisfactory restoration of the Improvements and to permit the Completion of the Improvements prior to the Completion Date.

(k)     Subcontracts.  No Advance shall be made by Lenders with regard to work done by or on behalf of any Trade Contractor unless Borrower shall have delivered to Lender originals of the following documents as to such Trade Contractor, each in form and substance satisfactory to Lender:

4885-5497-3488, v. 2

(i)     a fully executed contract acceptable to Lender; and

(ii)     if requested by Lender, a "Will Serve" Letter from each Trade Contractor in form and substance satisfactory to Lender.

(l)     <u>Governmental Approvals and Legal Requirements</u>.  Borrower shall have delivered to Lender evidence satisfactory to Lender and the Construction Consultant that all Governmental Approvals necessary for the construction of the Improvements as contemplated by the Plans and Specifications have been obtained and that Borrower shall have complied with all Legal Requirements promulgated by any Governmental Authority and applicable to the construction of the Improvements and to permit construction to continue to progress to the stage of completion at which work is then proceeding at the Project and to permit the Completion of the Improvements prior to the Completion Date.

(m)     <u>Construction Consultant Approval</u>.  At least five (5) Business Days prior to the proposed Borrowing Date, Lender shall have received advice from the Construction Consultant, satisfactory to Lender, as to Construction Consultant's determination based on on-site inspections of the Improvements and the data submitted to and reviewed by it as part of Borrower's Draw Request of the value of the labor and materials in place, that the construction of the Improvements is proceeding satisfactorily and according to schedule and that the Work on account of which the Advance is sought has been completed in a good and workmanlike manner to such Consultant's satisfaction within cost estimates approved by Lender and substantially in accordance with the Plans and Specifications.

(n)     <u>Other Documents</u>.  Lender shall have received such other documents and certificates as Lender or its counsel may require.

(o)     <u>Lien Waivers</u>.  To the extent not previously delivered, Borrower shall deliver duly executed (1) unconditional lien waivers from all Trade Contractors for all Work performed, and all labor or material supplied for which payment thereof has been made prior to the Borrowing Date and (2) conditional lien waivers from the General Contractor and all Trade Contractors for the Work for which payment thereof has been or will be made in connection with the applicable Advance (which Advance may reimburse Borrower for such payment(s)).

(p)     <u>Draw Request</u>.  Borrower shall submit a Draw Request in accordance with the provisions of this Agreement.

48

(q)    <u>Architect's Certificates</u>.    Borrower shall cause to be delivered to Lender an Architect's Certificate certifying the use of the funds requested under the applicable Advance.

(r)    <u>Evidence of Completion</u>.    Lender shall have received evidence satisfactory to Lender that the Completion of the Improvements can occur prior to the Completion Date.

(s)    <u>Fees</u>.  Borrower shall have paid to Lender all fees and expenses required to be paid by Borrower under this Agreement, including without limitation, those fees specified in Section 2.4 of this Agreement.

(t)    <u>Bonding Requirements</u>.  Unless waived by Lender, Borrower shall have delivered to Lender performance bonds naming Lender as co-obligee and labor and material payment bonds, each in AIA Document No. A-312 (1984 Edition) form or other form approved by Lender, for penal sums equal to the amounts of the general contract between Borrower and General Contractor and such Trade Contractors specified by Lender.

(u)    <u>Funding Cutoff</u>.  Lender shall have absolutely no obligation to make any Advances after the Completion Date.  Borrower shall indemnify Lender, and hold Lender harmless from, any liability or claim of any nature whatsoever that arises from Lender's due right under this Agreement to discontinue Advances following the Completion Date.

(v)    <u>Trade Contract Deposits</u>.  Lender shall not be required to make any Advances to fund any deposit due in connection with any construction contract, nor shall Lender be required to make Advances to reimburse Borrower for any funds previously expended by Borrower to fund any deposit due in connection with any construction contract.

(w)    <u>Trustee</u>. No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed with respect to Borrower or its properties or assets under the Chapter 11 Case.

(x)    <u>[Post-Closing Obligations</u>. Borrower has complied with all of the terms and conditions of [Section 5.1.39] hereunder.][7]

---

[7] If applicable.

49

(3)　　Conditions of Final Construction Advance.

In addition to the conditions set forth in Section 3.1.1 and Section 3.1.2, the Lender's obligation to make the final Advance (the "Final Advance") pursuant to this Agreement shall also be subject to the following conditions precedent:

(a)　　Balancing.　Borrower is in compliance with the provisions of Section 2.1.11.

(b)　　Completion of Improvements.　Lender shall have received evidence satisfactory to Lender of the Final Completion of the Improvements.

(c)　　Approval by Construction Consultant.　Lender shall have received notification from the Construction Consultant that Completion of the Improvements has occurred and that all utilities necessary to service the Property have been connected and are in operation.

(d)　　Final Unconditional Lien Waivers and Release/Payment Receipts.　Borrower shall have furnished to Lender duly executed final unconditional lien waivers and release/payment receipts from the General Contractor and all Trade Contractors who have performed work in connection with the Project, for the work so performed, and/or who have supplied labor and/or materials in connection with the Project, for the labor and/or materials so supplied.

(e)　　Final Survey.　Borrower shall have furnished to Lender a final survey, certified (by a land surveyor registered as such and appropriately licensed in the State) to Lender, and its successors and assigns, and the Title Company, dated within thirty (30) days of the proposed Borrowing Date, which survey shall comply with Lender's survey requirements and shall otherwise be acceptable to Lender and the Title Company and show the as-built location of the completed Improvements (all of which shall be within lot lines of the Property and in compliance with all set-back requirements) and all easements appurtenant thereto.

(f)　　Payment of Costs.　Lender shall have received evidence satisfactory to Lender that all sums due in connection with the construction of the Improvements have been paid in full and that no party claims or has a right to claim any statutory or common law lien arising out of the construction of the Improvements or the supplying of labor, material, and/or services in connection therewith.

50

(g)     <u>Construction Consultant Approval</u>. Lender shall have received advice from the Construction Consultant within five (5) Business Days of the proposed Borrowing Date, satisfactory to Lender, as to Construction Consultant's determination based on on-site inspections of the Improvements and the data submitted to and reviewed by it as part of Borrower's Draw Request of the value of the labor and materials in place, that the construction of the Improvements is proceeding satisfactorily and according to schedule and that the work on account of which the Advance is sought has been completed in a good and workmanlike manner to such Consultant's satisfaction within cost estimates approved by Lender and in accordance with the Plans and Specifications.

(h)     <u>"As-Built" Plans and Specifications</u>. Borrower shall furnish to Lender a full and complete set of "as built" Plans and Specifications certified by Architect.

(i)     <u>Insurance</u>. Lender shall have received an original hazard insurance policy written complying with the terms of the Loan Documents and evidence that the current premium or installment payment due on such policy has been paid and that the policy is in full force and effect.

(j)     <u>Title Policy</u>. Lender shall have received a new title policy, or an endorsement to the Title Policy, insuring that the Deed of Trust is a first (1st) lien encumbering the Project for the amount of the outstanding principal indebtedness of the Note, with a survey reading showing no new encroachments unless (i) such new encroachments shall be permitted by applicable law, and (ii) the applicable title policy shall insure that such new encroachments may remain as long as the Improvements shall stand.

(k)     <u>Other Documents</u>. Lender shall have received such documents, letters, affidavits, reports and assurances, as Lender, Lender's counsel and the Construction Consultant may require, including, without limitation, completed AIA Form G704 (Certificate of Substantial Completion) and completed AIA Form G707 (Consent of Surety to Final Payments), if applicable.

(4)     <u>No Reliance</u>.

All conditions and requirements of this Agreement are for the sole benefit of Lender and its successors and assigns, and no other Person (including, without limitation, the Construction Consultant, General Contractor and Trade Contractors engaged in the construction of the Improvements) shall have the right to rely on the satisfaction of such conditions and requirements

4885-5497-3488, v. 2

by Borrower.  Lender shall have the right, in its sole and absolute discretion, to waive any such condition or requirement.

        (5)    Defects.

Lender shall not be obligated to make any Advance if any inspection report submitted by the Construction Consultant (or any other party having jurisdiction over the Work) reveals any structural or material defects ("Defects") in the Work until such time as Borrower repairs or replaces such Defects to Lender's satisfaction (to the extent Lender deems such Defect reparable). In addition, Lender shall not be obligated to make any Advance if any inspection report submitted by the Construction Consultant (or any other party having jurisdiction over the Work) reveals any Defects which Lender, in Lender's sole and absolute judgment, deems material and irreparable. Alternatively, in addition to any Retainage, Lender may elect to withhold proceeds from any Advance in the amount of one hundred fifty percent (150%) of the cost (as estimated by Lender) to repair or replace Defects to Lender's sole and absolute satisfaction. For the avoidance of doubt, Lender shall not be required to make any future Advances of the Loan, until such time as the defective Work is corrected to the reasonable satisfaction of Lender and the Construction Consultant.

**Section 3.2**    Borrowing Procedures.

(1)    Draw Requests.

Borrower shall submit to Lender and the Construction Consultant a Draw Request complying with the provisions of this Agreement together with the form of Borrower's Requisition attached hereto as Exhibit F not less than fifteen (15) Business Days prior to the date upon which a disbursement of the Loan is requested (the "Borrowing Date").  The Draw Request, which shall constitute irrevocable notice of Borrower's intention to borrow funds, shall be executed by a Responsible Officer.  Each Draw Request shall be accompanied by: (a) payment receipts from the General Contractor and all Trade Contractors evidencing that they have been paid in full for all work performed and/or materials supplied to the date of the preceding advance; (b) at the request of Lender, current requisitions for payment from Trade Contractors and/or any of their subcontractors allocable to the Project; (c) Borrower's reasonable estimate of the amount, value and type of Stored Materials that will be stored onsite and offsite over the following sixty (60) days; and (d) such other information and documents as may be requested or required by Lender or the Construction Consultant with respect to the Costs covered by such Draw Request.  All such

requests and requisitions for payment shall have been approved by the Borrower and, with respect to Costs, recommended for payment by the Construction Consultant.

(2)     Number of Advances per Certain Periods; Minimum Amount of Advance.

Lender shall have no obligation to make Advances of the Loan more often than once in each thirty (30) day period.  No Advance (excluding the Final Advance) shall be for an amount less than $250,000.00 unless otherwise approved by Lender in its sole discretion.  Each Advance shall be made on a percentage completion basis in accordance with the terms and conditions of this Agreement.

(3)     Procedure for Advances.

Upon fulfillment of the applicable conditions in Section 3.1, Lender will make such funds available to Borrower under each Draw Request in accordance with the terms of this Section 3.2 on or before the Borrowing Date thereof.

(4)     Funds Advanced; Borrower's Designated Account to be Segregated.

Each Advance shall be made by Lender by wire transfer to Borrower's Designated Account or as provided in Section 3.2.5.  All proceeds of all Advances shall be used by Borrower only for the purposes for which such Advances were made.  Borrower shall not commingle such funds with other funds of Borrower.

(5)     Direct Advances to Third Parties.

At Lender's option, Lender may make any or all Advances directly or through the Title Company to (a) General Contractor or any Trade Contractor for construction expenses which shall theretofore have been approved by Lender and for which Borrower shall have failed to make payment, (b) Architect to pay its fees to the extent funds are allocated thereto in the Project Cost Budget, (c) the Construction Consultant to pay its fees and disbursements, (d) Lender's counsel to pay its fees and disbursements, (e) Lender to pay (i) any installment of interest due under the Note, (ii) any expenses incurred by Lender which are reimbursable by Borrower under the Loan Documents (including, without limiting the generality of the foregoing, attorneys' fees and expenses and other fees and expenses incurred by Lender), or (iii) following an Event of Default, any other sums due to Lender under the Note, this Agreement or any of the other Loan Documents,

53

all to the extent that the same are not paid by the respective due dates thereof, and in each case subject to the approval of Lender, and (f) any other Person to whom Lender in good faith on the basis of invoices or other documents determines payment is due and any portion of the Loan so disbursed by Lender shall be deemed disbursed as of the date on which the Person to whom payment is made receives the same.  The execution of this Agreement by Borrower shall, and hereby does, constitute an irrevocable authorization to Advance the proceeds of the Loan directly or through the Title Company to such Persons in accordance with this Section 3.2.5 as amounts become due and payable to them hereunder and any portion of the Loan so disbursed by Lender shall be deemed disbursed as of the date on which the Advance is made by Lender.  No further authorization from Borrower shall be necessary to warrant such direct Advances to such relevant Person, and all such Advances shall satisfy *pro tanto* the obligations of Lender hereunder and shall be secured by the Security Instrument and/or the other Loan Documents as fully as if made directly to Borrower.

> (6)　　Advances after Completion Date.

Notwithstanding anything contained herein to the contrary, Lender shall have no obligation to make any Advance after the Completion Date. Borrower shall indemnify Lender and hold Lender harmless from any liability or claim of any nature whatsoever that arises from Lender's right under this Agreement to discontinue Advances following the Completion Date.

> (7)　　Advances Do Not Constitute a Waiver.

No Advance shall constitute a waiver of any of the conditions of Lender's obligation to make further Advances nor, in the event Borrower is unable to satisfy any such condition, shall any Advance have the effect of precluding Lender from thereafter declaring such inability to be an Event of Default hereunder.

## ARTICLE IV.  REPRESENTATIONS AND WARRANTIES

**Section 4.1**　　Borrower Representations and Warranties.

Borrower represents and warrants that:

(1)    <u>Organization</u>.

Borrower is duly organized, validly existing, and in good standing in the jurisdiction in which it is organized, with requisite power and authority to own the Property and to transact the businesses in which it is now engaged. Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with the Property, its businesses and operations. Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own the Property and to transact the businesses in which it is now engaged and possesses (or will obtain in accordance with applicable law) all rights, licenses, permits and authorizations necessary to construct the Improvements.  The organizational chart attached as <u>Schedule II</u> hereto is true, complete and correct on and as of the Closing Date.

(2)    <u>Proceedings</u>.

Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(3)    <u>No Conflicts</u>.

The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Borrower, the Property or any of Borrower's other assets, or any license or other approval required to own, manage or operate the Property, and any consent, approval,

4885-5497-3488, v. 2

authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents have been obtained and is in full force and effect except that with respect to the construction of the Improvements such consents, approvals, authorizations, orders, registrations and qualifications have been obtained to the extent necessary prior to the Closing Date.

(4)      Litigation.

Except for the Chapter 11 Case, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to the best of Borrower's knowledge, threatened against or affecting Borrower, any other Restricted Party, or any Affiliate thereof, or the Property, which actions, suits or proceedings, if determined against Borrower, any other Restricted Party, or any of their Affiliates or the Property, might materially adversely affect the condition (financial or otherwise) or business of Borrower or the condition or ownership of the Property or which involve the validity or enforceability of the Security Instrument or the priority of the Lien thereof, at law or in equity, or before or by any Governmental Authority and Borrower is not in default with respect to any order, ruling or decree of any court, arbitration body, or other Governmental Authority.

(5)      Agreements.

Borrower is not a party to any agreement or instrument or subject to any restriction which might materially and adversely affect Borrower or the Property, or Borrower's business, properties or assets, operations or condition, financial or otherwise. Borrower is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property is bound. Borrower has no financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation and construction of the Property, as applicable and (b) obligations under the Loan Documents.  Borrower is not in breach of, in default under, or in violation of any agreement or instrument to which the Property securing the Loan are subject, or of any Legal Requirement applicable to the Property.

(6)     <u>Solvency</u>.

Subject to the DIP Order, Borrower (a) has not entered into the transaction or executed the Note, this Agreement or any other Loan Documents with the intent to hinder, delay or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Subject to the DIP Order, after giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. Borrower does not intend to incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

(7)     <u>Full and Accurate Disclosure</u>.

No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents (including, without limitation, all information contained in the Case's docket) contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact presently known to Borrower which has not been disclosed to Lender which materially and adversely affects, or might materially and adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower or Guarantor.

(8)     <u>No Plan Assets</u>.

Borrower is not a Plan and none of the assets of Borrower constitute or will constitute, by virtue of the application of 29 C.F.R. §2510.3-101(f) as modified by Section 3(42) of ERISA, "Plan Assets" of one or more Plans. In addition, (a) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with Borrower are not subject to State statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

4885-5497-3488, v. 2

(9)    <u>Compliance</u>.

Borrower and the Property and the use thereof comply with all Applicable Laws and applicable Legal Requirements. Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

(10)   <u>Financial Information</u>.

All financial data, including, without limitation, the statements of cash flow and income and operating expense that have been delivered to Lender in respect of Borrower and the Property (i) are true, complete and correct, (ii) accurately represent the financial condition of Borrower and the Property, as applicable, as of the date of such reports, and (iii) have been prepared in accordance with the Acceptable Accounting Basis throughout the periods covered. Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and might have a material adverse effect on the Property or the operation thereof, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no material adverse change in the financial condition, operations or business of Borrower from that set forth in said financial statements.

(11)   <u>Condemnation</u>.

No Condemnation or other similar proceeding has been commenced or, to the best of Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

(12)   <u>Federal Reserve Regulations</u>.

No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or

58

any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

(13)     <u>Utilities and Public Access</u>.

The Property has rights of access to public ways and is served by public water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended use. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy. All roads necessary for the use of the Property for its current purpose have been completed, are physically open and are dedicated to public use and have been accepted by all Governmental Authorities.

(14)     <u>Not a Foreign Person</u>.

Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

(15)     <u>Separate Tax Lot and Zoning Lot</u>.

The Property constitutes a distinct parcel or parcels for purposes of zoning and of taxes, assessments and impositions (public or private) and is not otherwise considered as part of a larger single lot which includes property other than the Property for purposes of zoning or of taxes, assessments or impositions (public or private).

(16)     <u>Assessments</u>.

There are no pending or, to the best of Borrower's knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor to the best of Borrower's knowledge are there any contemplated improvements to the Property that may result in such special or other assessments.

4885-5497-3488, v. 2

(17)    <u>Enforceability</u>.

The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, including the defense of usury, and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

(18)    <u>No Prior Assignment</u>.

There are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding.

(19)    <u>Insurance</u>.

Borrower has obtained and has delivered to Lender certified copies of all insurance policies and ACORD certificates with respect thereto reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any such policy.

(20)    <u>Use of Property</u>.

Upon Completion of the Improvements, the Property shall be used exclusively as residential rental apartments.

(21)    <u>Certificate of Occupancy; Licenses</u>.

Upon Completion, all certifications, permits, licenses and approvals, including without limitation, certificates of completion and occupancy permits (whether temporary or final) required for the legal use, occupancy and operation of the Property by Borrower in accordance with the Improvements (collectively, the "<u>Licenses</u>"), shall have been obtained.

(22)    <u>Flood Zone</u>.

None of the Improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards and, if so located, the flood insurance required pursuant to Section 6.1(a) is in full force and effect.

4885-5497-3488, v. 2

(23)     <u>Physical Condition</u>.

The Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are, or will be upon Completion, in good condition, order and repair; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company, or from any Governmental Authority, of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond. The Property is free from damage caused by fire or other Casualty. All liquid and solid waste disposal, septic and sewer systems located on the Property are or upon Completion will be in a good and safe condition and repair and in compliance with all Legal Requirements.

(24)     <u>Boundaries</u>.

Upon Completion, all of the Improvements shall lie wholly within the boundaries and building restriction lines of the Property, no improvements on adjoining properties shall encroach upon the Property, and no easements or other encumbrances upon the Property shall encroach upon the Improvements.

(25)     <u>Leases</u>.

The Property is not subject to any Leases.  No Person has any possessory interest in the Property or right to occupy the same. Attached hereto and made a part hereof as <u>Exhibit E</u> is a current Rent Roll (which may be marked "None") covering the tenancies at the Property, which is true, complete and accurate as of the date hereof.

(26)     <u>Survey</u>.

The Survey for the Property delivered to Lender in connection with this Agreement does not fail to reflect any matter affecting the Property or the title thereto.

61

(27)     <u>No Other Debt</u>.

Borrower has not borrowed or received debt financing that has not been heretofore repaid in full.

(28)     <u>Filing and Recording Taxes</u>.

All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid or will be paid at or prior to the filing or recordation of the Security Instrument or any other Loan Document.  All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid or will be paid at or prior to the filing or recordation of the Security Instrument or any other Loan Document.

(29)     <u>Title</u>.

Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property and Collateral, free and clear of all Liens whatsoever except the Permitted Encumbrances. The Security Instrument, when properly recorded in the appropriate records, together with any UCC financing statements contemplated to be filed in connection therewith, will create (i) valid, first priority perfected Lien on Borrower's interest in the Property, subject only to Permitted Encumbrances, and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to the Permitted Encumbrances. There are no mechanics', materialmen's or other similar Liens or claims which have been filed for work, labor or materials affecting the Property which are or may be Liens prior to, or equal or coordinate with, the lien of the Security Instrument. None of the Permitted Encumbrances, individually or in the aggregate, (a) interfere with the benefits of the security intended to be provided by the Security Instrument and this Agreement, (b) adversely affect the value of the Property, (c) impair the use or operations of the Property or the Work contemplated to be performed thereon, or (d) impair Borrower's ability to pay its Obligations in a timely manner.

(30)     <u>Management Agreement</u>.[8]

As of the Closing Date, the Property is not subject to any Management Agreement. Borrower will not enter into a management agreement regarding the management of the Property without the prior written consent of Lender, and thereafter Borrower and any agent retained by Borrower, upon entering into a management agreement, shall execute an Assignment and Subordination of Management Agreement substantially in the form attached hereto as <u>Exhibit C</u>.

(31)     <u>Illegal Activity</u>.

No portion of the Property has been or will be purchased with proceeds of any illegal activity and there are no illegal activities or activities relating to any controlled substances at the Property.

(32)     <u>No Change in Facts or Circumstances: Disclosure</u>.

All information submitted by Borrower to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document (the "<u>Provided Information</u>") are accurate, complete and correct in all material respects. There has been no material adverse change in any condition, fact, circumstance or event that would make any such Provided Information inaccurate, incomplete or otherwise misleading in any respect or that otherwise adversely affects or might reasonably be likely to adversely affect the use, operation or value of the Property or the business operations or the financial condition of Borrower. Borrower has disclosed to Lender all facts and has not failed to disclose any fact that could cause any Provided Information or information described in this Section 4.1.32 or any representation or warranty made herein to be misleading.

(33)     <u>Investment Company Act</u>.

Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended, (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either

---

[8] Borrower to confirm there is no Management Agreement in place. If there is, this provision will be modified to reflect same.

4885-5497-3488, v. 2

a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended, or (c) subject to any other federal or State law or regulation which purports to restrict or regulate its ability to borrow money.

(34)     Principal Place of Business; State of Organization; Foreign Qualification.

Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement. Borrower is an organization of the type specified in the first paragraph of this Agreement. Borrower is incorporated or organized under the laws of the State specified in the first paragraph of this Agreement. If Borrower is not incorporated or organized in the State in which the Property is located, and if required by Applicable Law, Borrower is appropriately registered and qualified to do business in the State in which the Property is located. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change).

(35)     Single Purpose Entity.

Borrower covenants and agrees that its Organizational Documents shall provide that it has not, and shall not:

(a)     engage in any business or activity other than the acquisition, development, ownership, operation, leasing, managing and maintenance of the Property, and entering into the Loan, and activities incidental thereto;

(b)     acquire or own any assets other than (i) the Property, and (ii) such incidental personal property as may be necessary for the operation of the Property;

(c)     merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure (including, without limitation, a Division or a conversion to a series limited liability company or a Delaware Statutory Trust);

64

(d)　　　(i) fail to observe its organizational formalities or preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, and qualification to do business in the State where the Property is located, if applicable, or (ii) without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of Borrower's Organizational Documents, as the case may be;

(e)　　　own any subsidiary or make any investment in any Person without the prior written consent of Lender;

(f)　　　commingle its assets with the assets of any of its members, general partners, Affiliates, principals or of any other Person, participate in a cash management system with any other Person or fail to use its own separate stationery, telephone number, invoices or checks;

(g)　　　incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt, except for trade payables in the ordinary course of its business of owning, developing and operating the Property, provided that such debt (i) is not evidenced by a note, (ii) is paid within sixty (60) days of the date incurred, (iii) does not exceed, in the aggregate, one percent (1%) of the outstanding Principal, (iv) is payable to trade creditors and in amounts as are normal and reasonable under the circumstances, and (v) is not secured by the Property, the Improvements or any interest in Borrower;

(h)　　　fail to remain solvent or fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;

(i)　　　fail to maintain its records (including financial statements), books of account and bank accounts separate and apart from those of the members, general partners, principals and Affiliates of Borrower, as the case may be, the Affiliates of a member, general partner or principal of Borrower, as the case may be, and any other Person, (ii) permit its assets or liabilities to be listed as assets or liabilities on the financial statement of any other Person, or (iii) include the assets or liabilities of any other Person on its financial statements;

(j)　　　enter into any contract or agreement with any member, general partner, principal or Affiliate of Borrower, Guarantor or any member, general partner, principal or Affiliate thereof, except upon terms and conditions that are commercially reasonable, intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties

4885-5497-3488, v. 2

other than any member, general partner, principal or Affiliate of Borrower, Guarantor, or any member, general partner, principal or Affiliate thereof;

(k)        seek the dissolution or winding up in whole, or in part, of Borrower;

(l)        fail to correct any known misunderstandings regarding the separate identity of Borrower or any member, general partner, principal or Affiliate thereof or any other Person;

(m)        guarantee or become obligated for the debts of any other Person or hold itself out to be responsible for the debts of another Person;

(n)        make any loans or advances to any third party, including any member, general partner, principal or Affiliate of Borrower or any member, general partner, principal or Affiliate thereof, and shall not acquire obligations or securities of any member, general partner, principal or Affiliate of Borrower, as the case may be, or any member, general partner, or Affiliate thereof;

(o)        fail to file its own tax returns or be included on the tax returns of any other Person except as required by Applicable Law;

(p)        fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or a name franchised or licensed to it by an entity other than an Affiliate of Borrower and not as a division or part of any other entity in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any member, general partner, principal or Affiliate of Borrower or any member, general partner, principal or Affiliate thereof);

(q)        fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(r)        share any common logo with or hold itself out as or be considered as a department or division of (i) any general partner, principal, member or Affiliate of Borrower, (ii) any Affiliate of a general partner, principal or member of Borrower, or (iii) any other Person;

66

4885-5497-3488, v. 2

(s)     fail to allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate;

(t)     pledge its assets for the benefit of any other Person;

(u)     fail to maintain a sufficient number of employees in light of its contemplated business operations;

(v)     fail to hold its assets in its own name;

(w)     if Borrower is a corporation, fail to consider the interests of its creditors in connection with all corporate actions to the extent permitted or required by Applicable Law;

(x)     have any of its obligations guaranteed by an Affiliate or a Restricted Party except Guarantor in connection with the Loan; or

(y)     fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person.

(36)     <u>Business Purposes</u>.

The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

(37)     <u>Taxes</u>.

Borrower has filed all federal, State, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it. Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

(38)    <u>Forfeiture</u>.

Neither Borrower nor any other Person in occupancy of or involved with the operation or use of the Property has committed any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under the Note, this Agreement or the other Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

(39)    <u>Single Asset Real Estate</u>. Borrower hereby represents and warrants that the Property constitutes "single asset real estate" as defined in, and pursuant to, Section 101(51B) of the United States Bankruptcy Code.

(40)    <u>Taxpayer Identification Number</u>.

Borrower's United States taxpayer identification number is [88-0623682].

(41)    <u>OFAC</u>.

Borrower represents and warrants that neither Borrower, Pledgor, nor Guarantor, nor any of their respective Affiliates, is a Prohibited Person, and Borrower, Pledgor, Guarantor, and their respective Affiliates are in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury ("<u>OFAC</u>"). Borrower further represents and warrants that neither Borrower nor any other Person that owns 20% or more of Borrower or otherwise controls Borrower is operating, organized, or resident in a country or territory that is the target of comprehensive sanctions administered and enforced by OFAC.

Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act (as defined below) and all applicable requirements of governmental authorities having jurisdiction of the Borrower and the Property, including those relating to money laundering and terrorism. The Lender shall have the right to audit the Borrower's compliance with the Patriot Act and all applicable requirements of governmental authorities having jurisdiction of the Borrower and the Property, including those relating to money laundering and terrorism. In the event that the Borrower fails to comply with the Patriot Act or any such requirements of governmental authorities, then the Lender may, at its option, cause the Borrower to comply therewith and any

4885-5497-3488, v. 2

and all reasonable costs and expenses incurred by the Lender in connection therewith shall be secured by the Security Instrument and the other Loan Documents and shall be immediately due and payable.

Borrower represents and warrants that neither the Borrower, Pledgor, nor Guarantor, nor any of their respective Affiliates (a) is listed on any Government Lists (as defined below), (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (d) is not currently under investigation by any governmental authority for alleged criminal activity.

Borrower will promptly notify Lender in writing if any of the representations in this Section 4.1.41 ceases to be true.

(42)   <u>Consents</u>.

No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, this Agreement or the other Loan Documents or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower or, in connection with the construction of the Improvements, will be obtained by Borrower prior to the Initial Advance.

(43)   <u>Purchase Options</u>.

Neither the Property nor any part thereof is subject to any purchase options or other similar rights in favor of third parties.

(44)   <u>Embargoed Person</u>.

As of the Closing Date and at all times throughout the Term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower or Guarantor or any other Restricted Party constitute property of, or are

69

beneficially owned, directly or indirectly, by any Person subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by Applicable Law or the Loan made by Lender is in violation of Applicable Law ("Embargoed Person"), (b) no Embargoed Person has any interest of any nature whatsoever in Borrower or Guarantor or any other Restricted Party, as applicable, with the result that the investment in Borrower or Guarantor or such other Restricted Party, as applicable (whether directly or indirectly), is prohibited by Applicable Law or the Loan is in violation of Applicable Law, and (c) none of the funds of Borrower or Guarantor or any other Restricted Party, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower or Guarantor or any other Restricted Party, as applicable (whether directly or indirectly), is prohibited by Applicable Law or the Loan is in violation of Applicable Law.

(45)    General Contractor's Agreement.

On the Closing Date and on the date of the Initial Advance: (a) the General Contractor's Agreement is and will be in full force and effect; (b) Borrower and General Contractor will be in compliance with their respective obligations under the General Contractor's Agreement in all respects; (c) the Work to be performed by General Contractor under the General Contractor's Agreement is the work called for by the Plans and Specifications; and (d) all work on the Improvements shall be completed substantially in accordance with the Plans and Specifications in a good and workmanlike manner and shall be free of any Defects.  Borrower shall from time to time, upon request by Lender, cause General Contractor to provide Lender with reports in regard to the status of construction of the Improvements, in such form and detail as requested by Lender.

(46)    Architect's Agreement.

On the Closing Date and on the date of the Initial Advance, (a) the Architect's Agreement is and will be in full force and effect; (b) both Borrower and Architect will be in compliance in all respects with their respective obligations under the Architect's Agreement; (c) the services to be performed by the Architect under the Architect's Agreement is the architectural services required to design the Improvements to be built in accordance with the Plans and Specifications and all architectural services required to complete the Improvements substantially in accordance with the Plans and Specifications will be provided for under the Architect's Agreement; (d) each Other

70

Design Professionals Agreement, if any, will be in full force and effect; (e) both Borrower and the Other Design Professionals thereunder will be in compliance in all respects with their respective obligations under such Other Design Professionals Agreements, if any; (f) the work to be performed by the Other Design Professionals under the Other Design Professionals Agreements, if any, is the design services other than architectural services required to design the Improvements to be built substantially in accordance with the Plans and Specifications and all design services (excluding architectural services) required to complete the Improvements in accordance with the Plans and Specifications as provided for under the Other Design Professionals Agreements, if any; and (g) all work on the Improvements shall be completed substantially in accordance with the Plans and Specifications in a good and workmanlike manner and shall be free of any Defects. Borrower shall from time to time, upon request by Lender, cause Architect to provide Lender with reports in regard to the status of construction of the Improvements, in such form and detail as reasonably requested by Lender.

(47)    Plans and Specifications.

Borrower has furnished Lender true and complete sets of the Plans and Specifications which comply with all applicable Legal Requirements, all Governmental Approvals, and all restrictions, covenants and easements affecting the Property, and which have been approved by Lender, General Contractor, Guarantor, Architect, and each such Governmental Authority as is required for construction of the Improvements.

(48)    Governmental Approvals and Permits.

Borrower has obtained and delivered to Lender copies of all Governmental Approvals and all other approvals, if any, necessary for the Completion of the Improvements, as contemplated by the Plans and Specifications.

(49)    Data Privacy.

Borrower is in compliance in all respects with all data privacy and security laws to which it is subject. To the extent Borrower is governed by the General Data Protection Regulation (EU) 2016/679 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data (the "GDPR"), it is in compliance in all respects with the obligations and requirements set forth within such regulation or other Applicable Laws.

(50)     <u>Project Cost Budget</u>.

The Project Cost Budget accurately reflects all Project Costs.  Upon the making of the Advances requested in Borrower's Draw Request in the manner set forth therein, all materials and labor theretofore supplied or performed in connection with such respective Advance will have been paid for in full or will be paid in full out of such Advance.

(51)     <u>Feasibility</u>.

Each of the Construction Schedule and the Disbursement Schedule will be accurate on the date of the Initial Advance.  The preliminary Construction Schedule and Disbursement Schedule submitted by Borrower in connection with the execution of this Agreement is accurate as of the Closing Date.

(52)     <u>Lien Waivers</u>.

To the extent permitted by law, every contract or agreement providing for services, goods or materials entered into between Borrower and a third party in connection with the construction of the Improvements contains a provision waiving and releasing any and all liens or rights of liens which may arise in any manner on the Property or any part thereof, and a provision which subordinates any liens or any rights of lien of such third party to the lien of the Security Instrument and the rights of Lender under the Security Instrument.

(53)     <u>Work Performed.</u>

As of the date hereof, there are no outstanding unpaid bills to materialmen or laborers for work done on the Property or materials supplied for any such work.  No notice of any mechanic's or materialman's liens or of any claim or right to any such liens has been received by the Borrower regarding the Property.

(54)     <u>Brokers and Financial Advisors.</u>

Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement, except (a) as previously disclosed to Lender in writing, (b) to whom Borrower or its Affiliate is fully responsible for payment pursuant to a separate written agreement, and (c)

72

4885-5497-3488, v. 2

those that are properly licensed in the State of California as required pursuant to Applicable Law. Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's reasonable attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated herein. The provisions of this Section 4.1.54 shall survive the expiration and termination of this Agreement and the payment of the Debt.

(55)　　<u>DIP Orders</u>.　The DIP Order is in full force and effect and has not been vacated, reversed, terminated, stayed, modified or amended in any manner without the written consent of Lender.　Upon the occurrence of the Maturity Date (whether by acceleration or otherwise), Lender shall, subject to the applicable provisions of the DIP Order, be entitled to immediate payment of the Obligations, and to enforcement of the remedies provided for under the Loan Documents in accordance with the terms thereof and such DIP Order, as applicable, without further application to or order by the Bankruptcy Court.　No order has been entered in Borrower's Chapter 11 Case (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of a responsible officer or examiner (other than a fee examiner) having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code or (c) to convert Borrower's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or to dismiss Borrower's Chapter 11 Case.

**Section 4.2**　　<u>Survival of Representations</u>.

Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender by Borrower under this Agreement or any of the other Loan Documents. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

4885-5497-3488, v. 2

## ARTICLE V.  **BORROWER COVENANTS**

**Section 5.1**    Affirmative Covenants.

From the Closing Date and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the lien of the Security Instrument encumbering the Property (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

(1)    Existence; Compliance with Legal Requirements.

(a)    Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises, and comply, in all respects, with all Applicable Laws and the Legal Requirements applicable to the Property. There shall never be committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower shall at all times maintain, preserve and protect all franchises and trade names and preserve all of the remainder of its property used or useful in the conduct of its business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Security Instrument. Borrower shall keep the Property insured at all times by financially sound and reputable insurers consistent with the requirements as stated in this Agreement, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.

(b)    Borrower agrees that the Property shall at all times comply with the requirements of the Access Laws, to the extent such Access Laws are applicable to the Property.  Borrower shall not alter the Property in any manner which would increase Borrower's responsibilities for compliance with the applicable Access Laws without the prior written approval of Lender. The foregoing shall apply to tenant improvements constructed by Borrower or any tenants. Lender may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Lender. Borrower agrees to give prompt notice

to Lender of the receipt by Borrower of any written complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

       (2)     <u>Taxes and Other Charges</u>.

Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable. Borrower shall furnish to Lender receipts or other evidence for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property.

       (3)     <u>Litigation</u>.

Borrower shall give prompt written notice to Lender of any litigation or proceedings (including by a Governmental Authority) pending or threatened against Borrower, Pledgor or Guarantor.

       (4)     <u>Access to the Property</u>.

Borrower shall permit, upon prior notice (except in the event of an emergency, in which case no notice is necessary), during business hours, Lender and the Construction Consultant and their respective representatives to enter upon the Property, inspect the Project and all materials to be used in connection with the Work and to examine the Plans and Specifications (which are to be kept at the construction site) and shall cooperate, and cause the General Contractor to cooperate, with the Construction Consultant to enable the Construction Consultant to perform the Construction Consultant's functions hereunder.

       (5)     <u>Notice of Default</u>.

Borrower shall promptly advise Lender of any material adverse change in Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default.

4885-5497-3488, v. 2

(6)    <u>Cooperate in Legal Proceedings</u>.

Borrower shall cooperate fully with Lender with respect to any proceedings before any Governmental Authority which may in any way adversely affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

(7)    <u>Award and Insurance Proceeds</u>.

Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Award or Insurance Proceeds.

(8)    <u>Further Assurances</u>.

Borrower shall, at Borrower's sole cost and expense:

(a)    furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or requested by Lender in connection therewith;

(b)    execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the Collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may require including, without limitation, the authorization of Lender to file UCC financing statements; and

(c)    do and execute all and such further lawful acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall require from time to time, expressly including, without

4885-5497-3488, v. 2

limitation, all steps necessary or desirable to maintain the priority, validity and enforceability of the DIP Claims and the DIP Liens on the Collateral.

(9)      <u>Deed of Trust and Intangible Taxes</u>.

Borrower shall pay all State, county and municipal recording, mortgage, intangible, and all other taxes imposed upon the execution and recordation of the Security Instrument and/or upon the execution and delivery of the Loan Note.

(10)      <u>Financial Reporting</u>.

(a)      Borrower shall keep and maintain or shall cause to be kept and maintained in accordance with the Acceptable Accounting Basis, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation on an individual basis of the Property. Lender shall have the right from time to time during normal business hours upon reasonable notice (which may be given orally) to Borrower to examine such books and records at the office of Borrower or other Person maintaining such books and records and to make such copies or extracts thereof as Lender shall desire. Borrower shall pay any costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)      Borrower shall furnish Lender annually, within ninety (90) days following the end of each Fiscal Year, a complete copy of Borrower's audited annual financial statements prepared and reviewed by an independent certified public accountant acceptable to Lender prepared in accordance with the Acceptable Accounting Basis covering the Property, including statements of income and expense and cash flow for Borrower and the Property and a balance sheet for Borrower and a copy of all of Borrower's most recent State and Federal income tax returns. Borrower's annual financial statements shall be accompanied by (i) a current rent roll for the Property and (ii) an Officer's Certificate of Borrower certifying (A) that such annual financial statement is true, correct, accurate and complete in all material respects and fairly presents the financial condition and the results of operations of Borrower and the Property and (B) whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(c)     Borrower shall furnish Lender on or before the thirtieth (30th) day after the end of each calendar quarter throughout the Term, the following items, accompanied by an Officer's Certificate of Borrower certifying (i) that such items attached to such certificate are true, correct, accurate and complete and fairly present the financial condition and results of the operations of Borrower and the Property, and (ii) whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same:

> (i)     quarterly and year-to-date statements of income and expense and cash flow for such quarter with respect to the Property, with a balance sheet for such quarter for Borrower, prepared in accordance with the Acceptable Accounting Basis;

> (ii)     a comparison of the budgeted income and expenses as set forth in the Approved Annual Budget and the actual income and expenses for such quarter and year to date for the Property, together with a detailed explanation of any variances of more than five percent (5%) between budgeted and actual amounts for such quarter and year to date; and

> (iii)     a current rent roll for the Property.

(d)     Borrower shall furnish Lender on or before the thirtieth (30th) day after the end of each calendar month the following items, accompanied by an Officer's Certificate of Borrower certifying (i) that such items attached to such certificate are true, correct, accurate and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property and (ii) whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same:

> (i)     monthly and year-to-date statements of income and expense and cash flow for such month with respect to the Property, with a balance sheet for such month for Borrower, prepared in accordance with the Acceptable Accounting Basis;

> (ii)     a current rent roll for the Property; and

(iii)    a monthly progress report with respect to the construction/ renovation work being done at the Property (if applicable).

In addition, no later than the first Tuesday of each month, Borrower shall provide Lender (each in Approved Form):

(i)    A variance report (certified by an appropriate officer of Borrower) comparing, on a line-item basis, actual cash receipts and disbursements to those contained in the Approved Annual Budget, for both the preceding month and cumulatively from the date hereof, together with detailed explanations of all variances (if any) (it being understood and agreed that in no event shall actual cash receipts vary downward, or cash disbursements vary upward, from the Approved Annual Budget (on a line-item, monthly, or cumulative basis) by more than 7.5% (the "Permitted Variances"); and

(ii)    A rolling 13-week cashflow forecast for Borrower.

Notwithstanding the foregoing, the items required to be delivered under Sections 5.1.10(d)(i) – (iii) above with respect to the months of March, June, September and December may be delivered concurrently with the other financial information delivered pursuant to Section 5.1.10(c) for the applicable calendar quarter.

(e)    Borrower will cause Guarantor to furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year, (i) a complete copy of Guarantor's audited annual financial statements prepared in accordance with the Acceptable Accounting Basis containing statements of profit and loss for Guarantor, (ii) a balance sheet for Guarantor, and (iii) a copy of all of Guarantor's most recent State and federal income tax returns (to be provided within 30 days after filing). Guarantor's annual financial statements shall be accompanied by a certificate executed by a Responsible Officer of Guarantor (or Guarantor, if an individual) stating that each such annual financial statement presents fairly the financial condition and the results of operations of Guarantor in all respects and has been prepared in accordance with the Acceptable Accounting Basis.  Upon request of Lender, Borrower shall furnish Lender with evidence that Guarantor continues to satisfy the net worth and liquidity requirements set forth in the Guaranty.

(f)    Borrower shall submit to Lender an Annual Budget for the Property not later than thirty (30) days prior to the commencement of such period or Fiscal Year in form satisfactory to Lender, and shall be subject to Lender's written approval (each such Annual Budget after it has

79

been approved in writing by Lender shall be hereinafter referred to as an "Approved Annual Budget"). Subject to Permitted Variances, in the event that Lender objects to a proposed Annual Budget submitted by Borrower, Lender shall advise Borrower of such objections within twenty (20) Business Days after receipt thereof and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) Business Days after receipt thereof and Borrower shall promptly revise the same in accordance with the process described in this subsection (e) until Lender approves the Annual Budget. Until such time that Lender approves a proposed Annual Budget, the most recently Approved Annual Budget shall apply; provided that such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and utilities expenses.

(g) Borrower shall provide written notice to Lender upon receipt of notice from its independent manager or independent director that such independent manager or independent director intends to resign or terminate its obligations as an independent manager or independent director, respectively. Lender shall be entitled to make a protective advance under the Loan to ensure that Borrower at all times has an independent manager or independent director as required by the Loan Documents.

(h) Bankruptcy Matters. (x) As soon as practicable in advance, and in any event no less than three (3) calendar days in advance of filing, Borrower shall deliver to Lender (1) prior written notice of any assumption or rejection of Borrower's material contracts pursuant to Section 365 of the Bankruptcy Code; and (2) copies of Borrower's material pleadings, affecting the Loan in the Chapter 11 Case which shall be reasonably satisfactory to Lender, provided, Borrower shall not be required to provide material pleadings relating to the Loan if doing so would violate any applicable legal rule or such material pleadings contain privileged information and (y) substantially contemporaneously with the filing or distribution thereof, copies of all financial information and non-privileged information distributed by or on behalf of Borrower to the Creditors' Committee.

(i) Borrower shall furnish to Lender, within ten (10) days after request such further detailed information with respect to the operation of the Property and the financial affairs of Borrower and/or Guarantor, as may be requested by Lender.

(j) Borrower agrees that Lender may forward to each purchaser, transferee, assignee, trustee, servicer (including master, special, and sub-servicers), participant or investor in all or any portion of the Loan (collectively, the "Investor") and any Rating Agency or organization maintaining databases on the underwriting and performance of commercial mortgage loans, all

80

documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor and the Property, whether furnished by Borrower, any Guarantor or otherwise, as Lender determines necessary or desirable. Borrower irrevocably waives any and all rights (i) it may have under any Applicable Laws to prohibit such disclosure, including, but not limited, to any right of privacy, and (ii) any ownership rights to such data, or any intellectual property developed in whole or in part based upon such data, including when used for analytics purposes, whether or not on an aggregated or anonymized basis.

(11)    Business and Operations.

Borrower will continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property. Borrower will remain in good standing under the laws of each jurisdiction to the extent required for the ownership, maintenance, management and operation of the Property.

(12)    Costs of Enforcement.

In the event (a) that Lender exercises any of its rights or remedies under the Security Instrument or any other Loan Document as and when permitted thereby, (b) that the Security Instrument encumbering the Property is foreclosed in whole or in part or that the Security Instrument and/or the Note and/or any of the other Loan Documents is put into the hands of an attorney for collection, suit, action or foreclosure, (c) of the foreclosure of any mortgage prior to or subsequent to the Security Instrument encumbering the Property in which proceeding Lender is made a party, or (d) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, Borrower, its successors or assigns, shall be chargeable with and agrees to pay all costs of collection and defense, including reasonable attorneys' fees and costs, actually incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes, all at the Default Rate as is set forth in Section 2.2.5.

(13)    Estoppel Statement.

(a)      After request by Lender, Borrower shall within ten (10) Business Days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid Principal, (iii) the Note Rate, (iv) the date

4885-5497-3488, v. 2

installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification, and (vii) that there is no Default or Event of Default by any Person under the Loan Documents or any other contracts or agreements to which Borrower or any Guarantor is a party or by which their respective assets are bound (or, if there is such a Default or Event of Default, identifying the Person responsible for such Default or Event of Default and a description of the nature of such Default or Event of Default).

(b)       After request by Lender, Borrower shall within ten (10) Business Days furnish Lender with tenant estoppel certificates from each commercial tenant, if any, leasing space at the Property in form and substance satisfactory to Lender.

(14)    Loan Proceeds.

Borrower shall use the proceeds of the Loan received by it only for the purposes set forth herein.

(15)    Performance by Borrower.

Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

(16)    Title to the Property.

Borrower will warrant and defend the validity and priority of the Lien of the Security Instrument and the Assignment of Leases on the Property against the claims of all Persons whomsoever, subject only to the Permitted Encumbrances.

(17)    Leasing Matters.

(a)       All Leases and proposed Leases (including the renewal or extension of an existing Lease (a "Renewal Lease")) shall be subject to the prior written approval of Lender, in Lender's

4885-5497-3488, v. 2

sole discretion.  Borrower shall furnish Lender with executed copies of all Leases. In addition, no modifications and/or terminations of any Leases may be made without the prior written consent of Lender.

(b)　　Borrower: (i) shall observe and perform all of the obligations imposed upon the lessor under the Leases, if any, and shall not do or permit to be done anything to impair the value of any of the Leases, if any, as security for the Debt; (ii) shall promptly send copies to Lender of all notices of default or other matters which Borrower shall send or receive with respect to the Leases; (iii) shall enforce all of the terms, covenants and conditions contained in the Leases, if any, upon the part of the tenant thereunder to be observed or performed; (iv) shall not collect any of the Rents more than one (1) month in advance; (v) shall not execute any other assignment of the lessor's interest in any of the Leases, if any, or the Rents; and (vi) shall not consent to any assignment of or subletting under any Leases, if any, not in accordance with their terms, without the prior written consent of Lender.

(c)　　Upon request, Borrower shall promptly furnish Lender with executed copies of all Leases and relevant documentation required to be filed with all Governmental Authorities.

(d)　　In addition, all Leases, if any, and Renewal Leases, if any, shall provide for rental rates comparable to existing local market rates.

(e)　　All Leases, if any, and Renewal Leases, if any, shall provide that they are subordinate to the Security Instrument and that the lessee agrees to attorn to Lender.

(18)　　<u>Management Agreement</u>.

(a)　　In no event shall Borrower enter into a Management Agreement with any Manager for the Improvements or the Property without the prior written consent of Lender, which consent shall be in Lender's sole and absolute discretion. If Lender consents to Borrower  entering into a Management Agreement with such Manager, such consent shall be conditioned on Borrower and such Manager entering into an Assignment and Subordination of Management Agreement in the form attached as <u>Exhibit C</u>.  If Borrower shall be permitted to enter into a Management Agreement pursuant this Section 5.1.18, Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement, on the part of Borrower to be performed and observed to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under the Management Agreement, and (ii) promptly notify Lender of the

4885-5497-3488, v. 2

giving of any notice by Manager to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of the Management Agreement on the part of Borrower to be performed and observed and deliver to Lender a true copy of each such notice; Borrower shall not surrender such Management Agreement, consent to the assignment by the Manager of its interest under the Management Agreement, terminate or cancel the Management Agreement, or modify, change, supplement, alter or amend the Management Agreement, in any respect, either orally or in writing. Borrower shall be required to assign to Lender as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Agreement, all the rights, privileges and prerogatives of Borrower to surrender such Management Agreement, or to terminate, cancel, modify, change, supplement, alter or amend the Management Agreement, in any respect, and any such surrender of the Management Agreement, or termination, cancellation, modification, change, supplement, alteration or amendment of the Management Agreement, without the prior consent of Lender shall be void and of no force and effect.

(b)     If Borrower shall default in the performance or observance of any term, covenant or condition of such Management Agreement on the part of Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under the Management Agreement shall be kept unimpaired and free from default. Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property upon prior notice at all times and from time to time for the purpose of taking any such action. If the Manager shall deliver to Lender a copy of any notice sent to Borrower of default under such Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Borrower shall not, and shall not permit the Manager to, sub-contract any or all of its management responsibilities under such Management Agreement to a third-party without the prior written consent of Lender. Borrower shall, from time to time, obtain from the Manager such certificates of estoppel with respect to compliance by Borrower with the terms of the Management Agreement as may be requested by Lender. Borrower shall exercise each individual option, if any, to extend or renew the term of the Management Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may

84

be exercised, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest. Any sums expended by Lender pursuant to this paragraph (i) shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, (ii) shall be deemed to constitute a portion of the Debt, (iii) shall be secured by the lien of the Security Instrument and the other Loan Documents, and (iv) shall be immediately due and payable upon demand by Lender therefor.

(c)     Without limitation of the foregoing, Borrower, upon the request of Lender, shall terminate such Management Agreement and replace Manager, without penalty or fee, if at any time during the Term (i) Manager shall become insolvent or a debtor in any bankruptcy or insolvency proceeding, (ii) a Default or Event of Default has occurred, or (iii) a default occurred by Manager under the Management Agreement beyond any applicable notice and cure period. At such time as the Manager is removed, a Qualified Manager shall assume management of the Property pursuant to a Replacement Management Agreement.

(19)    <u>Alterations</u>.

Other than with respect to the Work, Borrower shall obtain Lender's prior written consent to any alterations to any Improvements.

(20)    <u>OFAC</u>.

At all times throughout the term of the Loan, Borrower, each other Restricted Party, and their respective Affiliates shall be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

4885-5497-3488, v. 2

(21)    <u>Mortgage of Adjacent Lots</u>. In the event Borrower acquires or comes to own any one or more of the lots adjacent to the Property which becomes, or is planned to become, a part of the Property, Borrower shall, upon the request of Lender, promptly grant to Lender a deed of trust lien thereon, whether by delivery of (a) a new deed of trust in form and substance substantially similar to the Security Instrument, or (b) a spreader agreement pursuant to which the Security Instrument shall be spread to encumber such additional adjacent lots.

(22)    <u>Confirmation of Representations</u>.

Borrower shall deliver, upon the request of Lender (a) one or more Officer's Certificates certifying as to the accuracy of all representations made by Borrower in the Loan Documents, and (b) certificates of the relevant Governmental Authorities in all relevant jurisdictions indicating the good standing and qualification of Borrower.

(23)    <u>Negative Pledge</u>.

Borrower has granted the Lender a first priority deed of trust lien on the Property. Borrower shall not create or permit any Lien upon the Property other than the Loan and the Permitted Encumbrances and Borrower will not, and will not permit any other Person to, create, assume, incur or suffer to exist any Lien with respect to the Property.

(24)    <u>Signage; Publicity</u>.

(a)    Borrower shall permit Lender to erect, furnish and maintain a sign, at Borrower's sole cost and expense, at a location on the Property satisfactory to Lender (subject to Legal Requirements), which sign may contain Lender's and/or its Affiliates' names, addresses (including website addresses), and contact information, and may recite, among other things, that Lender and/or its Affiliates are providing financing for the Project.

(b)    All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, or to Lender or any of its Affiliates, shall be subject to the prior written approval of Lender, except disclosure required by any federal or State securities laws, rules or regulations, as determined by Borrower's counsel. Lender may, in its sole discretion, release publicity articles and/or advertisements in connection with the financing evidenced by the Loan Documents, and Borrower shall invite representatives of Lender and its Affiliates to

86

4885-5497-3488, v. 2

participate in public relations opportunities (e.g., speaking opportunity at ribbon cutting, ground breaking, etc.), and grant Lender and its Affiliates access to and permission to use any photographic and/or schematic images of the Project (e.g., website, brochures, advertisements, etc.).

(25)     General Contractor's Agreement.

Borrower shall (a) enforce the General Contractor's Agreement in the best interests of Borrower consistent with the construction of the Improvements using sound business judgment, (b) waive none of the obligations of any of the parties thereunder, (c) do no act which would relieve General Contractor from its obligations to construct the Improvements according to the Plans and Specifications, and (d) make no amendments to or Change Orders under the General Contractor's Agreement, without the prior written approval of Lender.

(26)     Architect's Agreement.

Borrower shall (a) enforce the Architect's Agreement in the best interests of Borrower consistent with the construction of the Improvements using sound business judgment, (b) waive none of the obligations of Architect thereunder, (c) do no act which would relieve Architect from its obligations under the Architect's Agreement, and (d) make no amendments to the Architect's Agreement without the prior written approval of Lender.

(27)     Completion of Construction.

Borrower shall diligently pursue the Completion of the Improvements and obtain a permanent certificate of occupancy (and to the extent the same are conditional or require performance by Borrower, satisfy all conditions to the issuance of and/or perform all obligations required for the continued validity of the same) for the Property on or prior to the Completion Date in accordance with the Plans and Specifications and in compliance with all restrictions, covenants and easements affecting the Property, all applicable Legal Requirements, and all Governmental Approvals, and with all terms and conditions of the Loan Documents; to pay all sums and to perform such duties as may be necessary to complete such construction of the Improvements substantially in accordance with the Plans and Specifications and in compliance with all restrictions, covenants and easements affecting the Property, all Legal Requirements and all Governmental Approvals, and with all terms and conditions of the Loan Documents, all of which shall be accomplished on or before the Completion Date, free from any Liens, claims or

4885-5497-3488, v. 2

assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith. Evidence of compliance with the foregoing shall be furnished by Borrower to Lender on or before the Completion Date. In addition, if such certificate of occupancy or other Governmental Approvals are temporary in nature, Borrower shall diligently pursue procuring final Governmental Approvals. In addition, Borrower shall diligently pursue construction of the entire Improvements to Final Completion after the Completion Date.

(28)    <u>Inspection of Property</u>.

Borrower shall permit Lender, the Construction Consultant, and their respective representatives to enter upon the Property, inspect the Improvements and all materials to be used in the construction thereof and to examine the Plans and Specifications which are or may be kept at the construction site at all times and will cooperate, and use best efforts to cause the General Contractor and the Trade Contractors to cooperate with the Construction Consultant to enable such Construction Consultant to perform its functions hereunder.

(29)    <u>Construction Consultant</u>.

Borrower acknowledges that (a) the Construction Consultant has been retained by Lender to act as a consultant and only as a consultant to Lender in connection with the construction of the Improvements and has no duty to Borrower, (b) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Lender, (c) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Agreement, and to accept or not accept any matter or thing required to be accepted by Lender under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto, (d) Lender reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Lender or any other Person, and (e) Lender reserves the right to replace the Construction Consultant with another construction consultant at any time and without prior notice to or approval by Borrower.

4885-5497-3488, v. 2

(30)    <u>Construction Consultant/Duties and Access</u>.

Borrower shall permit Lender to retain the Construction Consultant at the cost of Borrower to perform the following services on behalf of Lender:

(a)    To review and advise Lender whether, in the opinion of the Construction Consultant, the Plans and Specifications are satisfactory;

(b)    To review Draw Requests and Change Orders; and

(c)    To make periodic inspections (approximately at the date of each Draw Request) for the purpose of assuring that construction of the Improvements to date is in accordance with the Plans and Specifications and to approve Borrower's then-current Draw Request as being consistent with Borrower's obligations under this Agreement and otherwise perform its responsibilities to Lender.

The fees of the Construction Consultant shall be paid by Borrower within ten (10) days after billing therefor (unless same are paid from the proceeds of the Loan) and may be paid directly by Lender to Construction Consultant pursuant to Section 3.2.5, but neither Lender nor the Construction Consultant shall have any liability to Borrower on account of (i) the services performed by the Construction Consultant, (ii) any neglect or failure on the part of the Construction Consultant to properly perform its services, or (iii) any approval by the Construction Consultant of construction of the Improvements. Neither Lender nor the Construction Consultant assumes any obligation to Borrower or any other Person concerning the quality of construction of the Improvements or the absence therefrom of Defects. Construction Consultant's first periodic inspection will be performed on or about the date of the Draw Request for the Initial Advance.

(31)    <u>Laborers, Subcontractors and Materialmen</u>.

Borrower shall notify Lender immediately, and in writing, if Borrower receives any default notice, notice of lien or demand for past due payment, written or oral, from any laborer, subcontractor or materialman. Borrower will also furnish to Lender at any time and from time to time upon demand by Lender, Lien waivers in form satisfactory to Lender bearing a then-current date from each Trade Contractor covering Work performed which was the basis of the immediately prior Advance.

(32)     Defects in the Work.

Borrower shall immediately advise Lender of any Defects in the Work of which Borrower is aware and shall promptly correct same to Lender's satisfaction.  Borrower shall, upon demand of the Construction Consultant and prior to the next Advance, correct to Lender's satisfaction any Defect in the Work as may be determined to exist by Lender or the Construction Consultant or any departure from the Plans and Specifications not approved by the Construction Consultant.  The making of an Advance by Lender shall not constitute a waiver of Lender's right to require compliance with this covenant with respect to any such Defects or departures from the Plans and Specifications not theretofore discovered by, or called to the attention of, Lender or the Construction Consultant.

(33)     Purchase of Material Under Conditional Sale Contract.

Borrower shall not permit any materials, equipment, fixtures or any other part of the Improvements to be purchased or installed under any security agreement or other arrangements wherein the seller reserves or purports to reserve the right to remove or to repossess any such items or to consider them personal property after their incorporation in the Improvements, unless authorized by Lender in writing and in advance.

(34)     Protection of the Property.

Borrower shall, or shall cause General Contractor to, employ suitable means to protect the Property and all tools and building materials stored on the Property from theft or vandalism.

(35)     Loan Proceeds; Advances.

(a)     Borrower shall apply all proceeds of the Loan to complete the Project, and Borrower shall not require and shall not avail itself of any additional extension of credit for such purpose.

(b)     Borrower shall, at Borrower's sole cost and expense, pay for all Costs necessary to complete the Project in excess of the Loan.  In no event shall Lender be required to fund more than the amount of the Loan.

4885-5497-3488, v. 2

(c)     Borrower shall receive all Advances and shall hold the right to receive said Advances in trust solely for the purpose of paying the costs of the Project and Borrower shall apply said Advances solely to paying the costs of the construction of the Improvements.

(d)     Each Advance received shall be used for the purposes set forth in the applicable Draw Request.

(36)     Vouchers; Receipts, etc.

Borrower shall deliver to Lender, immediately on demand, any contracts, bills of sale, statements, receipted vouchers or other agreements under which Borrower claims title to any materials, fixtures or articles incorporated in the Property or subject to the Lien of the Security Instrument.

(37)     Bankruptcy Matters.

(a)     Borrower shall commence all actions in, file all motions, applications, and proposed orders with, and make all other submissions to the Bankruptcy Court only in Approved Form. Borrower (x) covenants that it will not at any time in any manner whatsoever claim or take the benefit or advantage of any stay, extension, or usury law (wherever enacted) that may affect the performance in full of this Agreement and (y) expressly waives the benefit of all such laws. Borrower shall not (directly or indirectly) incur, create, or permit to exist any administrative-expense claim, expense, or cost (x) with priority senior or equal to the DIP Claims or (y) not expressly contemplated by the Project Cost Budget.

(b)     Borrower covenants, represents, and warrants that, upon entry of the DIP Order, all Obligations shall, pursuant to Bankruptcy Code Section 364(c)(1), constitute DIP Claims, payable from and having recourse to all property of Borrower's estates (expressly including all Collateral).

(c)     As to all Collateral, Borrower assigns and conveys as security, grants a security interest in and Lien on, hypothecates, mortgages, pledges, and sets over and unto Lender all right, title, and interest of Borrower in the Collateral (collectively, the "DIP Liens"), including all Avoidance Actions. Borrower acknowledges that, pursuant to the DIP Order, the DIP Liens granted to Lender in all Collateral shall be automatically perfected without reference to any notice or recordation requirements of non-bankruptcy law. The DIP Liens shall be senior to all pre-

91

4885-5497-3488, v. 2

petition and post-petition liens, on all present and future Collateral. Borrower covenants, represents, and warrants that, upon entry of DIP Order, the DIP Liens shall comprise:

(i)     Pursuant to Bankruptcy Code Section 364(c)(2), an automatically perfected, senior DIP Lien on all Collateral;

(ii)    Pursuant to Bankruptcy Code Section 364(c)(3), an automatically perfected, junior DIP Lien on all Collateral;

(iii)   Pursuant to Bankruptcy Code Section 364(d)(1), an automatically perfected, equal DIP Lien on all Collateral; and

(iv)    Pursuant to Bankruptcy Code Section 364(d)(1), an automatically perfected, senior DIP Lien on all Collateral.

At such time as (a) UCC financing statements in appropriate form are filed in the appropriate offices (and the appropriate fees are paid) and (b) the other requirements of the Loan Documents have been taken as and when required therein, Lender shall have a perfected security interest under the UCC and any other jurisdiction required in the Loan Documents in that portion of such Collateral to the extent that the Liens thereon may be perfected upon the taking of the actions described in clauses (a) and (b) above, and such security interest is (i) entitled to the benefits, rights and protections afforded under the Loan Documents applicable thereto and (ii) of such priority as provided herein and in the DIP Order.

(d)     Borrower shall not permit any of the following:

(i)     use of any portion or proceeds of the Loan or the Collateral for payments or purposes that would violate the terms of the DIP Order;

(ii)    incur, create, assume, suffer to exist or permit, except as otherwise expressly permitted by the DIP Order, any other superpriority administrative claim which is *pari passu* with or senior to the claim of Lender against Borrower;

(iii)   subject to the DIP Order, assert, join, investigate, support or prosecute any claim or cause of action against any Lender unless such claim or cause of action is in connection with the enforcement of the Loan Documents against any such party;

(iv)      seek, consent to, or permit to exist any order granting authority to take any action that is prohibited by the terms of this Agreement, the DIP Order, or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the DIP Order or any of the other Loan Documents;

(v)      subject to the terms of the DIP Order, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by Lender with respect to the Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by Lender to lift an applicable stay of proceedings to do the foregoing (<u>provided</u> that Borrower may contest or dispute whether an Event of Default has occurred in accordance with the terms of the DIP Order and the Loan Documents);

(vi)      make or permit to be made any change to the DIP Order, unless approved by Lender; or

(vii)      file, prosecute, support or otherwise adopt, in any manner whatsoever, any Chapter 11 Plan in the Chapter 11 Case that does not provide for the treatment of the Obligations consistent with the terms and conditions of the Loan Documents and the DIP Order.

(38)     <u>Debtor-in-Possession Obligations</u>¶. Borrower shall comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the Bankruptcy Rules and any order of the Bankruptcy Court (including, for the avoidance of doubt, the DIP Order), as each such order is amended and in effect from time to time

(39)     <u>Post-Closing Undertaking</u>. **[ADD AS NECESSARY]**

**Section 5.2**     <u>Negative Covenants</u>.

From the Closing Date until payment and performance in full of all obligations of Borrower under the Loan Documents, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

4885-5497-3488, v. 2

(1)      <u>Liens</u>.

Borrower shall not create, incur, assume or suffer to exist any Lien (other than the Loan Documents and the Permitted Encumbrances) on any portion of the Property or permit any such action to be taken.

(2)      <u>Dissolution</u>.

Borrower shall not (a) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (b) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the properties or assets of Borrower except to the extent expressly permitted by the Loan Documents or (c) modify, amend, waive or terminate its Organizational Documents or its qualification and good standing in any jurisdiction, in each case, without obtaining the prior written consent of Lender.

(3)      <u>Change in Business</u>.

Borrower shall not enter into any line of business other than the ownership, acquisition, development, operation, leasing and management of the Property (including providing services in connection therewith), or make any change in the scope or nature of its business objectives, purposes or operations or undertake or participate in activities other than the continuance of its present business.

(4)      <u>Debt Cancellation</u>.

Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith and/or the Deed of Trust) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

(5)      <u>Zoning</u>.

Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a nonconforming use under any zoning ordinance or any other Applicable Law, without the prior written consent of Lender. If under applicable zoning provisions the use of all or any portion of the Property is or

94

shall become a nonconforming use, Borrower shall not cause or permit the nonconforming use to be discontinued or the nonconforming improvement to be abandoned without the express written consent of Lender. Borrower shall not establish any condominium or cooperative regime with respect to the Property without the prior written consent of Lender, nor shall Borrower initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restrictions, limiting or defining the uses which may be made of the Property or any portion thereof.

(6)    No Joint Assessment.

Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

(7)    Name, Identity, Structure, or Principal Place of Business.

Borrower shall not change its name, identity (including its trade name or names), or principal place of business set forth in the introductory paragraph of this Agreement, without, in each case, first giving Lender thirty (30) days prior written notice. Borrower shall not change its corporate, partnership or other structure, or the place of its organization as set forth in the first paragraph of this Agreement, without, in each case, the consent of Lender. Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

(8)    ERISA.

(a)    During the Term of the Loan or of any obligation or right hereunder, Borrower shall not be a Plan and none of the assets of Borrower shall constitute Plan Assets.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the Term of the Loan, as requested by Lender in its sole discretion, and represents and covenants that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA,

95

or a "<u>governmental plan</u>" within the meaning of Section 3(32) of ERISA, (B) Borrower is not subject to State statutes regulating investments and fiduciary obligations with respect to governmental plans, and (C) one or more of the following circumstances is true:

      (i)      Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

      (ii)      Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

      (iii)      Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

      (9)      <u>Affiliate Transactions</u>.

Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or Guarantor, or any of the partners, shareholder or members of Borrower or Guarantor except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

      (10)      <u>Transfers</u>.

      (a)      Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein or permit a Sale or Pledge of an interest in any Restricted Party (individually and collectively, as the case may be, a "<u>Transfer</u>") without the prior written consent of Lender.

      (b)      A Transfer shall include, but not be limited to: (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder (including, without limitation, for short term rentals, such as Airbnb®,or for co-working or office-sharing arrangements, such as

96

WeWork®) or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interests or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of the Manager (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.1.18 hereof, (viii) any Sale or Pledge of any ownership interest in Borrower or a Restricted Party, (ix) any change of Control of Borrower, (x) any change of Control of the Property, (xi) any assignment-in-lieu or consensual foreclosure relating to the Collateral, (xii) any Division of a Restricted Party, and (xiii) any conversion of a Restricted Party to a Delaware Statutory Trust or a series limited liability company.  For the avoidance of doubt, the Pledge Agreement and the exercise of the rights and remedies by Lender under and pursuant to the terms and conditions of the Pledge Agreement shall not constitute an impermissible Transfer pursuant to this Section 5.2.10.

(c)      In the event Lender elects to consent to any proposed Transfer that is otherwise prohibited under this Agreement or the other Loan Documents, Lender reserves the right to condition the consent required hereunder upon a modification of the terms hereof and on assumption of the Loan (and execution of replacement guarantees by replacement guarantors acceptable to Lender in its sole discretion) as so modified by the proposed transferee, payment of a transfer fee, or such other conditions as Lender shall determine in its sole discretion to be in the interest of Lender.

4885-5497-3488, v. 2

(d)      Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer in violation of this Section 5.2.10.  This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer. No Transfer shall be made to any Prohibited Person, and in the event any proposed Transfer would result in any Person and its Affiliates or constituent members owning in excess of twenty percent (20%) of the ownership interest in Borrower or any other Restricted Party, Borrower shall provide to Lender, not less than thirty (30) days prior to such Transfer, the name and identity of each proposed transferee, together with the names of its controlling principals and beneficial owners, the social security number or employee identification number of such transferee and controlling principals and beneficial owners, and such transferee's, controlling principals' and beneficial owners' home addresses or principal places of business, and home or business telephone numbers, in each case so as to permit Lender to complete its customary searches (including, without limitation, know-your-customer, credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) as Lender may reasonably require with respect to such transferee, its owners and/or controlling Persons, as applicable, the results of which must be acceptable to Lender in its sole discretion.  In connection with any Transfer, Borrower shall pay all fees and costs incurred by Lender (including, without limitation, attorneys' fees).

(e)      To the extent that any Guarantor is a natural person, the death or incapacity of such Guarantor shall be an Event of Default hereunder unless such Guarantor is replaced in accordance with this Section 5.2.10(e).  Borrower shall be permitted to substitute a replacement guarantor (a "Substitution") and no Event of Default shall be deemed to have occurred hereunder, provided that each of the following terms and conditions are satisfied:  (a) no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Substitution; (b) within fifteen (15) days after the occurrence of such death or incapacity, Borrower delivers to Lender notice of its intent to substitute such Guarantor and, concurrently therewith, gives Lender all such information concerning the proposed substitute guarantor as Lender may reasonably require, including, without limitation, certified financial statements detailing assets and liabilities; (c) the replacement guarantor is a Satisfactory Replacement Guarantor (as hereinafter defined); (d) within fifteen (15) days after delivery of the written notice described in the preceding clause (b), such Satisfactory Replacement Guarantor (i) assumes the obligations of Guarantor under the Guaranty or (ii) executes and delivers to Lender replacements for each Guaranty in each case in form and substance the same as each existing Guaranty, respectively, and otherwise reasonably acceptable to Lender; (e) concurrently with such assumption or execution and delivery (i) such Satisfactory

98

4885-5497-3488, v. 2

Replacement Guarantor delivers to Lender a spousal consent in form and substance acceptable to Lender, as and to the extent applicable, and (ii) each of Borrower, the remaining Guarantors and/or such Satisfactory Replacement Guarantor, as applicable, affirms each of their respective obligations under the Loan Documents; (f) intentionally omitted; and (g) if required by Lender or the Rating Agencies, Borrower delivers to Lender an opinion from counsel, and in form and substance, in each case reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion stating, among other things, that the Guaranty and the Environmental Indemnity (or the replacement guaranty and environmental indemnity, as the case may be) are enforceable against such Satisfactory Replacement Guarantor in accordance with their terms. No such death or replacement of a Guarantor shall hinder, impair, limit, terminate or effectuate a novation of the obligations or liabilities of any other Guarantor under any of the Loan Documents. As used herein, the term "Satisfactory Replacement Guarantor" shall mean a replacement guarantor that is acceptable to Lender, which determination shall be based upon, inter alia, (A) such replacement guarantor having (1) a direct or indirect ownership interest in Borrower, which is reasonably satisfactory to Lender, and (2) the ability to Control Borrower, (B) such replacement guarantor having a net worth and liquidity reasonably satisfactory to Lender, (C) Lender's receipt of searches (including, without limitation, credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) reasonably required by Lender on such replacement guarantor, the results of which must be reasonably acceptable to Lender, (D) such replacement guarantor otherwise satisfying Lender's then current applicable underwriting criteria and requirements, and (E) such replacement guarantor being an experienced operator and/or owner of properties similar in location, size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably requested by Lender or requested by the Rating Agencies.

(f)     Borrower shall pay all costs and expenses of Lender in connection with any Transfer, assumption and/or replacement of any Guarantor, including, without limitation, the cost of any Rating Agency Confirmation and all reasonable fees and expenses of Lender's counsel, and the cost of any required counsel opinions.

(11)    Waste.

Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which shall in any way invalidate or give cause for cancellation of any Policy,

or do or permit to be done thereon anything that may in any way impair the value of the Property or the security for the Loan.

    (12)    <u>Petroleum and Minerals Exploration and Extraction</u>.

Borrower shall not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any petroleum or minerals from the surface or the subsurface of the Property, regardless of the depth thereof or the method of mining or extraction thereof, except as may be required by Applicable Law or in accordance with the mandatory orders of any Governmental Authorities having jurisdiction thereof.

    (13)    <u>Reciprocal Easement Agreement</u>.

Borrower shall not enter into any reciprocal easement agreement after the Closing Date without Lender's prior written consent.

    (14)    <u>Limitation on Securities Issuances</u>.

Neither Borrower nor any other Restricted Party shall issue any membership interests or other securities, other than those that have been issued as of the Closing Date and delivered to Lender, without the prior written consent of Lender.

    (15)    <u>Subordinate Financing</u>.

Neither Borrower nor any Restricted Party shall be permitted to place or incur any (i) subordinate financing on the Property, (ii) preferred equity financing, (iii) mezzanine financing or (iv) any other indebtedness on the Property.

    (16)    <u>Developer Fees</u>.

Borrower shall not use any proceeds of the Loan to pay Borrower, any other Restricted Party, or any Affiliate thereof any developer's fee or other fee.

    (17)    <u>Change Orders</u>.

    (a)    Borrower shall not directly or indirectly, without the prior written consent of Lender and all Governmental Authorities (to the extent required by law):

100

4885-5497-3488, v. 2

(i)　　　modify or supplement the Plans and Specifications or any permits granted to construct the Improvements in any respect;

(ii)　　　amend, supplement or otherwise modify the Architect's Agreement, or the General Contractor's Agreement or any Trade Contract, (A) to increase the amount payable by Borrower thereunder, (B) to lengthen the time for performance of any party thereto other than Borrower or (C) in any other way that could adversely affect Lender; or

(iii)　　　direct or permit the performance of any work pursuant to any revision (of whatever nature or form) of the Plans and Specifications, or any Change Order or change bulletin or other instrument or understanding relating to the construction of the Improvements (or allow the making of any Change Order).

## ARTICLE VI.　INSURANCE; CASUALTY; CONDEMNATION

### Section 6.1　Insurance.

(a)　　　Borrower will keep the Property insured against loss or damage by fire, flood (if in flood hazard area) and such other hazards, risks and matters, including, without limitation, business interruption, rental loss, builder's risk, terrorism, public liability, and boiler damage and general liability, as Lender may from time to time reasonably require in amounts reasonably required by Lender and consistent with market practice, and shall pay the premiums for such insurance (collectively, the "Insurance Premiums") as the same become due and payable.  All policies of insurance (collectively, the "Policies") shall be issued by insurers acceptable to Lender and shall contain all applicable standard California mortgagee non-contribution clauses naming Lender as the person to which all payments made by such insurance company shall be paid.  Borrower will assign and deliver the Policies to Lender.  Not later than ten (10) days prior to the expiration date of each of the Policies, Borrower will deliver evidence satisfactory to Lender of the renewal of each of the Policies.   All Policies shall be issued by companies reasonably approved by Lender and licensed to do business in the state where the Property is located, with a claims paying ability rating of "BBB" or better by Standard & Poor's Ratings Services, a division of McGraw-Hill Companies, Inc. and a rating of "A:IX" or better in the current Best's Insurance Reports.

(b)　　　In the event of loss (other than non-material losses), Borrower shall give prompt written notice to the insurance carrier and to Lender after Borrower has actual knowledge of such loss.  Lender shall have the right to participate with Borrower in connection with making proof of

101

loss, adjusting and compromising any claim under insurance policies, appearing in and prosecuting any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Lender's expenses incurred in the collection of such proceeds.

(c)      If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Security Instrument and shall bear interest at the Default Rate.

(d)      In the event of a foreclosure of the Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower in and to the Policies then in force and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

Section 6.2    Casualty.

If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "Casualty"), Borrower shall give prompt notice of such Casualty to Lender and shall promptly commence and diligently prosecute the completion of the Restoration of the Property as nearly as possible to the condition the Property was immediately prior to such Casualty, with such alterations as may be approved by Lender and otherwise in accordance with and subject to the provisions of Section 6.4 hereof.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.

Section 6.3    Condemnation.

Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any part of the Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute

any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking following a *bona fide* written threat of Condemnation from the applicable Governmental Authority, which such transfer in lieu of Condemnation may be made only with Lender's prior written consent), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property subject to and otherwise in compliance with the provisions of Section 6.4 hereof. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

**Section 6.4**　　<u>Restoration</u>.

The following provisions shall apply in connection with the Restoration of the Property:

(a)　　If the Net Proceeds shall be less than Fifty Thousand and 00/100 Dollars ($50,000.00) and the costs of completing the Restoration shall be less than Fifty Thousand and 00/100 Dollars ($50,000.00), the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)　　If the Net Proceeds are equal to or greater than Fifty Thousand and 00/100 Dollars ($50,000.00) or the costs of completing the Restoration is equal to or greater than Fifty Thousand and 00/100 Dollars ($50,000.00), but less than One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00), Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 6.4. If the Net Proceeds are equal to or greater than One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00), then Lender shall have no obligation to make the Net Proceeds available for Restoration. The term "<u>Net Proceeds</u>" shall mean: (i) the net amount

of all insurance proceeds received by Lender and/or Borrower pursuant to Section 6.1(a) as a result of such damage or destruction, after deduction of its costs and expenses (including, but not limited to, counsel fees), if any, in collecting same ("Insurance Proceeds"), or (ii) the net amount of the Award received by Lender and/or Borrower, after deduction of its costs and expenses (including, but not limited to, counsel fees), if any, in collecting same ("Condemnation Proceeds"), whichever the case may be.

(i)　　If the Net Proceeds are required to be made available to Borrower for Restoration, or if Lender otherwise elects to make the Net Proceeds available to Borrower for Restoration, then the Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions are met:

(A)　　no Default or Event of Default shall have occurred and be continuing;

(B)　　Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion in compliance with all Applicable Laws, including, without limitation, all applicable Environmental Laws;

(C)　　Lender shall be satisfied that any operating deficits, including all scheduled payments of Principal and interest under the Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, or (2) by other funds of Borrower;

(D)　　Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) one hundred twenty (120) days prior to the Maturity Date, (2) six (6) months after the occurrence of such Casualty or Condemnation, or (3) the earliest date required for such completion under the terms of any Leases which are required in accordance with the provisions of this Section 6.4(b) to remain in effect subsequent to the occurrence of such Casualty or Condemnation and the completion of the Restoration, or (4) such time as may be required under Applicable Law, in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or Condemnation;

104

      (E)      the Property and the use thereof after the Restoration will be in compliance with and permitted under all Applicable Laws;

      (F)      such Casualty or Condemnation, as applicable, does not result in the total loss of access to the Property or the related Improvements, unless such access shall be restored to the reasonable satisfaction of Lender in connection with the Restoration;

      (G)      Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by the Architect or engineer stating the entire cost of completing the Restoration, which budget shall be reasonably acceptable to Lender;

      (H)      the Net Proceeds together with any Cash or Cash equivalent deposited by Borrower with Lender are sufficient in Lender's discretion to cover the cost of the Restoration; and

      (I)      the Management Agreement in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case may be, shall (1) remain in full force and effect during the Restoration and shall not otherwise terminate as a result of the Casualty or Condemnation or the Restoration or (2) if terminated, shall have been replaced with a Replacement Management Agreement with a Qualified Manager, prior to the opening or reopening of the Property or any portion thereof for business with the public.

      (ii)      The Net Proceeds shall be held by Lender in an account and, until disbursed in accordance with the provisions of this Section 6.4(b), shall constitute additional security for the Debt and other obligations under the Loan Documents. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanics' or materialmen's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded and discharged of

record or in the alternative fully insured by the title company issuing the Title Insurance Policy.

(iii)     All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "Casualty Consultant"). Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage. The Casualty Retainage shall in no event be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 6.4(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be requested by Lender or by the title company issuing the Title Insurance Policy for the Property, and Lender receives an endorsement to such Title Insurance Policy

4885-5497-3488, v. 2

insuring the continued priority of the lien of the related Security Instrument and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every thirty (30) days.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, if any, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 6.4(b) shall constitute additional security for the Debt and other obligations under the Loan Documents.

(vii)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 6.4(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and be continuing under the Note, this Agreement or any of the other Loan Documents.

(c)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 6.4(b)(vii) may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its sole discretion shall deem proper, or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall approve, in its discretion. If Lender shall receive and retain Net Proceeds, the lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

4885-5497-3488, v. 2

**ARTICLE VII.  INTENTIONALLY OMITTED.**

**ARTICLE VIII.  DEFAULTS**

**Section 8.1**　　Event of Default.

(a)　　Each of the following events shall constitute an event of default hereunder (an "Event of Default"):

(i)　　if any portion of the Debt or any payment of Reserve Funds is not paid on or before the date the same is due and payable;

(ii)　　Borrower shall fail to pay all sums due on the Maturity Date;

(iii)　　if any of the Taxes or Other Charges are not paid on or before the date when the same are due and payable;

(iv)　　if the Policies are not kept in full force and effect or if certified copies of the Policies (or if such Policies are not yet available, ACORD certificates with respect to such policies, with certified copies of such Policies to be delivered to Lender promptly upon availability) are not delivered to Lender in accordance with this Agreement or upon Lender's request;

(v)　　any Transfer in violation of the provisions of Section 5.2.10 hereof, or if Borrower transfers or encumbers any portion of any of the Property in violation of Section 8 of the Security Instrument;

(vi)　　if any representation or warranty made by Borrower or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been incorrect, incomplete, false or misleading in any respect;

(vii)　　if Borrower, Pledgor or Guarantor shall make an assignment for the benefit of creditors;

(viii)　　if a receiver, liquidator or trustee shall be appointed for any Restricted Party or any portion of the Property, or if any Restricted Party shall be adjudicated a bankrupt or

108

insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, any Creditors Rights Laws, or any similar federal or State law, shall be filed by or against, consented to, solicited by or acquiesced in by, any Restricted Party, or in the event Lender makes a formal filing to lift the stay in such bankruptcy proceedings and any Restricted Party formally contests such filing and the lifting of the applicable stay in connection therewith, or if any Restricted Party, the Property or any part thereof shall become an asset in a bankruptcy or insolvency proceeding pursuant to the Bankruptcy Code, any Creditors Rights Laws, or any similar federal or State law, or if any proceeding for the dissolution or liquidation of any Restricted Party pursuant to the Bankruptcy Code, any Creditors Rights Laws, or any similar federal or State law shall be instituted; <u>provided</u>, <u>however</u>, if such appointment, adjudication, petition or proceeding was involuntary and not initiated, permitted, solicited by, acquiesced or consented to by any Restricted Party, upon the same not being discharged, stayed or dismissed within thirty (30) days;

(ix)    if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(x)    failure to satisfy any Milestone as and when required hereunder;

(xi)    if Borrower breaches, violates or does not comply with any of the provisions of Section 5.1;

(xii)    if Borrower breaches any of its negative covenants contained in Section 5.2 hereof;

(xiii)    if a default has occurred and continues beyond any applicable cure period under the Management Agreement (or any Replacement Management Agreement);

(xiv)    if Borrower violates or does not comply with any of the provisions of Section 4.1.35 hereof;

(xv)    if the Property becomes subject to any mechanics', materialmen's or other Lien other than a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of ten (10) days;

109

(xvi)   if any federal tax Lien or state or local income tax Lien is filed against Borrower, Guarantor or the Property and not satisfied or bonded over within ten (10) days of the filing therefrom;

(xvii)   if (A) Borrower fails to provide Lender with the written certification and evidence referred to in Section 5.2.8 hereof within fifteen (15) days from Lender's request therefor, (B) Borrower is a Plan or its assets constitute Plan Assets, or (C) Borrower consummates a transaction which would cause the Security Instrument or Lender's exercise of its rights under the Security Instrument, the Note, this Agreement or the other Loan Documents to constitute a nonexempt prohibited transaction under ERISA or result in a violation of a State statute regulating governmental plans, subjecting Lender to liability for a violation of ERISA, the Code, a State statute or other similar law;

(xviii)   if Borrower shall fail to deliver to Lender, within ten (10) Business Days after request by Lender, the estoppel certificates required pursuant to the terms of Section 5.1.13 hereof;

(xix)   with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement and performance period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice and the expiration of such performance period;

(xx)   if Borrower executes any conditional bill of sale, chattel mortgage or other security instrument covering any personal property, or files a financing statement publishing notice of such security instrument, or purchases any of such personal property so that ownership of the same shall not vest unconditionally in Borrower, free from encumbrances, on delivery to the Property; or if Borrower does not furnish to Lender, upon demand, the contracts, bills of sale, statements, receipted vouchers or agreements, or any of them, under which Borrower claims title to such personal property;

(xxi)   if any order or decree of judgment is rendered in any judicial or administrative proceeding declaring the Property (or any portion thereof) to be in violation of any Legal Requirements;

(xxii)   if a final, non-appealable judgment is filed against Borrower or Guarantor;

110

(xxiii) if the Work is not carried on with reasonable dispatch or at any time is discontinued for a period of thirty (30) consecutive days;

(xxiv) if Lender, the Construction Consultant or their representatives are denied permission to enter upon and/or inspect the Property or the Work and all materials, fixtures and articles used or to be used in the Work and to examine the Plans and Specifications, or if Borrower shall fail to furnish to any of such parties, when requested, copies of the Plans and Specifications;

(xxv) if Borrower fails to Complete the Improvements on or before the Completion Date, with time being of the essence;

(xxvi) if any Restricted Party is arrested in connection with a felony criminal offense or, subject to Section 5.2.10(e), the death or incapacity of any individual Guarantor;

(xxvii) in the event of any material adverse change in the financial conditions of Borrower or any Guarantor;

(xxviii) if any default occurs under any pledge, guaranty or indemnity executed in connection herewith (including, without limitation, the Guaranty, and the Environmental Indemnity) and such default continues after the expiration of applicable grace periods, if any;

(xxix) if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument;

(xxx) if Borrower fails to maintain at least one (1) independent manager as required by Borrower's organizational documents;

(xxxi) If Borrower consummates a transaction which would cause this Agreement or Lender's exercise of its rights under this Agreement, the Note or the other Loan Documents to constitute a nonexempt prohibited transaction under ERISA (as defined below) or result in a violation of a State statute regulating governmental plans, subjecting Lender to liability for a violation of ERISA, the Code, a State statute or other similar law;

111

4885-5497-3488, v. 2

(xxxii) If Borrower fails to deposit the Shortfall within ten (10) days of Lender's notification of such Shortfall in accordance with Section 2.1.11 hereof;

(xxxiii) if Borrower opts out of Article 8 of the applicable Uniform Commercial Code in contravention of its Organizational Documents in effect as of the date hereof;

(xxxiv) if the Bankruptcy Court or another court of competent jurisdiction shall enter an order, without the prior written consent of Lender:

(xxxv) the granting of adequate protection, under Bankruptcy Code Sections 361, 362, 363, or 364 or otherwise, to any party, except as set forth in the Project Cost Budget;

(xxxvi) the granting of relief from the automatic stay, under Bankruptcy Code Section 362 or otherwise, to any party, other than Lender, with respect to any Collateral;

(xxxvii) surcharging, under Bankruptcy Code Section 506(c) or otherwise, any Collateral in any amount, or subjecting Lender or the Collateral to the equitable principle of marshaling;

(xxxviii) approving credit or debt (other than the Loan) secured by a Lien, under Bankruptcy Code Section 364 or otherwise, on any Collateral;

(xxxix) approving any administrative-expense claim, expense, or cost against Borrower (other than the DIP Claims), under Bankruptcy Code Section 364, 502, 507, or otherwise, with priority of payment senior or equal to the DIP Claims;

(xl) modifying, staying, vacating, or rescinding any part of any DIP Order, or failure of Borrower to comply with the DIP Order in any material respect;

(xli) holding, adjudicating, or declaring any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any Obligation, any Loan Document, or any right or remedy of Lender to be invalid, unenforceable, of no further force and effect, or otherwise subject to question, challenge, or impairment;

(xlii) appointing an examiner or trustee in Borrower's Case;

4885-5497-3488, v. 2

(xliii)   confirming any Chapter 11 Plan that does not provide for repayment in full in cash on the effective date of such plan of all outstanding Obligations;

(xliv)   converting Borrower's Case to a case under Bankruptcy Code Chapter 7; or

(xlv)   dismissing or closing Borrower's Case;

(xlvi)   an application shall be filed by Borrower for the approval of, or an order of the Bankruptcy Court shall be entered granting, any other Liens in any of the Chapter 11 Case that are *pari passu* with or senior to the DIP Liens on the Collateral, or any claims (as such word is defined in the Bankruptcy Code) senior to or *pari passu* with the claims of Lender against Borrower;

(xlvii)  [OTHER, including post-closing obligations]

(b)      Upon the occurrence and during the continuance of an Event of Default and at any time during its continuance thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to all of the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and any or all of the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vii) or (viii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

**Section 8.2**      Remedies.

(a)      Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have

113

commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Property or any other Collateral. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by Applicable Law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by Applicable Law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default has occurred and is continuing: (i) Lender is not subject to any "one action" or "election of remedies" law or rule, (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the other Collateral and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full, (iii) Lender shall have the right to apply any monies which Lender may have on deposit against any amounts, which may be past due under the Loan, or hold as security for the payment hereof any other property heretofore or hereafter delivered by Borrower into the custody, control or possession of Lender for any reason or purpose whatsoever, (iv) Lender may (a) move or apply to the Bankruptcy Court for entry of an order, (b) terminate the automatic stay with respect to any Collateral, (c) terminate Borrower's exclusivity to propose a Chapter 11 Plan, (d) appoint an examiner or Chapter 11 trustee, and/or (e) convert Borrower's Case to Chapter 7. If Lender so moves or applies, Borrower shall be limited to contesting solely whether the Event of Default has occurred and/or is continuing, and Borrower expressly waives the right to contest such relief whatsoever beyond the foregoing limitation.

(b)      Upon the occurrence and during the continuance of any Event of Default, Lender may, but without any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose the Deed of Trust or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period from the date that such cost or expense was incurred by Lender to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured

114

by the Deed of Trust and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.  With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property or the Collateral for the satisfaction of any of the Debt in preference or priority to any other Collateral, and Lender may seek satisfaction out of the Property or any other Collateral or any part thereof, in its absolute discretion in respect of the Debt. For the avoidance of doubt, and notwithstanding anything to the contrary contained herein or in the other Loan Documents, Borrower acknowledges and agrees that Lender shall be permitted to make protective advances under the Loan, and all such protective advances shall accrue interest in accordance with the terms of this Agreement and shall constitute a portion of the Debt hereunder.

(c)      Upon the occurrence of an Event of Default, in addition to any other rights and/or remedies available to Lender under this Agreement, the Security Instrument any other Loan Document or at law or equity, Lender shall also have the right and is hereby given an unconditional and irrevocable license to enter, or to cause the Construction Consultant or another independent contractor of Lender's selection to enter the Property, the Project or any part thereof and perform any and all work and labor necessary to complete the Project substantially in accordance with the Plans and Specifications and to employ watchmen to protect the Property and the Project, and all sums expended and costs incurred by Lender for such purposes shall be deemed to have been paid to Borrower and shall be secured by the Security Instrument.

(d)      For the purposes set forth in Section 8.2(c) above, Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably constitutes and appoints Lender (and any Persons selected by Lender) Borrower's true and lawful attorney-in-fact with full power of substitution to complete the Project in the name of Borrower, and hereby empowers said attorney (or attorneys) as follows: to make such additions, changes and/or corrections in the Plans and Specifications which shall be necessary or desirable to complete the Project in substantially the manner contemplated by the Plans and Specifications; to use any funds of Borrower including, without limitation, any balance which may be held in escrow and any proceeds of the Loan which may remain unadvanced under the Loan Documents, for the purpose of completing the Project in the manner called for by the Plans and Specifications as same may be modified hereby and pursuant to any of Lender's rights and remedies contained in the Completion Guaranty, which is hereby incorporated by reference; to employ such contractors, subcontractors, agents, architects and inspectors as shall be desirable or required for said purposes; to pay, settle or compromise all existing bills and claims which are or may become liens against the Property or any part thereof,

115

or may be necessary for the completion of the Project or the clearance of title; to execute all applications and certificates in the name of Borrower which may be required by any construction contract; and to do any and every act with respect to the Work which Borrower may do on Borrower's own behalf.  It is understood and agreed that this power of attorney shall be deemed to be a power coupled with an interest which cannot be revoked.  Said attorney-in-fact shall also have the power to prosecute and defend any and all actions or proceedings in connection with the Work and to take such action and require such performance as it deems necessary.  Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably assigns and quitclaims to Lender all sums advanced pursuant to either this Section 8.2(d) and/or Section 8.2(c) above, and all sums in escrow, subject to the condition that said sums, if any, be used for the completion of the Project.  The entering of the Property by Lender or Lender's agents or representatives in order to complete the Project and/or exercise the aforesaid license and/or power-of-attorney shall not exclude Borrower from possession, custody, ownership or control of the Property or the Project or of any the rents, income, issues or profits.

(e)     If the Property consists of two or more distinct parcels and the Security Instrument is foreclosed, whether pursuant to the power of sale herein granted to Lender, or otherwise, the Property, or any interest therein, may, at the discretion of Lender, be sold in bulk, in individual parcels or in several interests or portions and in any order or manner as the Lender may elect and specify in the notice of sale.

(f)     If the indebtedness secured by this Agreement and the Security Instrument is also secured by one or more other deeds of trust on property consisting of more than one functionally separate and distinct property and an Event of Default occurs under this Agreement and the Security Instrument or any such other deed of trust which is cross-defaulted with this this Agreement and the Security Instrument, upon a foreclosure of this Agreement and the Security Instrument and such other deeds of trust, whether pursuant to a power of sale or otherwise, the Property, or any interest therein, and the property encumbered by such other deeds of trust may, at the discretion of Lender, be sold in the order designated by Lender in the notice of sale.

(g)     In addition to the rights and remedies enumerated in this Section 8.2, Lender shall be entitled, while any Event of Default has occurred and is continuing, to pursue all rights and remedies available to it under the Bankruptcy Code (whether as a creditor, party in interest, or otherwise) or as a secured party under the Uniform Commercial Code.  For the avoidance of doubt,

all costs incurred by Lender in connection with this Section 8.2 shall constitute DIP Lender Expenses and Obligations for all purposes.

**Section 8.3**     Remedies Cumulative; Waivers.

The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one or more Defaults or Events of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

**ARTICLE IX.  SPECIAL PROVISIONS**

**Section 9.1**     Sale of Note.

(a)     Lender shall have the right at any time (i) to sell, assign, pledge or otherwise transfer the Loan or any portion thereof or interest therein to any Person, and/or (ii) to sell participation interests in the Loan to any Person.  (The transactions referred to in clauses (i) and (ii) are each hereinafter referred to as a "Secondary Market Transaction".

(b)     If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies or applicable Legal Requirements in connection with any Secondary Market Transactions, including to:

(i)     (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Guarantor, any Affiliate of Borrower or Guarantors and Manager, (B) provide updated budgets and rent rolls (including itemized percentage of floor area occupied and percentage of aggregate base rent for each tenant) relating to the Property, and (C) provide updated appraisals, market

117

studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the information referred to in <u>clauses (A)</u>, <u>(B)</u> and <u>(C)</u> shall hereinafter be referred to collectively as "<u>Updated Information</u>"), together, if customary, with appropriate verification of the Updated Information through letters of auditors, certificates of third party service providers or opinions of counsel acceptable to Lender and the Rating Agencies;

(c)      Borrower agrees that (i) Lender may disclose any information relating to Property, the business operated at the Property, Borrower, Guarantors, any Affiliate of Borrower or Guarantors, Manager or the Loan (including information provided by or on behalf of Borrower or any of its Affiliates to Lender) to any Person (including, but not limited to, investors or prospective participants, investment banking firms, accounting firms, law firms and other third-party advisory and service providers relating to a Secondary Market Transaction) actually or potentially involved in or related to any Secondary Market Transaction or any other Person reasonably requesting such information and (ii) the findings and conclusions of any third-party due diligence report obtained by Lender or other Indemnified Persons may be made publicly available if required, and in the manner prescribed, by applicable Legal Requirements.

**Section 9.2**      <u>Intentionally Omitted.</u>

**Section 9.3**      <u>Severance Documentation.</u>

(a)      Borrower acknowledges that Lender may at any time sell, participate, transfer, pledge or assign all or any portion of the Loan, including without limitation, the Note, this Agreement, the Security Instrument and the other Loan Documents, and assign participation interests or other types of interests in all or any portion of the Loan and all servicing rights to one or more domestic or foreign banks, insurance companies, pension funds, trusts or other institutional lenders or other persons, parties or investors (including, but not limited to, grantor trusts, owner trusts, special purpose corporations, REMICs, real estate investment trusts or other similar or comparable investment vehicles as may be selected by Lender in its sole and absolute discretion) on terms and conditions satisfactory to Lender in its sole and absolute discretion. Borrower grants to Lender, and shall cause each Guarantor and other person or party associated or connected with this Borrower or the Collateral therefore to grant to Lender the right to distribute financial and other information concerning the Property, the Borrower, each such Guarantor and other person or party and the property encumbered by the Security Instrument and any other pertinent information with respect to this Loan or any portion thereof or interest therein to any

118

party who has provided collateral financing for or has purchased a participation interest in this Loan or any portion thereof or interest therein who has expressed an interest in providing collateral financing for or purchasing any such interest in this Loan or any portion thereof or interest therein.

(b)    Lender may provide to any actual or potential purchaser, transferee, assignee, servicer, participant or investor or any Rating Agency, all documents and information which Lender now has or may hereafter acquire relating to the Loan, Borrower, Guarantor any other party to the Loan or the Property which shall have been furnished by or on behalf of Borrower, Guarantor or any other party to the Loan, as Lender in its discretion determines is desirable. Borrower shall cooperate with Lender with the same, including providing such information and documents as Lender may reasonably request.

(c)    Lender, without in any way limiting Lender's other rights under the Loan Documents, in its sole and absolute discretion, shall have the right, at any time, with respect to all or any portion of the Loan, to modify, split and/or sever all or any portion of the Loan. Without limiting the foregoing, Lender may (i) cause the Note and the Security Instrument to be split into multiple mortgage loans, (ii) create one or more senior and subordinate notes (e.g., an A/B or A/B/C structure), (iii) create multiple interests or components of the Note (and allocate or reallocate the Principal among such components), (iv) otherwise sever the Loan into multiple components secured by deeds of trust and by a pledge of partnership or membership interests (directly or indirectly) in Borrower (i.e., a senior loan/mezzanine loan structure), in each such case described in clauses (i) through (iv) above, in whatever proportion and whatever priority Lender determines, and (v) modify the Loan Documents with respect to the newly created Notes or components of the Note. Notwithstanding the foregoing, no such amendment described above shall (i) modify or amend any material economic term of the Loan, or (ii) materially increase the obligations, or materially decrease the rights, of Borrower under the Loan Documents; provided, however, in each such instance the outstanding Principal of all the notes evidencing the Loan (or components of such Notes) immediately after the effective date of such modification equals the outstanding Principal immediately prior to such modification and the weighted average of the interest rates for all such Notes (or components of such Notes) immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification. If requested by Lender, Borrower (and Borrower's constituent members, if applicable, and Guarantors) shall execute within five (5) Business Days after such request, such documentation as Lender may request to evidence and/or effectuate any such modification or severance. At Lender's election, each note comprising the Loan may be subject to one or more

119

securitizations. Lender shall have the right to modify the Note and/or Notes and any components in accordance herewith and, provided that such modification shall comply with the terms hereof, it shall become immediately effective. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance and/or modification, Borrower ratifying all that its said attorney shall do by virtue thereof. Copies of all documents executed by Lender as Borrower's attorney shall be promptly provided to Borrower.

(d)     In connection with any actions taken by Lender in accordance with this Section 9, Lender shall be permitted, without the consent of Borrower, to appoint an administrative agent (the "Administrative Agent"), which may or may not be an affiliate of Lender, as the agent of Lender under this Agreement and the other Loan Documents to take such action on Lender's behalf permitted under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to Administrative Agent by Lender in a separate agreement between Lender and Administrative Agent, together with such other powers as are reasonably incidental thereto, in each case provided that such powers and duties are consistent with this Agreement and the other Loan Documents. Notwithstanding any provision to the contrary elsewhere in this Agreement and the Loan Documents, an Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein or therein, or any fiduciary relationship with Lender or any other lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any Loan Document or otherwise exist against an Administrative Agent. For the avoidance of doubt, nothing herein shall relieve Lender of any of its obligations under this Agreement or the other Loan Documents.

120

4885-5497-3488, v. 2

Section 9.4    Servicer.        At the option of Lender, the Loan (or any portion thereof) may be serviced by a servicer/trustee (the "Servicer") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "Servicing Agreement") between Lender and Servicer, and Borrower shall pay any reasonable servicing fees due in connection therewith. Upon notice thereof from Lender, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower and Guarantor under the Loan Documents.  Provided Borrower shall have received notice from Lender of Servicer's address, Borrower shall deliver, and cause to be delivered, to Servicer duplicate originals of all notices and other documents and instruments which Borrower and/or Guarantor deliver to Lender pursuant to the Loan Documents.  No delivery of any such notices or other documents shall be of any force or effect unless delivered to Lender and Servicer as provided in this Section 9.4.

Section 9.5    Recourse/Full Recourse.

(a)        Except as otherwise provided herein, in the Security Instrument or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Agreement, the Note or the Security Instrument by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may, without limitation, bring a foreclosure action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Agreement, the Note, the Security Instrument, the other Loan Documents, and the interest in the Property, the Rents, Gross Income From Operations and any other Collateral given to Lender created by this Agreement, the Note, the Security Instrument and the other Loan Documents. The provisions of this Section shall not: (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Agreement, the Note, the Security Instrument or the other Loan Documents; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of any indemnity (including, without limitation, the Environmental Indemnity), guaranty (including, without limitation, the Guaranty), or similar instrument made in connection with this Agreement, the Note, the Security Instrument, or the other Loan Documents; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) impair the right of Lender to enforce the provisions of Sections 15, 21 or 29 of the Security Instrument or Articles 4 or 5 hereof; or (vii) impair the right of Lender to obtain a deficiency judgment or other judgment on the Note against Borrower if necessary to (A) preserve or enforce

121

its rights and remedies against the Property or (B) obtain any Insurance Proceeds or Awards to which Lender would otherwise be entitled under the terms of this Agreement or the Security Instrument.

(b)       In furtherance of, but without limiting, the foregoing Section 9.5(a), Borrower and Guarantors shall be fully and personally liable for all Losses incurred by Lender in connection with (i) misapplication, misappropriation or conversion of Insurance Proceeds, Awards or other sums or payments attributable to the Property; (ii) misapplication, misappropriation or conversion of tenant security deposits, Rents, profits, issues, products and income of the Property received or collected by or on behalf of the Borrower or any Affiliate or subsidiary thereof; (iii) misapplication, misappropriation or conversion of or failure to turn over to Lender, after an Event of Default, any security deposits or Rents collected in advance; (iv) failure to pay any amounts due and owing to the Lender in connection with any Transfer of the Property or Transfer of ownership interests, whether direct or indirect, in the Borrower; (v) other than as set forth in Section 9.5(c) below, the incurrence by Borrower of any indebtedness not expressly permitted pursuant to the Loan Documents; (vi) failure by the Borrower, Guarantor or any other Restricted Party, or their respective Affiliates to comply with the covenants, obligations, liabilities, warranties and representations contained in the Environmental Indemnity or in this Agreement; (vii) commission of waste, arson and/or damage to the Property, including, without limitation, the removal or disposal of any portion of the Property (or Improvements); (viii) any misrepresentation, or breach of any representation contained in the Loan Documents by the Borrower, Guarantor, any other Restricted Party, any of their Affiliates, or any other Person acting on their behalf; (ix) collecting any amount due and owing under the Loan Documents; (x) any unpaid Taxes or Other Charges, charges for labor or materials or other charges that can create Liens on the Property or any part thereof, heretofore or hereafter imposed upon the Borrower or in respect of the Property which become a lien or charge upon the Borrower, the Property, or any part thereof; (xi) the failure to maintain insurance with respect to the Property as required by the terms of the Loan Documents, or to pay or provide or cause to be provided the amount of any insurance deductible, to the extent of the applicable deductible, following a casualty event or other insured event; (xii) any violation of any of the covenants and representations under Section 4.1.35 hereof which do not result in the substantive consolidation of Borrower with another Person; (xiii) the existence of any open deeds of trust (other than the Deed of Trust) of record affecting the Property; (xiv) failure by Borrower to pay any and all transfer taxes in connection with a foreclosure or deed-in-lieu of foreclosure of the Property and (xv) the gross negligence or willful misconduct of Borrower, Guarantor, any other Restricted Party, or any of their respective Affiliates, principals, officers, general partners,

4885-5497-3488, v. 2

members, authorized agents or authorized employees (all such liability and obligation of Borrower for any or all of the foregoing being referred to herein as "Borrower's Recourse Liabilities").

(c)      Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect and the Loan shall become fully recourse to Borrower and Guarantor, jointly and severally, in the event there shall occur any of the following (each, a "Springing Full Recourse Event"): (i) any violation of the provisions of Section 5.2.10 or Section 8 of the Security Instrument hereof; (ii) any violation of any of the covenants and representations under Section 4.1.35 hereof which violation results in the substantive consolidation of Borrower with any other Person; (iii) any involuntary bankruptcy or other insolvency opinion filed against a Restricted Party which is not dismissed within ninety (90) days of filing, or any Restricted Party files, or joins in the filing of, an involuntary petition against any other Restricted Party under any Creditors Rights Laws, or solicits or causes to be solicited petitioning creditors for any involuntary petition against any Restricted Party from any Person, (iv) any Restricted Party files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under any Creditors Rights Laws, or solicits or causes to be solicited petitioning creditors for any involuntary petition from any Person, or in the event Lender makes a formal filing to lift the stay in such bankruptcy proceedings and Borrower or Guarantor formally contests such filing and the lifting of the applicable stay in connection therewith, (v) a receiver, liquidator or trustee of Borrower or of any Guarantor shall be appointed for any Restricted Party or any portion of the Property, (vi) if any Restricted Party, the Property or any part thereof shall become an asset in a voluntary bankruptcy or insolvency proceeding or if any proceeding for the dissolution or liquidation of Borrower or of any Guarantor shall be instituted by Borrower or any Guarantor or any other Restricted Party, (vii) fraud or failure to disclose a material fact or a misrepresentation by Borrower, Guarantor or any other person acting on behalf of Borrower or Guarantor; (viii) Borrower, Guarantor or any other Restricted Party or any of their respective Affiliates shall, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Note, the Security Instrument or any of the Loan Documents, asserts a defense, seeks judicial intervention or injunctive or other equitable relief of any kind or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan which the court in such action or proceeding determines is without merit (in respect of a defense) or unwarranted (in respect of a request for judicial intervention or injunctive or other equitable relief); (ix) any violation of the provisions of Section 5.2.15 hereof, and/or Borrower fails to obtain Lender's prior written consent

123

to any subordinate financing or other voluntary lien encumbering the Property; (x) a claim is made by any party that the Loan Documents were not properly authorized or otherwise consented to upon the origination of the Loan or at any other time, (xi) Borrower fails to obtain Lender's prior written consent, when and as required: (1) to any alteration, modification, or change to an existing Lease or (2) prior to entering into a new Lease, or any other breach or default by Borrower of Section 5.1.17 hereof; or (xii) if Borrower opts out of Article 8 of the applicable Uniform Commercial Code in contravention of its organizational documents in effect as of the date hereof.

(d)      Nothing herein shall be deemed to be a waiver of any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provision of the Bankruptcy Code to file a claim for the full amount of the indebtedness secured by the Security Instrument or to require that all Collateral shall continue to secure all of the indebtedness owing to Lender in accordance with this Agreement, the Note, the Security Instrument and the other Loan Documents.

**Section 9.6**    <u>Certain Additional Rights of Lender</u>.

(a)      Notwithstanding anything to the contrary contained herein or in the other Loan Documents, for so long as the Loan is outstanding, Lender shall have:

(i)      the right, in accordance with the terms of this Agreement, to visit and inspect any of the properties of Borrower and examine (and request copies of) the books and records of Borrower relating to the Property at any time upon prior notice;

(ii)      the right, without restricting any other right of Lender under this Agreement (including any similar right), to restrict, upon the occurrence of an Event of Default, (A) Borrower's payments of management consulting, director or similar fees to Affiliates or Restricted Parties of Borrower (or their personnel), and (B) Borrower's distribution of funds to any Restricted Party, which right, in each case, shall be deemed automatically exercised by Lender without the need for any further document, instrument or notice, immediately upon the occurrence of an Event of Default;

(iii)      the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any other significant property; and

4885-5497-3488, v. 2

(iv) the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict the transfer of voting interests in Borrower held by its members, and the right to restrict the transfer of interests in such members.

(b) The rights described above may be exercised by any Person that owns or Controls Lender, or that has been designated the authority by Lender to administer or service the Loan in such manner.

## ARTICLE X.   MISCELLANEOUS

**Section 10.1**   Survival.

This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 10.2**   Lender's Discretion.

Except as otherwise set forth herein, whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall be in the sole discretion of Lender and shall be final and conclusive. As used in this Agreement and the other Loan Documents, (a) the phrases "Lender's discretion," "Lender's sole discretion," "Lender's sole and absolute discretion," and other variations thereof, and (b) the phrases "acceptable to Lender," "approved by Lender," "satisfactory to Lender," and other variations thereof, shall be interpreted in accordance with this paragraph.

4885-5497-3488, v. 2

**Section 10.3**   <u>Governing Law</u>.

(a)      THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT ENTERED INTO PURSUANT TO THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE, AND SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)      WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER OR UNDER THIS AGREEMENT, THE NOTE, OR THE OTHER LOAN DOCUMENTS, BORROWER (A) IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, TO THE EXTENT NOT PREEMPTED THEREBY, THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF, AND (B) IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS BROUGHT IN ANY SUCH COURT, AND IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS WILL BE DEEMED TO PRECLUDE LENDER FROM BRINGING AN ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

[BORROWER'S COUNSEL]

ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID

**AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS) AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.**

       **Section 10.4**    <u>Modification, Waiver in Writing</u>.

       No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on, Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

       **Section 10.5**    <u>Delay Not a Waiver</u>.

       Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.

4885-5497-3488, v. 2

**Section 10.6**    Notices.

All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person with receipt acknowledged by the recipient thereof, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Borrower:          Compass Pointe Off Campus Partnership B LLC
                         [2401 A-Waterman Boulevard, PMB 143]
                         [Fairfield, California 94534]
                         Attention:  [_____]

With a copy to:          [_____]
                         [_____]
                         [_____]
                         Attention:  [_____]


If to Lender:            **MERCED DIP LENDER LLC**
                         [_____]
                         [_____]
                         Attention:  [_____]

With a copy to:          Kriss & Feuerstein LLP
                         360 Lexington Avenue
                         New York, New York 10016
                         Attention:  Jerold C. Feuerstein, Esq.

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications; provided, however that Lender's failure to notice any Person other than Borrower shall not render ineffective or otherwise derogate from the validity of any notices properly issued to Borrower.  Borrower shall not refuse or reject delivery of any notice

128

given in accordance with this Agreement, and shall acknowledge, in writing, the receipt of any notice upon request of Lender.  Notices may be sent by a party's counsel.

**Section 10.7**  Waiver of Notice.

Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 10.8**  Trial by Jury.

BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

**Section 10.9**  Headings.

The Article and/or Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 10.10**  Severability.

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective to the extent of

129

such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 10.11** Preferences.

Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder or under the other Loan Documents.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, State or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 10.12** Remedies of Borrower.

In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 10.13** Expenses; Indemnity.

(a)      Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse Lender on demand for all costs and expenses (including attorneys' fees and disbursements) incurred by Lender in connection with: (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and

130

4885-5497-3488, v. 2

covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance and fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, Guarantor, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; (viii) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; (ix) intentionally omitted; (x) the negotiation, preparation, execution, delivery, review and administration of any consents, amendments, waivers or other modifications of or under any Loan Document; and (xi) any of the items referenced in Section 9.5 hereof. Any cost or expense due and payable to Lender shall also be payable to Lender's designee. Borrower shall also pay all costs and expenses required to achieve Completion and the satisfaction of the conditions of this Agreement, including (xii) the fees and expenses of the Construction Consultant and Lender's counsel in connection with the Loan, including in connection with the preparation for and consummation of the transactions contemplated hereby, in connection with the advance of proceeds of the Loan, and for any services of such parties which may be required in addition to those normally and reasonably contemplated hereby, (xiii) any taxes, insurance premiums, Liens, security interests or other claims or charges against the Property or Improvements, and (xiv) all costs of completion of the work required to be performed by Borrower at the Improvements) (including public space) to permit the lawful occupancy thereof for the purposes contemplated by actual or prospective lessees or owners of such space as set forth in any Lease by which Borrower is bound, as the case may be (such work to the extent approved by Lender, in writing). The obligations and liabilities of Borrower under this Section 10.13 shall survive the term and the exercise by Lender of any of its rights or remedies under the Loan

4885-5497-3488, v. 2

Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

(b)      Borrower shall indemnify, defend and hold harmless Lender and Indemnified Parties from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that may be imposed on, incurred by, or asserted against Lender or the Indemnified Parties in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or in connection with a sale of the Note, a participation of the Loan, or any of the other activities contemplated in Section 9 of this Agreement, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "Additional Indemnified Liabilities"). To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under Applicable Law to the payment and satisfaction of all Additional Indemnified Liabilities incurred by Lender.

(c)      Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless Lender and the Indemnified Parties from and against any and all Losses (including, without limitation, attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA, the Code, any State statute or other similar law that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 4.1.8 or 5.2.8 hereof.

(d)      Borrower's payment obligations with respect to any indemnified liability shall constitute Obligations for all purposes hereunder, and each Indemnified Party that is not a party to this Agreement shall be deemed a third-party beneficiary of this Agreement for purposes enforcing such obligations.

**Section 10.14** <u>Schedules, Exhibits and Cover Page Incorporated</u>.

The Schedules, Exhibits and Cover Page annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 10.15** <u>Offsets, Counterclaims and Defenses</u>.

Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 10.16** <u>No Joint Venture or Partnership; No Third Party Beneficiaries</u>.

(a)        Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)        This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

4885-5497-3488, v. 2

**Section 10.17** <u>Waiver of Marshalling of Assets</u>.

Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of the Security Instrument, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

**Section 10.18** <u>Waiver of Counterclaim</u>.

Borrower hereby waives the right to assert a counterclaim in any action or proceeding brought against it by Lender or its agent.

**Section 10.19** <u>Conflict; Construction of Documents; Reliance</u>.

In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower has relied and shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any direct or indirect equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower, any other Restricted Parties, or their Affiliates.

134

4885-5497-3488, v. 2

**Section 10.20** Prior Agreements.

This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower, any other Restricted Party and/or their Affiliates and Lender are superseded by the terms of this Agreement and the other Loan Documents.

**Section 10.21** Waiver of Statute of Limitations.

Borrower and Guarantor hereby expressly waive and release, to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its other Obligations set forth in the Loan Documents.

**Section 10.22** Counterparts; Electronic Signatures.

This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. In addition, the parties may execute separate signature pages, and such signature pages (and/or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of all of the parties hereto. It shall not be necessary in making proof of this Agreement to produce or account for more than a single instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures and acknowledgment of, or on behalf of, each of the parties hereto. Further, facsimile or electronic (e.g., .pdf format) copies of signatures and documents, as well as original signatures or documents converted to electronic signatures or documents by Lender for convenient recordkeeping or other purposes in accordance with Applicable Law, shall be considered originals for purposes of binding the parties hereto and thereto.

**Section 10.23** Joint and Several.

If more than one Person has executed this Agreement as "Borrower," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.

135

4885-5497-3488, v. 2

**Section 10.24** Nonliability of Lender.

Borrower acknowledges and agrees that:

(a)        it has no defense, counterclaim, offset, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of its liability to repay the obligations or to seek affirmative relief or damages of any kind or nature from Lender. Borrower hereby voluntarily and knowingly releases and forever discharges Lender and its predecessors, agents, employees, Affiliates, attorneys, participants, successors and assigns (collectively, the "Released Parties") from any and all claims whatsoever, whether known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, or at law or in equity, in any case originating in whole or in part on or before the Closing Date that Borrower may now or hereafter have against the Released Parties, if any, irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise, and that arise from the Loan, the exercise of any rights and remedies under this Agreement or any of the other Loan Documents, and/or the negotiation for and execution of this Agreement, including, without limitation, any contracting for, charging, taking, reserving, collecting or receiving interest in excess of the Maximum Legal Rate.  Borrower acknowledges that the foregoing release is a material inducement to Lender's decision to extend to Borrower the financial accommodations hereunder and has been relied upon by Lender in agreeing to make the Loan;

(b)        in any litigation, arbitration or other dispute resolution proceeding relating to any of the Loan Documents, Borrower waives any and all defenses, objections and counterclaims it may have or could interpose with respect to (i) any of its directors, officers, employees or agents being deemed to be employees or managing agents of Borrower for purposes of all Applicable Law regarding the production of witnesses by notice for testimony (whether in a deposition, at trial or otherwise), (ii) Lender's counsel examining any such individuals as if under cross-examination and using any discovery deposition of any of them as if it were an evidence deposition, and (iii) using all commercially reasonable efforts to produce in any such dispute resolution proceeding, at the time and in the manner requested by Lender, all Persons, documents (whether in tangible, electronic or other form) and other things under its control and relating to the dispute;

(c)        any inspections of the construction of the Improvements made by or through Lender are for purposes of administration of the Loan only and Borrower is not entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship, conformity

136

to the Plans and Specifications, state of completion or otherwise; Borrower shall make its own inspections of such construction to determine that the quality of the Improvements and all other requirements of such construction are being performed in a manner satisfactory to Borrower and in conformity with the Plans and Specifications and all other requirements; and Borrower shall immediately notify Lender, in writing, should the same not be in conformity with the Plans and Specifications and all other requirements under the Loan Documents;

(d) by accepting or approving anything required to be observed, performed, fulfilled or given to Lender pursuant to the Loan Documents, including any certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof and such acceptance or approval thereof shall not constitute a warranty or representation to any Person with respect thereto by Lender;

(e) Lender does not undertake or assume any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Property, including, without limitation, matters relating to the quality, adequacy or suitability of (i) the Plans and Specifications, (ii) architects, contractors, subcontractors and materialmen employed or utilized in connection with the construction of the Improvements, or the workmanship of or the materials used by any of them, or (iii) the progress or course of construction and its conformity or nonconformity with the Plans and Specifications; and Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Borrower by Lender in connection with such matters is for the protection of Lender only and neither Borrower nor any third party is entitled to rely thereon;

(f) Lender owes no duty of care to protect Borrower against negligent, faulty, inadequate or defective building or construction; and

(g) Lender shall not be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any Person or property arising from any construction on, or occupancy or use of, any of the Property, including, without limitation, any loss, claim, cause of action, liability, indebtedness, damage or injury caused by, or arising from: (i) any defect in any building, structure, grading, fill, landscaping or other improvements thereon or in any on-site or off-site improvement or other facility therein or thereon; (ii) any act or omission of Borrower, the parties comprising Borrower or any of Borrower's agents,

137

employees, independent contractors, licensees or invitees; (iii) any accident in or on the Property and Improvements or any fire, flood or other casualty or hazard thereon; (iv) the failure of Borrower, any of Borrower's licensees, employees, invitees, agents, independent contractors or other representatives to maintain the Property in a safe condition; and (v) any nuisance made or suffered on any part of the Property.

**Section 10.25** Commercial Division.

To the extent applicable, in an action commenced in the Commercial Division, New York State Supreme Court, the parties hereby agree, subject to the requirements for a case to be heard in the Commercial Division, to apply the Court's accelerated adjudication procedures set forth in Rule 9 of the Rules of Practice for the Commercial Division, in connection with any dispute, claim or controversy arising out of or relating to the Note or any of the Loan Documents, or the breach, termination, enforcement or validity hereof or thereof.

**Section 10.26** Subrogation.

If, and to the extent that, the proceeds of the Loan are used to pay, satisfy, or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust, or other lien encumbering the Property, such Loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall be subrogated automatically, and without further action on its part, to the rights, including lien priority, of the owner or holder of the obligation secured by such prior lien, whether or not such prior lien is released.

**Section 10.27** Certain Additional Rights of Lender (VCOC). Notwithstanding anything to the contrary contained in the Loan Documents, Lender shall have:

(a)　　the right to routinely consult with and advise Borrower's management regarding the significant business activities and business and financial developments of Borrower, including, but not limited to, with respect to (i) annual operating and capital budgets, (ii) insurance, (iii) material leases and lease forms, (iv) property management and leasing agents and amendments, modifications or termination of any agreements with such agents, and (v) changes in business; provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of materials substances. Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times upon reasonable notice;

4885-5497-3488, v. 2

(b)     the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower at any reasonable times upon reasonable notice;

(c)     the right, in accordance with the terms of this Agreement to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness; and

(d)     the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any other significant property (other than personal property required for the day to day operation of the Property) and to restrict any financing and/or indebtedness with respect thereto.

[SIGNATURE PAGE FOLLOWS]

139

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**<u>BORROWER</u>:**

**Compass Pointe Off Campus Partnership B LLC**,
a California limited liability company

By: _____
Name:
Title:

STATE OF                                       )
                                                      ) ss.:
COUNTY OF                                  )

On this ____ day of _____, in the year 2022, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

[SIGNATURES CONTINUE FROM PREVIOUS PAGE]

**LENDER**:

**MERCED DIP LENDER LLC,**
a New York limited liability company

By: _____
Name:
Title:

STATE OF                              )
                                     ) ss.:
COUNTY OF                            )

      On this ___ day of _____, in the year 2022, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

## SCHEDULE I

Property Description

## SCHEDULE II

Organizational Chart

## SCHEDULE III

Project Cost Budget

## EXHIBIT A

### Pending Disbursements Clause

Pending disbursement of the full proceeds of the loan secured by the insured deed of trust described herein, this policy insures only to the extent of the amount actually disbursed plus interest accrued thereon but increases up to the face amount of the policy as disbursements are made in good faith and without knowledge of any defects in, or encumbrances prior to, the lien of the insured deed of trust other than exceptions on Schedule B of this policy not insured against hereunder.

Title shall be continued down to the date of each disbursement and the Company shall furnish to the Insured a continuation report which shall note (1) the new effective date and amount of the policy, (2) all assessments, taxes, liens, encumbrances, leases, deeds of trust, easements and setback violations then affecting the insured Property which have been filed of record or discovered by the Company since the original date of the policy regardless of whether they affect the lien of the insured deed of trust, (3) which of the aforesaid items have been filed or recorded since the date of the last preceding continuation report, and (4) which of said items are intended to be added as exceptions to the coverage of the policy as to (a) all amounts secured by the insured deed of trust, and (b) only amounts secured by the insured deed of trust advance on or after the new effective date of the policy.

In addition, each continuation search shall notify Lender of any liens which have been discharged by bonding, court deposit or any other means other than full payment.

In the event that the lien of the insured deed of trust described herein is insured by more than one insurer, this Company agrees that it shall be bound by the continuation reports of a single company specified as "lead" insurer herein.

2

<u>EXHIBIT B</u>

[Assignment and Subordination of Construction Management Agreement]

## <u>ASSIGNMENT AND SUBORDINATION OF</u>
## <u>CONSTRUCTION MANAGEMENT AGREEMENT</u>

**THIS ASSIGNMENT AND SUBORDINATION OF CONSTRUCTION MANAGEMENT AGREEMENT** (as amended, restated, supplemented or otherwise modified from time to time, this "<u>Assignment</u>") is executed effective as of [_____], by and between **COMPASS POINTE OFF CAMPUS PARTNERSHIP B LLC,** a California limited liability company, having an address at [2401 A-Waterman Boulevard, PMB 143, Fairfield, California 94534] ( "<u>Borrower</u>"), and [_____], a _____ ("<u>Construction Manager</u>"), having an address at _____, for the benefit of **MERCED DIP LENDER LLC**, a New York limited liability company, having an address at [_____] (together with its successors and assigns, collectively, "<u>Lender</u>"), having an address at [_____].

.

## <u>RECITALS:</u>

**WHEREAS**, pursuant to that certain (i) Debtor-in-Possession Construction Loan Agreement (as the same may be amended, modified, supplemented, restated or replaced from time to time, the "<u>Loan Agreement</u>") dated as of the date hereof and made between Borrower and Lender, Lender has agreed to make a certain construction loan to Borrower (collectively, the "<u>Loan</u>") in an aggregate and maximum principal amount of up to $[24,375,000.00], subject to the terms and conditions of the Loan Agreement;

**WHEREAS**, pursuant to that certain [Agreement for Contractor Agreement] (as amended, the "<u>Construction Management Agreement</u>"), by and between Borrower and Construction Manager, a true, correct and complete copy of which is attached hereto as <u>Exhibit A</u>, Construction Manager provides certain construction management services relating to the Property and Construction Manager is entitled to certain fees, commissions or other payments provided therein (collectively, the "<u>Construction Management Fee</u>");

**WHEREAS**, this Assignment is given in connection with the terms of the Loan Agreement;

**WHEREAS**, Lender requires as a condition to the making of the Loan that Borrower assign the Construction Management Agreement to Lender and that Construction Manager subordinate its interest in the Construction Management Fee to the lien of the Security Instrument and the payment of all amounts accruing under the Loan Documents as set forth below.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in order to induce Lender to make the Loan to Borrower, the parties hereto hereby agree as follows:

1.    **Assignment of Construction Management Agreement**.  As additional security for the Loan, Borrower hereby conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest (but not Borrower's obligations) in and to the Construction Management Agreement, said transfer and assignment to automatically become a present, unconditional assignment, at Lender's option, after the occurrence of an Event of Default (as defined in the Loan Agreement).  Borrower hereby irrevocably appoints Lender as Borrower's attorney-in-fact from and after the occurrence of an Event of Default, which appointment is coupled with an interest and is therefore irrevocable, with full power of substitution in the name of Borrower, to do all things and to execute and deliver all documents and receipt for all monies which are necessary or desirable in the performance or enforcement of the Construction Management Agreement.

2.    **Subordination of Construction Management Agreement**.  The Construction Management Agreement and any and all liens, rights, interests and privileges (whether choate or inchoate and including, without limitation, all mechanics' and materialmen's liens under applicable law) owed, claimed or held by Construction Manager, as applicable, in and to the Property are hereby and shall at all times continue to be subject and unconditionally subordinate in all respects to the Lien and security interests created or to be created for the benefit of Lender under, and to the terms, covenants and provisions of, the Loan Documents, and to any renewals, extensions, modifications, assignments, replacements, or consolidations thereof and the rights, privileges, and powers of Lender thereunder.

3.    **Subordination of Construction Management Fee.**

(a)    Notwithstanding anything to the contrary contained herein or in the Construction Management Agreement, Construction Manager hereby confirms and agrees that no Construction Management Fee of any sort whatsoever shall be due and payable in excess of the Construction Management Fee set forth in the Construction Management Agreement and contained in the Project Cost Budget (as defined in the Loan Agreement).  If, notwithstanding the provisions of this Assignment, any additional payment or distribution of any character (whether in cash, securities, or other property) shall be received by Construction Manager in contravention of the terms of this Assignment, and before the Loan shall have been paid in full, such payment, distribution or security shall not be commingled with any other asset of Construction Manager, shall be held in trust for the benefit of Lender, and shall be paid over and transferred to Lender or its representative.

(b)    Upon the occurrence of an Event of Default under the Loan Documents, Lender may elect to provide notice of such Event of Default to Construction Manager and, if Lender should so elect, no Construction Management Fee of any sort whatsoever shall be due and payable pursuant to the Construction Management Agreement.  Furthermore, if Lender should, pursuant to this Section 3(b), require such a cessation of payment to Construction Manager, Construction Manager shall not be required to continue the provision of services during such cessation.

4.    **Borrower's Covenants**.  Borrower hereby covenants and agrees that Borrower will (a) fulfill and perform in all respects the terms, covenant and provision of the Construction Management Agreement to be fulfilled or performed by Borrower thereunder; (b) give prompt written notice to Lender of any written notice received by Borrower under the Construction Management Agreement, together with a complete copy of any such notice; (c) enforce the

4

performance and observance in all respects, of the terms, covenant and provisions of the Construction Management Agreement to be performed or observed by Construction Manager; (d) not assign the Construction Management Agreement or its rights and obligations thereunder, except for this Assignment and as may be otherwise permitted under the Loan Documents (and Borrower hereby represents and warrants to Lender that no previous assignment of its interest in the Construction Management Agreement has been made, which remain in effect as of the date hereof); and (e) not terminate or amend the Construction Management Agreement (for the avoidance of doubt, Change Orders shall not be deemed amendments to the Construction Management Agreement, provided same are entered into in accordance with the Loan Agreement) without the prior written consent of Lender.

5. **Construction Manager's Representations, Warranties and Covenants**. Construction Manager represents and warrants to, and covenants with, Lender, as of the date hereof, that (a) Construction Manager has agreed to provide certain construction management services relating to the Property pursuant to the Construction Management Agreement; (b) the entire agreement between Construction Manager and Borrower with respect to the Property is evidenced by the Construction Management Agreement; (c) the Construction Management Agreement constitutes the valid and binding agreement of Construction Manager, enforceable in accordance with its terms, and Construction Manager has full authority under all state and local laws and regulations, to perform all of its obligations under the Construction Management Agreement; (d) neither Construction Manager nor Borrower is in default in the performance of any of its obligations under the Construction Management Agreement and all payments and fees required to be paid by Borrower to Construction Manager thereunder have been paid to the date hereof; and (e) Construction Manager will deliver to Lender copies of all notices received or given by Construction Manager with respect to any portion of the Property.

6. **Additional Construction Manager Covenants Regarding the Construction Management Agreement**. Until such time as the Loan shall have been paid in full, together with any and all other amounts which shall be due and payable under the terms of the Loan Documents, Construction Manager shall not take any of the following actions with respect to the Construction Management Agreement without the prior written consent of Lender:

(a) declare a default under the Construction Management Agreement or exercise any of its remedies under the Construction Management Agreement (including, without limitation, terminating the Construction Management Agreement) without first notifying Lender in writing of any default by Borrower, simultaneously with notice to Borrower under the Construction Management Agreement or, if the Construction Management Agreement shall not require notice to Borrower with respect to such default, promptly after Construction Manager becomes aware thereof, and Lender shall have a cure period of thirty (30) days from the later of the date of receipt of such notice by Lender or the expiration of any cure period granted to Borrower under the Construction Management Agreement with respect to such default, to cure any such default (or if such default is not curable within said 30-day period, such additional time as is required by Lender, provided that, Lender commences such action within such 30-day period and thereafter diligently proceeds to cure such default; provided further that, if such default by Borrower is not susceptible to cure by Lender, such default shall be deemed waived by Construction Manager upon Lender taking possession of the Property);

5

(b)     enter into any agreement modifying or amending the Construction Management Agreement or increasing Borrower's obligations or reducing Borrower's rights under the Construction Management Agreement or increasing Construction Manager's rights or decreasing Construction Manager's obligations thereunder and any such modification or amendment without Lender's consent shall not be binding upon Lender;

(c)     commence any legal proceedings against Borrower or commence any remedial action against the Property;

(d)     commence or consent to any bankruptcy, insolvency, reorganization or similar proceeding by or against Borrower; or

(e)     assign any of its rights or obligations under the Construction Management Agreement.

7.     **Subsequent Owner's Right to Continue or Terminate the Construction Management Agreement.**

(a)     If Lender (including any nominee or designee of Lender) or any purchaser of the Property at foreclosure or by deed in lieu of foreclosure shall take title to all or any portion of the Property (a "Subsequent Owner"), Construction Manager shall, at the request of such Subsequent Owner, continue performance, on behalf of such Subsequent Owner, of all of Construction Manager's obligations under the terms of the Construction Management Agreement, provided that, such Subsequent Owner shall give Construction Manager notice of such request and such Subsequent Owner performs or causes to be performed the outstanding obligations of Borrower under the Construction Management Agreement, including the payment of any Construction Management Fees payable thereunder in connection with such performance.  Notwithstanding the foregoing, the Construction Management Agreement shall be terminable at the option of any Subsequent Owner by written notice to Construction Manager, effective ten (10) days after delivery of such notice, at any time prior to any request by such Subsequent Owner to continue performance, and such Subsequent Owner waives the right to subsequently terminate the Construction Management Agreement (except pursuant to Section 7(b)).

(b)     In the event a Subsequent Owner requests Construction Manager to continue performing under Section 7(a) and then subsequently sells, assigns or transfers the Property to a third party, such Subsequent Owner may terminate the Construction Management Agreement by written notice to Construction Manager, effective ten (10) days after delivery of such notice.

(c)     Upon any termination under this Section (i) Construction Manager and Borrower shall cooperate with any successor construction manager to ensure an orderly transfer of the construction management services relating to the Property; (ii) Construction Manager shall be entitled only to the payment of any Construction Management Fees earned prior to the termination of the Construction Management Agreement and, notwithstanding any provision to the contrary in the Construction Management Agreement,

no monetary penalties, termination or similar fees shall be paid to Construction Manager, (iii) Construction Manager shall look solely to Borrower, and not to Lender, for the payment of any sums due to Construction Manager under the terms of the Construction Management Agreement or any obligations on the part of Borrower under the Construction Management Agreement, and (iv) to the extent permitted by law, Construction Manager hereby waives any and all rights to file any lien or encumbrance against the Property relating thereto.

8. **Termination of Construction Management Agreement by Lender.**

(a)    Lender may terminate, or ultimately cause Borrower to terminate, the Construction Management Agreement, by notice to Construction Manager, effective ten (10) days after delivery of such notice (i) For Cause (as defined below); (ii) at any time after the occurrence of an Event of Default under the Loan Documents; or (iii) at any time following the insolvency or bankruptcy of Construction Manager.  The term "For Cause" shall mean Construction Manager's gross negligence, willful misconduct or fraud or Construction Manager's default in the performance of any of its obligations under the Construction Management Agreement.

(b)    Upon such termination of the Construction Management Agreement under Section 8(a), of this Assignment, (i) Construction Manager and Borrower shall cooperate with any successor Construction Manager to ensure an orderly transfer of the construction management services relating to the Property and shall turn over all books and records, and contracts held by Construction Manager relating to the Property; (ii) Construction Manager shall look solely to Borrower, and not to Lender, for the payment of any sums due to Construction Manager under the terms of the Construction Management Agreement permitted by this Assignment or any obligations on the part of Owner under the Construction Management Agreement, but in all cases only after the Loan has been repaid to Lender in full as provided for in the Loan Documents; and (iii) to the extent permitted by law, Construction Manager hereby waives any and all rights to file any lien or encumbrance against the Property relating thereto.

9. **Lender Not Obligated Under Construction Management Agreement**. Construction Manager agrees that nothing herein shall impose upon Lender any obligation for payment or performance in favor of Construction Manager, except as, and to the extent, provided in Section 3(a) and Section 7(a) hereof if Lender requests that Construction Manager continue to perform its obligations under the Construction Management Agreement.

10. **Lender's Reliance on Representations**.  Construction Manager has executed this Assignment for the purpose of inducing Lender to make the Loan to Borrower and with full knowledge that Lender shall rely upon the representations, warranties and agreements herein contained when making Loan advances to Borrower, and that but for this Assignment and the representations, warranties and agreements herein contained, Lender would not take such actions.

11. **INDEMNIFICATION.  LENDER SHALL NOT BE OBLIGATED TO PERFORM OR DISCHARGE ANY OBLIGATION OF BORROWER AS A RESULT OF THIS ASSIGNMENT HEREBY EFFECTED, AND BORROWER SHALL PROTECT,**

7

**INDEMNIFY, DEFEND AND SAVE LENDER HARMLESS FROM AND AGAINST ALL LIABILITIES, OBLIGATIONS, CLAIMS, DAMAGES, PENALTIES, CAUSES OF ACTION, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, COURT COSTS AND ATTORNEYS' FEES AND EXPENSES) (COLLECTIVELY, "CLAIMS") IMPOSED UPON OR INCURRED BY OR ASSERTED AGAINST LENDER BY REASON OF ANY ACT UNDER THIS ASSIGNMENT. SHOULD LENDER INCUR ANY SUCH LIABILITY, LOSS OR DAMAGE BY REASON OF THIS ASSIGNMENT, OR IN DEFENSE OF ANY SUCH CLAIM OR DEMAND, THE AMOUNT THEREOF, INCLUDING, WITHOUT LIMITATION, COSTS, EXPENSES AND ATTORNEYS' FEES, TOGETHER WITH INTEREST THEREON (IF SUCH AMOUNT IS NOT PAID WITHIN TEN (10) DAYS OF WRITTEN DEMAND THEREFOR) AT THE DEFAULT RATE (AS DEFINED IN THE LOAN AGREEMENT), SHALL BE PAYABLE WITHIN TEN (10) DAYS OF WRITTEN DEMAND AND SHALL BE INCLUDED IN THE INDEBTEDNESS SECURED BY THE SECURITY INSTRUMENT. CONSTRUCTION MANAGER SHALL PROTECT, INDEMNIFY, DEFEND AND SAVE LENDER HARMLESS FROM AND AGAINST ALL CLAIMS IMPOSED UPON OR INCURRED BY OR ASSERTED AGAINST LENDER BY REASON OF, OR IN ANY WAY RELATED TO A BREACH OF ANY REPRESENTATION OR COVENANT CONTAINED HEREIN BY CONSTRUCTION MANAGER. BORROWER HEREBY AGREES TO PROTECT, DEFEND, INDEMNIFY AND HOLD LENDER HARMLESS FROM AND AGAINST ALL CLAIMS RESULTING FROM ANY FAILURE OF BORROWER TO PERFORM AND OBSERVE, AT THE TIME AND IN THE MANNER THEREIN PROVIDED, EACH OF THE COVENANTS, AGREEMENTS AND OBLIGATIONS OF BORROWER CONTAINED IN THE CONSTRUCTION MANAGEMENT AGREEMENT.**

12.    **Estoppel Certificate**. Construction Manager shall, at the request of Lender, execute an estoppel certificate stating that the provisions of the Construction Management Agreement have not been modified or amended, and that all fees due and payable to Construction Manager under the Construction Management Agreement have been paid in full.

13.    **No Joint Venture**. Lender and Construction Manager have no obligation to each other with respect to the Loan Agreement or the other Loan Documents except as provided herein and Construction Manager shall not be a third party beneficiary with respect to any of Lender's obligations to Borrower set forth in the Loan Documents. The relationship of Lender to Borrower, is one of creditor to debtor, and Lender is not a joint venturer or partner of Borrower.

14.    **Binding Nature of Assignment**. This Assignment shall be binding upon Construction Manager and Borrower and Construction Manager's and Borrower's respective successors and permitted assigns and shall inure to the benefit of Lender and Lender's successors and assigns, any receiver in possession of the Property, and any party acquiring title to the Property by reason of foreclosure, power of sale, deed in lieu of foreclosure or otherwise.

15.    **Termination of this Assignment**. At such time as the Loan is paid in full and the Security Instrument has been released of record, this Assignment and all of Lender's right, title and interest hereunder with respect to the Construction Management Agreement shall terminate.

16.    **Notices**. All notices or other communications hereunder shall be in writing and

shall be effective for all purposes only if (a) hand delivered, subject to signed receipt or refusal to accept delivery on a business day by 5 p.m., (b) sent by a nationally recognized overnight delivery service (such as UPS or FedEx) for next-business-day delivery, before 5 p.m., or (c) sent by email on a business day with the subject line, in capital letters, NOTICE DELIVERED UNDER [_____] LOAN DOCUMENTS, and confirmed by an email reply from each addressee thereof before 5 p.m.  In each case the notice shall be addressed as follows (or to such other address or Person as a party shall designate from time to time by a proper notice to the other party at such party's previously noticed address):

> If to Lender, to:

> > **MERCED DIP LENDER LLC**
> > [_____]
> > [_____]
> > Attention:  [_____]

> With a copy to:

> > Kriss & Feuerstein LLP
> > 360 Lexington Avenue, Suite 1200
> > New York, New York 10017
> > Attention:  Jerold C. Feuerstein, Esq.

> If to Borrower, to:

> > Compass Pointe Off Campus Partnership B LLC
> > [2401 A-Waterman Boulevard, PMB 143]
> > [Fairfield, California 94534]
> > Attention:  [_____]

> With a copy to:

> > [_____]
> > [_____]
> > [_____]
> > Attention: [_____]

> If to Construction Manager, to:

> > [GC NAME]
> > [_____]
> > [_____]
> > Attention: _____

> With a copy to:

> > [_____]

9

_____
_____
Attention: _____

17.     **Amendments; Modifications**.  This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower, Construction Manager or Lender.  Neither Borrower nor Construction Manager shall have the right to assign or transfer its rights or obligations under this Assignment without the prior written consent of Lender or as provided in the Loan Agreement, and any attempted assignment without such consent shall be null and void.

18.     **Inconsistencies with Construction Management Agreement**.  This Assignment shall supersede, to the extent inconsistent therewith, any provisions of the Construction Management Agreement.  Construction Manager has been furnished with a copy of the Loan Agreement and the other Loan Documents and is familiar with the terms thereof and Construction Manager hereby waives any provisions of the Construction Management Agreement to the extent such provisions are inconsistent with the terms and provisions of this Assignment, the Loan Agreement or the other Loan Documents.

19.     **Rights of Lender Cumulative**.  The rights of Lender under this Assignment shall be in addition to any other rights and remedies available to Lender under the terms of the Loan Documents.

20.     **Duplicate Originals; Counterparts**.  This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Assignment may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall constitute a single instrument, for the same effect as if all parties hereto had signed the same signature page.  Any signature page of this Assignment may be detached from any counterpart of this Assignment without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Assignment identical in form hereto but having attached to it one or more additional signature pages.  The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.  Counterparts hereof which are transmitted by facsimile or electronic transmission shall be given the identical legal effect as an original.

21.     **Partial Invalidity**.  In the event any term or provision of this Assignment or the application thereof to any person or circumstance shall, for any reason and to any extent be invalid or unenforceable, the remaining terms and provisions of this Assignment shall not be affected thereby, but rather shall be enforceable to the fullest extent permitted by law.

22.     **Further Documentation**.  The parties hereto agree to execute and deliver any and all further documents and instruments reasonably requested by any party hereto to give effect to the terms and provisions of this Assignment.  Construction Manager agrees to execute such further agreements of subordination as may be determined by Lender to be necessary to establish or confirm the priority in lien and payment of the Security Instrument over the lien of the Construction Management Agreement, which agreements shall be in substantially the same form as this

Assignment and contain such matters of estoppel with respect to Construction Manager's receipt of fees as may be true as of the date of such execution and as may be required by Lender.

23. **Secondary Market**. Lender may sell, assign, pledge, participate or transfer the Note, the Security Instrument, this Assignment and the other Loan Documents to one or more Persons ("Investors") in accordance with the terms and provisions of the Loan Agreement. Lender may disclose the terms of this Assignment, the identity of Construction Manager or any principal of Construction Manager, or any financial information regarding Construction Manager, to any Investors or potential Investors. In addition, in connection with such sale or at any time prior to such sale, and from time to time, Lender may retain or assign responsibility for servicing the Loan, including the Note, the Security Instrument, this Assignment and the other Loan Documents, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer, on behalf of the Investors. All references to Lender herein shall refer to and include any such servicer to the extent applicable.

24. **GOVERNING LAW. THIS ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) AND APPLICABLE UNITED STATES FEDERAL LAW.**

25. **SPECIFIC NOTICE. IT IS EXPRESSLY AGREED AND UNDERSTOOD THAT THIS ASSIGNMENT INCLUDES INDEMNIFICATION PROVISIONS WHICH, IN CERTAIN CIRCUMSTANCES, COULD INCLUDE AN INDEMNIFICATION BY BORROWER OF LENDER FROM CLAIMS OR LOSSES ARISING AS A RESULT OF LENDER'S OWN NEGLIGENCE.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the undersigned have executed this Assignment to be effective as of the date set forth in the first paragraph hereof.

<u>**BORROWER**</u>**:**

**Compass Pointe Off Campus Partnership B LLC**,
a California limited liability company

By: _____
Name:
Title:

12

**<u>CONSTRUCTION MANAGER</u>:**

**[GC NAME]**,
a [_____]


By: _____
Name:
Title:

**<u>Exhibit A – to Assignment and Subordination of Construction Management Agreement</u>**

<u>Construction Management Agreement</u>

[A copy of the Construction Management Agreement follows this cover page.]

4885-5497-3488, v. 2

EXHIBIT C

Subordination of Management Agreement

## CONDITIONAL ASSIGNMENT AND SUBORDINATION OF MANAGEMENT AGREEMENT

THIS CONDITIONAL ASSIGNMENT AND SUBORDINATION OF MANAGEMENT AGREEMENT (this "Agreement") is made as of _____, by **COMPASS POINTE OFF CAMPUS PARTNERSHIP B LLC,** a California limited liability company, having an address at [2401 A-Waterman Boulevard, PMB 143, Fairfield, California 94534] ("Borrower"), to **MERCED DIP LENDER LLC**, a New York limited liability company, having an address at [_____], as lender (in such capacity, together with its successors and assigns, "Lender") and is consented and agreed to by [_____], a [_____] having its principal place of business at [_____] ("Manager").

RECITALS:

A. Pursuant to that certain Debtor-in-Possession Construction Loan Agreement (as the same may be amended, modified, supplemented, restated or replaced from time to time, the "Loan Agreement"), dated as of the date hereof and made between Borrower and Lender, Lender has agreed to make a certain construction loan to Borrower ("Loan") in an aggregate and maximum principal amount of up to $[24,375,000.00], subject to the terms and conditions of the Loan Agreement. Capitalized terms used and not otherwise defined in this Agreement have the meanings ascribed to them in the Loan Agreement.

B. Pursuant to that certain Management Agreement dated [_____], between Borrower and Manager, a true and correct copy of which is attached hereto as Exhibit A (the "Management Agreement"), Borrower employed Manager to operate and manage the Property.

C. Pursuant to the Management Agreement, Manager is entitled to certain management fees (the "Management Fees") for services rendered in connection with the management and operation of the Property.

D. Lender requires as a condition to the making of the Loan that the Borrower and the Manager agree to the terms set forth in this Agreement.

AGREEMENT

For good and valuable consideration, the parties hereto agree as follows:

1. **Assignment of Management Agreement.** As additional collateral security for the Loan, Borrower hereby conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest in and to the Management Agreement, said transfer and assignment to automatically become a present, unconditional assignment, at Lender's option, in the event of a default by Borrower under the Loan Agreement, the Note, the Security Instrument

or any of the other Loan Documents, including but not limited to escrow agreements, and the failure of Borrower to cure such default within any applicable grace period.

2.    **Termination.**  At such time as the Loan is paid in full and the Security Instrument is released or assigned of record, this Agreement and all of Lender's right, title and interest hereunder with respect to the Management Agreement shall terminate.

3.    **Borrower's Covenants.**  Borrower hereby covenants with Lender that during the term of this Agreement: (a) Borrower shall not transfer the responsibility for the management of the Property from Manager to any other person or entity without prior written notification to Lender and the prior written consent of Lender, which consent may be withheld by Lender in Lender's sole discretion; (b) Borrower shall not terminate or amend any of the terms or provisions of the Management Agreement without the prior written consent of Lender, which consent may be withheld by Lender in Lender's sole discretion; and (c) Borrower shall, in the manner provided for in this Agreement, give notice to Lender of any notice or information that Borrower receives which indicates that Manager is terminating the Management Agreement or that Manager is otherwise discontinuing its management of the Property.

4.    **Agreement by Borrower and Manager.**  Borrower and Manager hereby agree that in the event of a default by Borrower (beyond any applicable grace period) under the Loan Agreement, the Note, the Security Instrument or any of the other Loan Documents during the term of this Agreement, at the option of Lender exercised by written notice to Borrower and Manager: (a) all rents, security deposits, issues, proceeds and profits of the Property collected by Manager, after payment of all costs and expenses of operating the Property (including, without limitation, operating expenses, real estate taxes, insurance premiums, repairs and maintenance and the fees and commissions payable under the Management Agreement), shall be applied in accordance with Lender's written directions to Manager; and (b) Lender may exercise its rights under this Agreement and may immediately terminate the Management Agreement and require Manager to transfer its responsibility for the management of the Property to a management company selected by Lender in Lender's sole and absolute discretion.

5.    **Lender's Right to Replace Manager.**  In addition to the foregoing, in the event that Lender, in Lender's reasonable discretion, at any time during the term of this Agreement, determines that the Property is not being managed in accordance with generally accepted management practices for properties similar to the Property, Lender shall deliver written notice thereof to Borrower and Manager, which notice shall specify with particularity the grounds for Lender's determination.  If Lender reasonably determines that the conditions specified in Lender's notice are not remedied to Lender's reasonable satisfaction by Borrower or Manager within thirty (30) days from receipt of such notice or that Borrower or Manager have failed to diligently undertake correcting such conditions within such thirty (30) day period, Lender may direct Borrower to terminate the Management Agreement and to replace Manager with a management company acceptable to Lender in Lender's sole discretion.

6.    **Subordination of Management Agreement and Fees.**  Borrower and Manager hereby agree that Manager shall not be entitled to receive any fee, commission or other amount payable to Manager under the Management Agreement, including without limitation the Management Fees, for and during any period of time that any amount due and owing Lender under

the Note and the Security Instrument is not paid when due; provided, however, that Manager shall not be obligated to return or refund to Lender any Management Fees, or other fee, commission or other amount already received by Manager, and to which Manager was entitled under this Agreement. Further, the Manager hereby fully and completely subordinates to the lien of the Note, Security Instrument and other Loan Documents, and to Lender's right to payment under the Note, Security Instrument and other Loan Documents, the following: (a) the Management Agreement; (b) any such claim or security interest the Manager may now or hereafter have against the Property and/or the rents, issues, profits and income therefrom; and (c) any right to payment of the Manager arising out of or in any way connected with its services performed under the Management Agreement; provided, however, that Manager shall not be obligated to return or refund to Lender any Management Fees or other fee, commission or other amount already received by Manager, and to which Manager was entitled under this Agreement.

7. **Consent and Agreement by Manager.** Manager hereby acknowledges and consents to this Agreement and agrees that Manager will act in conformity with the provisions of this Agreement and Lender's rights hereunder or otherwise related to the Management Agreement. In the event that the responsibility for the management of the Property is transferred from Manager in accordance with the provisions hereof, Manager shall, and hereby agrees to, fully cooperate in transferring its responsibility to a new management company and effectuate such transfer no later than thirty (30) days from the date the Management Agreement is terminated. Further, Manager hereby agrees (a) not to contest or impede the exercise by Lender of any right it has under or in connection with this Agreement; and (b) that it shall, in the manner provided for in this Agreement, give at least thirty (30) days prior written notice to Lender of its intention to terminate the Management Agreement or otherwise discontinue its management of the Property.

8. **Lender's Agreement.** So long as Borrower is not in default (beyond any applicable grace period) under this Agreement, the Loan Agreement, the Note, the Security Instrument or the other Loan Documents, Lender agrees to permit any sums due to Manager under the Management Agreement to be paid directly to Manager.

9. **Governing Law.** THIS AGREEMENT IS, AND SHALL BE DEEMED TO BE, A CONTRACT ENTERED INTO UNDER AND PURSUANT TO THE LAWS OF THE STATE OF NEW YORK AND SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW OF SUCH STATE. NO DEFENSE GIVEN OR ALLOWED BY THE LAWS OF ANY OTHER STATE OR COUNTRY SHALL BE INTERPOSED IN ANY ACTION OR PROCEEDING HEREON UNLESS SUCH DEFENSE IS ALSO GIVEN OR ALLOWED BY THE LAWS OF THE STATE OF NEW YORK.

10. **Consent to Jurisdiction.** FOR ANY CLAIM, ACTION, OR DISPUTE ARISING UNDER, OR TO INTERPRET OR APPLY, THIS AGREEMENT, OR TO RESOLVE ANY DISPUTE ARISING UNDER THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE PARTIES, BORROWER AND MANAGER IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY, NEW YORK, AND APPELLATE COURTS FROM

ANY OF SUCH COURTS. BORROWER AND MANAGER IRREVOCABLY WAIVE ANY OBJECTION THAT THEY MAY HAVE AT ANY TIME TO VENUE OF ANY SUCH SUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT, INCLUDING ANY CLAIM THAT ANY SUCH SUIT, ACTION, OR PROCEEDING SO BROUGHT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THIS AGREEMENT SHALL BE DEEMED TO PRECLUDE LENDER FROM BRINGING ANY SUIT, ACTION, OR PROCEEDING RELATING TO THIS AGREEMENT OR THE DEBT (AS SUCH TERM IS DEFINED IN THE NOTE) IN ANY OTHER JURISDICTION WHERE LENDER COULD OTHERWISE PROPERLY BRING SUCH SUIT, ACTION, OR PROCEEDING. BORROWER AND MANAGER FURTHER CONSENT AND AGREE TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO BORROWER AND MANAGER AT THE ADDRESSES SET FORTH ON PAGE 1 HEREOF, AND CONSENT AND AGREE THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

11. **Notices.** All notices required or permitted hereunder shall be given to the addresses set forth on the first page of this Agreement in the manner as provided in the Loan Agreement.

12. **No Oral Change.** This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

13. **Liability.** If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

14. **Inapplicable Provisions.** If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

15. **Headings, etc.** The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

16. **Duplicate Originals; Counterparts.** This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

17.    **Number and Gender.**  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

18.    **Miscellaneous.**

(a)    Wherever pursuant to this Agreement (i) Lender exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

(b)    Wherever pursuant to this Agreement it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date and year first written above.

BORROWER:

**Compass Pointe Off Campus Partnership B LLC**,
a California limited liability company

By: _____
Name:
Title:

LENDER:

**MERCED DIP LENDER LLC,**
a New York limited liability company

By: _____
Name:
Title:

MANAGER:

[_____]

By:_____
Name:
Title:

**[EXHIBIT A – to Subordination of Management Agreement]**

Management Agreement

(see attached)

**EXHIBIT D**

Intentionally Omitted

# EXHIBIT E

Rent Roll

**EXHIBIT F**

**Form of Borrower's Requisition**

[Letterhead of Borrower]

_____, 20__

**MERCED DIP LENDER LLC** ("_Lender_")

[_____]
[_____]

    Re:   Debtor-in-Possession Construction Loan Agreement ("**Construction Loan Agreement**"), by and between **Compass Pointe Off Campus Partnership B LLC** ("**Borrower**") and **MERCED DIP LENDER LLC** ("**Lender**") dated as of [_____]

Requisition #_____        Date:  _____, 20__

Ladies and Gentlemen:

    Pursuant to the Construction Loan Agreement, Borrower hereby requests that Lender advance to [applicable contractor] [$_____] with respect to costs of construction of the Improvements.  Attached hereto is the affidavit of _____ dated the date hereof and Borrower certifies that all statements in that affidavit are true and correct.

    Attached hereto are lien waivers for included in any prior Advances and invoices to be included in this Advance.  Additionally, attached hereto are completed AIA Forms G702 and G703 or such forms as reasonably required by Lender signed and certified by the Architect and Construction Manager.  All capitalized terms used herein shall have the meaning given thereto in the Construction Loan Agreement.

                     **Compass Pointe Off Campus Partnership B LLC**,
                     a California limited liability company

                     By:  _____
                     Name:
                     Title:

**AFFIDAVIT TO BE ANNEXED
TO EACH REQUISITION**

STATE OF                         )
                                 )  ss.:
COUNTY OF                        )

_____, being duly sworn, deposes and says:

1.      I am the _____ of **Compass Pointe Off Campus Partnership B LLC** (the "**Borrower**"), and have made due investigation as to the matters hereinafter set forth and am making this affidavit to induce **MERCED DIP LENDER LLC** ("**Lender**") to consider making an advance of $_____ as hereby requested by Borrower to be remitted directly to certain contractors and material suppliers of the Construction Work, pursuant to the terms of a Debtor-in-Possession Construction Loan Agreement, dated as of [_____] between Borrower and Lender and pursuant to the requisition to which this affidavit is attached ("**Current Requisition**").

2.      All representations and warranties contained in the Construction Loan Agreement are true and accurate in all material respects as of the date hereof.

3.      No Event of Default exists under the Construction Loan Agreement and no event or condition has occurred and is continuing or existing that, with the lapse of time or the giving of notice, or both, would constitute such an Event of Default.

4.      The Improvements have not been damaged by fire or other casualty, and no part of the Property has been taken by eminent domain and no proceedings or negotiations therefor are pending or threatened.

5.      The Construction Work is progressing in such manner so as to insure completion thereof in accordance with the Budget on or before the Completion Date.

6.      All funds received from the Lender previously under the Construction Loan Agreement have been expended for the sole purpose of paying for the costs set forth in the previous requisitions; and no part of said funds have used for any other purpose.  No item of costs previously certified to the Lender in a requisition remains unpaid as of the date of this Affidavit (other than for the Retainage).

7.      All of the statements and information set forth in the Current Requisition, and all documents attached thereto, are true and correct in every material respect as of the date hereof, and all costs certified to the Lender in the Current Requisition accurately reflect the precise amounts due.  All the funds to be received pursuant to the Current Requisition shall be used solely for the purposes of paying the items of cost specified therein or for reimbursing the Borrower for

such items previously paid by the Borrower.

8.      Nothing has occurred subsequent to the date of the Construction Loan Agreement that has or may result in the creation of any lien, charge or encumbrance upon the Property or the Improvements or any part thereof, or anything affixed to or used in connection therewith or which has or may substantially and adversely impair the ability of the Borrower to make all payments of principal and interest on the Construction Loan Note or any other note from Borrower to Lender, the ability of the Borrower to meet its obligations under the Construction Loan Agreement or the ability of the Guarantors to meet their respective obligations under the Guaranty.

9.      None of the labor, materials, overhead or other items of expenses specified in the Current Requisition submitted herewith have previously been made the basis of any prior requisition by the Borrower which resulted in an Advance by Lender or of any prior payment by the Lender.

10.      The estimated aggregate cost of completing the Construction Work, does not exceed $_____.

11.      All conditions to the Advance requested by pursuant to the Current Requisition have been met in accordance with the terms of the Construction Loan Agreement (including, without limitation, Article 3 thereof).

12.      As of the date hereof, there are no defenses or offsets in connection with the Construction Loan or the other Loan Documents, and Lender has complied with all requirements and obligations in connection with the Construction Loan and the other Loan Documents.

The capitalized terms used herein have the meaning given thereto in the Construction Loan Agreement.

_____


Sworn to before me this
____ day of _____, 20____


_____
Notary Public

EXHIBIT G

**Construction Milestones**

**EXHIBIT H**

Will Serve Letter – Architecture

[_____]
[_____]

_____ ____, 2022

**MERCED DIP LENDER LLC**, its successors and/or assigns, as their interest may appear
[_____]
[_____]

|  |  |
|---|---|
| <u>Property</u>: | 3700 Horizons Avenue, Merced, California 95348 |
| <u>Improvements</u>: | Construction of a _____ |
| <u>Borrower</u>: | Compass Pointe Off Campus Partnership B LLC |
| <u>Contract</u>: | [AIA Document B101-2007 Standard Form of Agreement between Owner and Architect, dated as of _____, between Borrower, as owner, and [ARCHITECT]] ("**_Architect_**") |
| <u>Contract Work</u>: | _____ |
| <u>Contract Amount</u>: | $_____ |

We, [_____], are the architectural firm responsible for performing the Contract Work described above for Borrower under the Contract. In consideration of you making a loan to Borrower and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, we hereby agree with, and certify to you, as follows:

We certify to you that, (A) a true, correct and complete copy of the Contract is attached hereto as <u>Exhibit A</u>, (B) the Contract contains all of the agreements between us and Borrower with respect to the Contract Work set forth in the Contract, and (C) the plans and specifications for the Improvements, which plans and specifications are scheduled below (the "**_Plans_**") and have been prepared by us, conform to and comply with the requirements of the Contract.

We further agree to certify to you upon the completion of the Improvements, that, on the date thereof, the same will have been completed in accordance with the Plans (except for such deviations as we may note in such certification). We agree to promptly notify you in writing of any deviations which may come to our attention during the course of construction.

Without limiting the generality of any of the foregoing, we also certify to you, as follows:

1.  We have examined all applicable federal, State and local building, fire, safety, zoning, land use, landmark, health, sanitation, energy, environmental,

ecological, sanitation and other similar codes, laws, ordinances and regulations affecting the Property or the Improvements, including, without limitation, guidelines promulgated by the Federal Housing Administration, and the Americans with Disabilities Act (collectively, the "***Building Laws***"). We have determined that the Property lies entirely in a [_____] zoning district and have determined that the intended use of the Property and the Improvements is permitted under an approval from the applicable governmental authority and that the Improvements, when built according to the Plans, will comply with all Building Laws.

2.    If constructed in accordance with the Plans, the Improvements will have [_____].

3.    We agree that (i) upon written notice from you that an Event of Default by Borrower has occurred under its loan documents with you, or (ii) in the event of an event of default by Borrower under the Contract, we shall, at your request, continue performance on your behalf under the Contract in accordance with the terms thereof, provided we are paid for all services rendered pursuant to the Contract. We hereby acknowledge and consent to the collateral assignment from Borrower to you of the Contract.

4.    Except as may otherwise be permitted in Borrower's loan documents with you, we shall not make any changes in the Plans or the Contract without your prior written consent. We shall promptly notify you of any changes in the Plans or the Contract of which we may become aware. We also agree that you shall be entitled to the same use of the Plans, including all drawings and any modifications, additions, enlargements or extensions thereof, as provided Borrower in the Contract, without additional cost to you.

5.    We represent and warrant that (a) as of the date hereof, no party is in default under the Contract and there are no circumstances which would constitute a default thereunder upon the passage of time, the giving of notice, or both; and (b) as of the date hereof, we have no counterclaim, right of set-off or other defense to performance by us under the Contract.

**[SIGNATURE PAGE TO FOLLOW]**

Very truly yours,

[_____]


By: _____
Name:
Title:

# Schedule of "Plans"

**<u>Exhibit A</u>**

**Contract**

[see attached]